1   Kelly F. Ryan, Esq. (SBN 195921)
    Susan X. Romero (SBN 249522)
2   THE RYAN LAW FIRM
    A Professional Law Corporation
3   80 South Lake Avenue, Suite 500
    Pasadena, California 91101
4   Telephone: (626) 568-8808
    Facsimile: (626) 568-8809
5
    Attorneys for Plaintiff
6   THE MISHEWAL WAPPO TRIBE OF ALEXANDER VALLEY

7

8              In The United States District Court

9            For The Northern District of California

10

11  The Mishewal Wappo Tribe of        ) Case No.
    Alexander Valley,                   )
12  P.O. Box 1794                       ) Hon.
    Middletown, CA 95461                )
13                                      )   C09 02502   JW
14                         Plaintiffs   ) COMPLAINT FOR DECLARATORY
                                        ) AND INJUNCTIVE RELIEF
15  v.                                  )
                                        )   (DEMAND FOR JURY TRIAL)
16                                      )
    KEN SALAZAR,                        )
17  in his official capacity as         )
    Secretary of the Interior,          )
18  U.S. Department of the Interior    )
    1849 C Street, NW                   )
19  Washington, DC 20240-0002; and      )
    DOES 1-50, inclusive                )
20                                      )
21                         Defendants   )
                                        )
22                                      )

23

24       COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

25  1.   This action is brought by the Mishewal Wappo Tribe of

26       Alexander Valley (the "Tribe" or "Plaintiff") to compel

27       agency action unlawfully withheld and unreasonably delayed.

28       Specifically, the Tribe seeks a court order directing

                COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

                                    1

Secretary of the Interior Ken Salazar (the "Secretary"), inter alia, to publish a list of federal recognized tribes as required by section 104 (a) of the Federally Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454, 108 Stat. 4791 (codified at 25 U.S.C. § 479 a-1 (a)), with such list to include the Tribe's name; Mishewal Wappo Tribe of Alexander Valley.  Further, the Tribe requests a court order directing the Secretary to take into trust such lands owned and designated by the Tribe located within the Mishewal Wappo Tribe of Alexander Valley historically aboriginal territory ("Designated Lands"), with such lands to be considered "Indian country" as defined in 18 U.S.C. § 1151 and "restored lands" as defined by 25. U.S.C. § 2719(b)(1)(B)(iii).  And, finally, the Tribe seeks a court order declaring that the Tribe is eligible for the protection, services and benefits of the federal government available to Indian tribes by virtue of their status as tribes.

**JURISDICTION AND VENUE**

2.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States.

3.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1361 in that the Tribe seeks to compel officers and employees of the United States and its agencies to perform duties owned to the Tribe.

4.  Venue lies in this District pursuant to 28 U.S.C. § 1391 (e) because the Secretary resides in this district and a

1    substantial part of the events or omissions giving rise to

2    the Tribe's claims occurred in this District.

3                              **PARTIES**

4  5.  Plaintiff is an American Indian Tribe consisting of Indian

5       members and their descendants, and/or their Indian

6       successors in interest, for whose benefit the United States

7       acquired and created the Mishewal Wappo Tribe of Alexander

8       Valley, a parcel of land located in Sonoma County,

9       California.   The Tribe was formally recognized as an Indian

10      Tribe by the United States from at least 1851 until 1959,

11      when it was purportedly terminated under the Act of August

12      18, 1958, Pub. L. No. 85-671, 72 Stat. 619, ("California

13      Rancheria Act"). Since the time of its purported

14      termination, the Tribe has been continuously identified as

15      an American Indian Tribe and has maintained its existence

16      as a distinct community from historical times to present.

17      The Tribe has also maintained autonomous political

18      influence and authority over members of the group from

19      historical times to present.

20 6.  Defendant Ken Salazar is the Secretary of the Department of

21      Interior.   The Secretary is an officer or employee of the

22      United States and has a direct statutory duty to carry out

23      the provisions of the Federally Recognized Indian Tribe

24      List Act of 1994 ("Tribe List Act"). The Secretary is sued

25      in his official capacity only.

26                      **STATEMENT OF FACTS**

27  *Establishment of the Mishewal Wappo Tribe of Alexander Valley*

28 7.  The Bureau of Indian Affairs ("BIA") is a sub-agency within

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    the United States Department of Interior.

2  8.   The BIA acquired two tracts of land equaling .54 acres in

3       Sonoma County, California, for the benefit of the Tribe in

4       1908 and 1913.

5  9.   This parcel of land, from its purchase was held in trust by

6       the United States for the benefit of the Tribe and its

7       members.

8  10.  Although the Tribe never adopted a formal Constitution, the

9       Tribal membership did vote in 1935 to become a Tribe

10      organized under the provisions in the Indian Reorganization

11      Act of 1934 ("IRA"), ch. 576, 48 Stat. 984.

12              *The California Rancheria Act*

13 11.  On August 18, 1958, Congress enacted the California

14      Rancheria Act, authorizing-but not requiring-the Secretary

15      of the Interior to terminate the trust status of the lands

16      and the status as Indian of the people of 41 specifically

17      enumerated California Rancherias, including the Mishewal

18      Wappo Tribe of Alexander Valley, under certain specific and

19      mandatory conditions.

20 12.  Under the California Rancheria Act, termination was to be

21      the result of a process in which the Rancheria Indians of

22      California could decide to accept termination in exchange

23      for free title of Rancheria assets, and the provision of

24      certain improvements and services aimed at providing the

25      soon-to-be-terminated Indians with adequate infrastructure

26      to subsist without treatment as Indians by the federal

27      government.

28 13.  The process for termination under the California Rancheria

Act required the Secretary of the Interior, after consultation with the Indians of the Rancheria to be terminated, to prepare a Distribution Plan detailing the measures that would be undertaken to successfully achieve the requirements of the Act.

14. Before the distribution of Rancheria assets could be finalized and termination completed, section 3 of the California Rancheria Act specifically required the Secretary of the Interior to take certain actions to prepare the Rancheria for termination before conveying individual deeds to Distributees.   The Secretary of the Interior was to, inter alia:

    A. Survey Rancheria boundaries to ensure marketable title to individual parcels (California Rancheria Act §3(a));

    B. Bring Indian Bureau roads serving the Rancheria up to comparable standards for similar county-maintained roads (id.§3(b)); and

    C. Install or rehabilitate irrigation  and domestic water systems as the Secretary of the Interior and Rancheria residents agreed upon (id §3(c)).

15. Section 8 of the California Rancheria Act instructed the Secretary of the Interior that before he could convey property pursuant to the Act, he was to "protect the rights of individual Indians who are minors, non compos mentis, or in the opinion of the Secretary in need of assistance in conducting their affairs, by causing the appointment of guardians for such Indians in courts of competent

1    jurisdiction, or by such other means as he may deem

2    adequate, without application from such Indians....”

3  16.  Section 9 of the California Rancheria Act instructed the

4    Secretary of the Interior to implement education and

5    vocational training programs for the benefit of the

6    Rancheria Indians before the distribution of Rancheria

7    assets could be finalized and termination completed.

8  17.  The provision set forth in sections 3, 8 and 9 of the

9    California Rancheria Act were conditions precedent to

10    lawful distribution of Rancheria assets and termination of

11    the individual status of Rancheria Indians.

12  *The Mishewal Wappo Tribe of Alexander Valley Distribution Plan*

13  18.  Soon after the enactment of the California Rancheria Act,

14    The Secretary of the Interior, acting through his

15    subordinates in the BIA, prepared a proposed Distribution

16    Plan for the Mishewal Wappo Tribe of Alexander Valley.

17    Under the provision of that plan the Rancheria was to be

18    divided into 3 lots.

19  19.  The Distribution Plan further stipulated that when all the

20    requirements in the plan were met by the federal government

21    and the Tribe was satisfied with such efforts, the Tribe

22    would then have its constitution and bylaws revoked and

23    termination would be finalized.

24  20.  The Proposed Mishewal Wappo Tribe of Alexander Valley

25    Distribution Plan was accepted by the Secretary of the

26    Interior on July 6, 1959.

27  21.  Induced by the promises of improvements set forth in the

28    California Rancheria Act and the proposed Distribution

1   Plan, those residents of the Rancheria erroneously
2   identified as the Mishewal Wappo Tribe of Alexander Valley
3   members voted to accept the Distribution Plan, which was
4   finalized on September 25, 1959.

5   *Failure to Execute the Mishewal Wappo Tribe of Alexander Valley*
6   *Distribution Plan:*

7   *County Road Standards and Subdivision Requirements*

8   22.  The Distribution Plan for the Mishewal Wappo Tribe of
9       Alexander Valley called for division of the Rancheria land
10      into three lots.

11  23.  Under California statues in effect at the time, this
12      division constituted the creation of a "subdivision,"
13      triggering specific requirements for water supply and
14      access roads.

15  24.  Section 3(b) of the California Rancheria Act specifically
16      instructed the Secretary of the Interior to complete any
17      construction or improvement needed to bring roads serving
18      the Rancheria up to "adequate standards comparable to
19      standards for similar roads of the State or subdivision
20      thereof."

21  25.  Specifically, the BIA sought to avoid, *inter alia,*
22      potential costs associated with additional road
23      construction, adding additional wells, a pressure tank and
24      fire hydrants.

25  26.  The only Rancheria road was gravel and became impassable in
26      the winter months, making transportation to and from the
27      Rancheria very difficult and living on the Rancheria very
28      burdensome. As a seasonal migrant working community, the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   resident members of the Rancheria were unable to travel to

2   seek out work in the winter months due to road conditions.

3   27.   If the Distribution Plan purposed by the Secretary of the

4         interior had met the requirements of the California

5         Rancheria act and conformed to the requirements of Sonoma

6         County, the deficient road conditions and associated

7         problems would have been eliminated.

8   *Failure to Execute the Mishewal Wappo Tribe of Alexander Valley*

9                      *Distribution Plan:*

10                  *Water and Sanitation Systems*

11  28.   In order for Sonoma County, California to assume

12        responsibility of the domestic water system on the

13        Rancheria, the BIA was required to make certain

14        improvements to the Rancheria's water system, including the

15        installation of fire hydrants and water mains.

16  29.   However, the Distribution Plan to be carried out by the

17        Secretary of interior called for no improvements noting

18        that there was an existing well, pressure pump and storage

19        tank. There was no water quality testing, no determination

20        of well volume, measurements of water pressure or

21        consideration of whether the water system was adequate for

22        future residences or agriculture.

23  30.   The water system on the Rancheria served as both domestic

24        and irrigation purposes, despite the fact that a 1952 BIA

25        study that found such water systems inadequate for these

26        purposes.

27  31.   The BIA failed to install sanitation equipment of any kind

28        on the Rancheria's water system, thereby automatically

1    making the existing water system inadequate and below the

2    minimum requirements of California Rancheria Act in its

3    original form and as amended, as well as under applicable

4    Sonoma County standards following purported termination.

5   32.   Living with a substandard water system and no sanitation

6      facilities whatsoever made life very difficult and

7      unbearable to those living in the Rancheria. In fact,

8      without the aforementioned improvements, the poor

9      conditions of Rancheria life that the California Rancheria

10      Act was intended to address, were ignored.

11   *Failure to Execute the Mishewal Wappo Tribe of Alexander Valley*

12               *Distribution Plan:*

13      *Provision of Educational and Vocational Training*

14   33.   Section 9 of the California Rancheria Act states:

15      Prior to the termination of the Federal trust relationship

16      in accordance with this Act, the Secretary of the Interior

17      is authorized to undertake, within the limits of available

18      appropriation, a special program of education and training

19      designed to help the Indians to earn a livelihood, to

20      conduct their own affairs, and to assume their

21      responsibilities as citizens without special services

22      because of their status as Indians. Such programs may

23      include language training, orientation in non-Indian

24      community customs and living standards, vocational training

25      and related subjects, transportation to the place of

26      training or instruction.

27   34.   The Secretary of the Interior failed to fully inform all

28      the Tribe's members about the availability of federally

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    funded education and training.

2    35.    As a result, many of the Tribe's members were without

3    educational or vocational training because of the economic

4    status of residents of the Rancheria and lack of access to

5    comparable educational or training programs.

6    36.    The lack of educational and vocational training added to

7    the ongoing economic hardship and substandard living

8    conditions the Tribe's members had to endure on the

9    Mishewal Wappo Tribe of Alexander Valley Rancheria.

10    *Purported Termination of the Mishewal Wappo Tribe of Alexander*

11    *Valley*

12    37.    Despite the failure to create an adequate Distribution Plan

13    in accordance with minimum standards as detailed above, the

14    BIA declared the Rancheria infrastructure satisfactory and

15    sought to complete the termination process.

16    38.    Further, the inadequate Notice provided to the members of

17    the Tribe by the BIA resulted in a lack of presence at the

18    meeting to vote for the Distribution Plan. Failure to

19    properly notify members coupled with a failure to ensure

20    those present at said meeting resulted in 2/3 of the

21    Tribe's land being distributed to non-Indians who resided

22    on the Rancheria by virtue of a previous relationship with

23    a member that had moved away.

24    39.    The BIA issued its Completion Statement for termination of

25    the Mishewal Wappo Tribe of Alexander Valley and finalized

26    the Distribution Plan on September 25, 1959.

27    40.    The Secretary of the Department of Interior published a

28    formal Termination of Federal Supervision proclamation in

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   the Federal Register. *See* 26 Fed. Reg. 146, 6875-6876

2   (August 1, 1961)

3               *Duties of the Secretary of the Interior*

4   41.  At all times pertinent hereto, the majority of Tribe's

5        membership had received minimal formal education and were

6        unsophisticated and inexperienced in handling even simple

7        business or legal affairs. Section 8 of the California

8        Rancheria Act as noted above, provided that the Tribe's

9        members should receive assistance in negotiating the terms

10       of the termination, including the Distribution Plan.

11  42.  At the time of the Secretary's approval of the Mishewal

12       Wappo Tribe of Alexander Valley Distribution Plan, the

13       Tribe was not represented by counsel and was given no

14       impartial advice as to the following:

15         A. Its legal rights under the California Rancheria Act,

16              generally; and

17         B. Its right to improvements to roads, water systems and

18              sanitation systems; and

19         C. Its right to educational or vocational training; and

20         D. Its right to insist upon provision of such services

21              and facilities under section 3 and 9 of the

22              California Rancheria Act.

23  43.  Beginning at least with the establishment of the Rancheria

24       in 1908, a trust relationship existed between the United

25       States and the Tribe and its membership.

26  44.  Under that trust relationship, the conduct of the United

27       States in its dealings with the Tribe and its members is

28       held to heightened standards of care that governs the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

11

1    actions of a private trustee toward a private beneficiary.

2 45. The United States, acting through the Secretary of

3    Interior, "has charged itself with moral obligations of the

4    highest responsibility and trust. Its conduct, as disclosed

5    in the acts of those who represent in dealings with the

6    Indians, should therefore be judged by the most exacting

7    fiduciary standards". *Seminole Nation V. United States*, 316

8    U.S. 286,297(1942).

9 46. Under the California Rancheria Act, and as a trustee of the

10   Indians subject thereto, the Secretary of the Interior was

11   obligated to enter into whatever agreement or agreements

12   with Indians of a given Rancheria electing to terminate

13   thereunder as might be necessary to ensure that upon

14   distribution of the Rancheria assets, the Rancheria's water

15   supply, water distribution, sanitation and other facilities

16   would be adequate to meet the reasonable present and

17   foreseeable needs of all the people of the Rancheria.

18 47. Under the California Rancheria Act, and as a trustee of the

19   Indians subject thereto, the Secretary of the Interior was

20   obligated to enter into whatever agreement or agreements

21   with Indians as a given Rancheria electing to terminate

22   there under as might be necessary to ensure that upon

23   distribution of the Rancheria assets the Tribe's membership

24   would be prepared to receive and capably manage such assets

25   and facilities.

26 48. Prior to seeking approval of the Distribution Plan by

27   members of a given Rancheria, the Secretary of the Interior

28   was obligated to provide tribal members such accurate and

1   adequate information, advice and assistance as reasonably

2   required by them in order that the members of the Rancheria

3   could understand their individual rights and the

4   obligations of the United Stated under the California

5   Rancheria Act.

6   49.  The Secretary of the Interior was also obligated to provide

7   tribal members such accurate and adequate information as to

8   the relative advantages and disadvantages of accepting

9   termination, the options available to them under the

10  California Rancheria Act, and the legal consequences of

11  exercising those options.

12          *Effects of the Tribe's Purported Termination*

13  50.  As a result of the Tribe's purported termination, the Tribe

14  and its membership have been greatly damaged, including but

15  not limited to the following losses:

16      A. The Tribe has been prevented from participating in

17          government programs specifically intended for

18          American Indian Tribal Governments; and,

19      B. The Tribe's ability to govern itself and exercise its

20          sovereignty and domination had been compromised;

21          and,

22      C. The Tribe members' land became taxable under the laws

23          of the state of California but for the wrongful

24          termination of the Tribe; and,

25      D. The Tribe's members, few if any of whom received any

26          training in financial management contemplated by the

27          Act, were unable to pay said property taxes and were

28          forced to sell their land at a fraction of its true

1        value to avoid foreclosure sales; and,

2    E. The Tribe members' trust and land became an available

3        asset subject to creditor process; and,

4    F. The Tribe's members lost their land to satisfy

5        creditor's claims; and,

6    G. The Tribe's members were denied access to BIA programs

7        and grants and had to go without training or higher

8        education opportunities; and,

9    H. The Tribe's members residing on the Mishewal Wappo

10       Tribe of Alexander Valley Rancheria, following the

11       wrongful termination of their status as Indians,

12       were forced to comply with local building and

13       sanitary codes due to their land being removed from

14       federally held status, resulting in expensive

15       alterations, license fees, inspections,

16       condemnations, etc; and,

17   I. Without the benefit of adequate water, sanitation

18       facilities, irrigation systems, or housing, as

19       contemplated by the California Rancheria Act, the

20       Tribe's members were forced to live under injurious

21       and unsanitary conditions, suffering damage to their

22       physical and mental health.

23   J. These living conditions also prevented the Tribe from

24       developing any self-sustaining, economic

25       developments of any kind.

26   **Subsequent Litigation Invalidating Terminations under the**

27   **California Rancheria Act**

28   51.  The Secretary of the Interior's failure to legally

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   implement the California Rancheria Act was the basis of
2   substantial subsequent litigation over the course of two
3   decades that in each and every case resulted in the
4   reinstatement of formal federal recognition of the tribes
5   terminated under the Act. In fact, the majority of those so
6   terminated were restored via litigation.

7   52. For example, *Knight V Kleppe*, Civ. No. C-74-005 WTS(N.D.
8       Cal.1976), was a class action brought on behalf of the
9       dependent members of the terminated Rancherias who sought
10      to reverse their termination. A final declaratory judgment
11      and permanent injunction was entered in that case by the
12      U.S. District Court for the Northern District of California
13      on February 20,1976. Among other things, the Court
14      permanently enjoined the Secretary of the Interior from
15      treating any person listed in a California termination roll
16      or a "dependent member" of a distributee's immediate family
17      as a terminated Indian.

18  53. In *Duncan V. Andrus*, 517 F. Supp. 1(N.D. Cal. 1977), the
19      District Court specifically held that the Secretary of the
20      Interior's termination of the Robinson Rancheria was
21      unlawful. The court reached that conclusion after
22      determining that the Secretary had failed to provide
23      adequate water facilities before conveying tribal land to
24      individual distributees and because tribal members had not
25      been represented by counsel in negotiating and approving
26      the Distribution Plan. *See id.* at 6; *see also*, 42 Fed. Reg.
27      33,099(June 29, 1977) (announcing restoration of Robinsons
28      Rancheria in accordance with court order). During that

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    litigation, the Secretary conceded that the termination was

2    unlawful because of his failure to comply with the

3    requirements of the California Rancheria Act. *See Duncan*,

4    517 F. Supp.56 at 4.

5    54.   Likewise, in *Smith v. United States*, 515 F. Supp. 56 (N.D.

6          Cal. 1978), the Secretary of the Interior conceded – and

7          the District Court found – that the termination of the

8          Hopland Rancheria had been unlawful and that, as a result,

9          the tribe would not be treated as terminated because of the

10         Secretary's failure to provide adequate water facilities

11         before conveying Rancheria land to individual distributees.

12         *See id.* at 59.

13   55.   In *Upper Lake Pomo Association V. Watt*, No. C-75-0181

14         (N.D.Cal.), the District Court entered an order on May 15,

15         1979, restoring the Upper Lake Rancheria because the

16         Secretary of the Interior had breached his obligations

17         under the California Rancheria Act by failing to provide

18         adequate water facilities before conveying Rancheria land

19         to individual distributees.

20   56.   In *Table Bluff Band of Indians V. Andrus,* 532 F.Supp.25

21         (N.D.Cal.1981), the Secretary of the Interior again

22         conceded and the District Court likewise found that the

23         Table Bluff Rancheria had been unlawfully terminated

24         because the Secretary failed to fulfill his duties under

25         section 3(c) of the California Rancheria Act. *See id.* at

26         259.

27   57.   In *Tillie Hardwick v. United States*, No. C-79-1710-SW

28         (N.D.Cal.), individuals from 34 of the terminated

1    Rancherias commenced similar litigation. In an order
2    entered on December 22, 1983, the District Court restored
3    17 of the plaintiff Rancherias previously terminated under
4    provisions of California Rancheria Act. *See also* 49 Fed.
5    Reg. 24,084 (June 11, 1984) (announcing restoration of 17
6    Rancherias pursuant to court order). Specifically, the
7    following Rancherias were restored as a result of the
8    Court's December 22, 1983 order: (1) Big Valley, (2) Blue
9    Lake, (3) Buena Vista, (4) Chicken Ranch (5) Cloverdale,
10   (6) Elk Valley (7) Greenville, (8) Mooretown, (9) North
11   Fork, (10) Picayune, (11) Pinoleville, (12) Potter Valley,
12   (13) Quartz Valley, (14) Redding, (15) Redwood Valley, (16)
13   Rohnerville and (17) Smith River.

14   58.  Claims asserted on behalf of the remaining plaintiff
15        Rancherias, which included the Mishewal Wappo Tribe of
16        Alexander Valley, were dismissed without prejudice subject
17        to their being refiled in another action. In dismissing
18        these claims without prejudice, the District Court in
19        *Tillie Hardwick* ordered that the Secretary of the Interior
20        could not assert any laches defense in any such subsequent
21        action.

22   59.  Finally, in *Scotts Valley Band of Pomo Indians of the Sugar*
23        *Bowl Rancheria v. United States*, No. C-86-3660-WWS
24        (N.D.Cal.), the district court approved settlements in
25        which the Secretary of the Interior conceded that the
26        termination of four additional Rancherias had been
27        unlawful. *See also* 57 Fed. Reg.5214(Feb.12, 1992)
28        (announcing restoration of the Guidiville Band of Pomo

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    Indians, the Scotts Valley Band of Pomo Indians and the

2    Lytton Indian Community of California in accordance with

3    the court-approved settlement); 57 Fed. Reg. 19,133(May 4,

4    1992) (announcing Chico Rancheria restoration in accordance

5    with the court-approved settlement).

6  60.  Following *Scotts Valley*, 23 of the 41 Rancherias listed in

7    the original California Rancheria Act had been restored via

8    court order.

9                         **Tribe List Act**

10  61.  In 1994, Congress enacted the Tribe List Act in response to

11    a "growing and disturbing trend" on the part of the BIA to

12    "capriciously and improperly withdraw federal recognition

13    from a native group or leader." H.R. Rep. No 103-781,at

14    3(1994), as reprinted in 1994 U.S.C.C.A.N.

15    3768,3769(footnotes omitted).

16  62.  The Tribe List Act requires the Secretary to "publish in

17    the Federal Register a list of all Indians tribes which the

18    Secretary recognizes to be eligible for the special

19    programs and services provided by the United States to

20    Indians because of their status as Indians." Tribe List Act

21    § 104 (a)(codified at 25 U.S.C. § 479a-1(a))

22  63.  In enacting the Tribe List Act, Congress made several

23    "findings" For example, Congress found that the "list

24    published by the Secretary should be accurate, regularly

25    updated, and regularly published, since it is used by the

26    various departments and agencies of the United States to

27    determine the eligibility of certain groups to receive

28    services from the United States." Tribe List Act §

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

18

103(7)(codified at 25 U.S.C. § 479a note). Congress also
found that the "list of federally recognized tribes which
the Secretary publishes should reflect all of the federally
recognized Indian tribes in the United States which are
eligible for the special programs and services provided by
the United States to Indians because of their status as
Indians." Tribe List Act §103(8)(codified at 25 U.S.C.
§479a note).

64.   The Tribe List Act commands the Secretary to publish the
list of tribes every year on or before January 30. Tribe
List Act §104(b) (codified at 25 U.S.C. §479a-1(b)).

65.   The Secretary is currently in breach of the annual
publication requirement, having last caused a list to be
published on November 25, 2005. *See* 70 Fed. Reg. 71,794.

66.   The Secretary has delegated responsibility for publishing
the list to the Assistant Secretary for Indian Affairs. *See*
*id.* However, as the officer of the United States
specifically named in the Tribe List Act, the Secretary
retains ultimate responsibility for assuring compliance
with the Tribe List Act.

***Basis for Belief that the Secretary Currently Recognizes the***
***Tribe***

67.   Upon information and belief, which is likely to have
evidentiary support after a reasonable opportunity for
further investigation or discovery, the Secretary currently
recognizes that the Tribe's purported termination was
unlawful and that the Tribe satisfies all requirements for
being eligible to participate in the special programs and

1  services provided by the United States to Indians because

2  of their status as Indians.

3  68.  For example, in testimony before the House Resources

4  Committee on May 16, 2000, then-Assistant Secretary for

5  Indian Affairs, Kevin Gover, repeated a finding made by

6  advisory group charted by Congress, which in 1997 had

7  recommended that the Tribe be immediately restored.  *See*

8  Testimony of Kevin Gover, Assistant Secretary for Indians

9  Affairs, Department of the Interior, Hearing before the

10  House Resources Committee on H.R. 946, the Graton Rancheria

11  Restoration Act, available at

12  http://www.doi.gov/ocl/2000/hr946.htm. Specifically, Mr.

13  Gover quoted the recommendation of the Advisory Council on

14  California Indian Policy, which had been created by

15  Congress a few years earlier. *See id ; see also* Advisory

16  Council on California Indian Policy Act of 1992, Pub .L.

17  No. 102-416,§ 4(a), 106 Stat. 2131,2132 (codified at25

18  U.S.C.§651 note). At the time he made this statement, Mr.

19  Gover was the official to whom the Secretary of the

20  Interior had delegated responsibility for publishing the

21  list required by the Tribe List Act. See 65 Fed. Reg.

22  13,298,13,299 (Mar.13,2000)(listing recognized tribes and

23  bearing Mr. Gover's signature).

24  69.  Recent statements by agency personnel provide further

25  evidence that the Secretary currently recognizes that the

26  Tribe should be eligible to participate in special programs

27  and services provided by the United States to Indians

28  because of their status as Indians. For example, in a

1    February 6,2009  memorandum written by Dale Risling, Acting
2    Regional Director for the California Pacific Region of the
3    Bureau of Indian Affairs, Mr. Risling concludes:

4        [T]he Bureau of Indian Affairs, Pacific Region,
5            supports the Tribe's efforts for restoration,
6            either through legislation or administrative
7            action.

8    70.  Earlier statements by agency personnel only serve to
9    further support the conclusion that the Secretary currently
10   recognizes that the Tribe's purported termination was
11   unlawful and that the Tribe satisfies all requirements for
12   being eligible to participate in the special programs and
13   services provided by the United States to the Indians
14   because of their status as Indians. For example, in a 1987
15   memorandum to the Assistant Secretary for Indian Affairs,
16   BIA  Area Director Maurice W. Babby recommended that a
17   "proposal[to settle claims belonging to those tribes not
18   part of the Tillie Hardwick settlement] receive favorable
19   consideration as to the following [R]ancherias:...
20   Alexander Valley."

21   71.  Through his agencies, the Secretary continues to recognize
22   the Tribe as recently as May 6, 2009 when the Bureau of
23   Land Management contacted the Tribe requesting comments,
24   questions or concerns regarding the potential leasing of
25   federal subsurface mineral estates beneath privately held
26   lands within the historically aboriginal territory of the
27   unlawfully terminated Tribe. Federal statutes and
28   regulations as well as a Presidential Executive Order

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  require such consultation with federally recognized Tribes.

2  72. Although not direct federal action, the Tribe is also

3  included in court cases in California in Indian Child

4  Welfare Cases involving its members. The federal statute's

5  enforcement is overseen by the Bureau of Indian Affairs.

6  73. In 1999, the California Regional Office initiated a plan

7  under the leadership of Dale Risling to research, gather

8  and prepare Tribal information for the purposes of

9  providing supportive data for a "legislative initiative" to

10  restore the remaining 11 unlawfully terminated Tribes,

11  including Alexander Valley

12  74. At no time since the enactment of the Tribe List Act has

13  the Tribe been listed as a federally recognized tribe even

14  though the Secretary, as noted above, has conceded on

15  numerous occasions that the termination of the Tribe's

16  recognition under federal law—purportedly accomplished by

17  the California Rancheria Act—was unlawful.

18  ### FIRST CAUSE OF ACTION

19  ### (Breach of Fiduciary Duty)

20  75. The Tribe re-alleges paragraphs 1 through 74, and

21  incorporates those paragraphs herein as if set forth in

22  full.

23  76. The Secretary, acting on behalf of the United States, owes

24  a fiduciary duty to the Tribe because the Tribe's purported

25  termination was not lawfully effectuated in conformance

26  with the requirements of the California Rancheria Act,

27  thereby rendering the Tribe's purported termination void

28  and of no legal effect.

77.   The Secretary's fiduciary duty to the Tribe imposes upon the Secretary "moral obligations of the highest responsibility and trust," *Seminole Nation*, 316 U.S. at 297, and his conduct must be judged "by the most exacting fiduciary standard." *Id.*

78.   The Secretary's fiduciary duty is further evidenced by the numerous federal statutes in which Congress has made express finding regarding the existence of such a duty. *See, e.g.*, Native American Housing and Self-Determination Act, 25 U.S.C. § 410(2)-(4) (finding that "there exists a unique relationship between the Government of the United States and the governments of the Indian tribes" the United States has" undertaken a unique trust responsibility to protect and support Indian tribes;" and "Congress...has assumed a trust responsibility for the protection and preservation of Indian tribes"); Indian Health Care Improvement Act, 25 U.S.C. §1601(a) (finding that "Federal health services to maintain and improve health of the Indians are consonant with and required by the Federal Government's  historical and legal relationship with, and resulting responsibility to, the American Indian people"); Indian Child Welfare Act, 25 U.S.C § 1901(2) (finding that "Congress, through statutes, treaties, and the protection and preservation of Indian tribes and their resources").

79.   The Secretary first breached his fiduciary duty to the Tribe by failing to provide proper notice of the meeting to approve the Distribution Plan.

80.   As a direct and proximate result of the Secretary's failure

1     to provide proper notice, the majority of members were

2     denied the opportunity to vote for or against voluntary

3     termination, making the reported vote a violation of due

4     process.

5  81.  The Secretary then breached his fiduciary duty by failing

6     to ensure that those present at the aforementioned meeting

7     were in fact members of the Tribe.

8  82.  As a direct and proximate result of Secretary's failure to

9     confirm membership, two-thirds of the Tribe's Rancheria was

10    unlawfully distributed to non-members residing on the

11    Rancheria, but not enrolled with the Tribe.

12  83.  The Secretary has continually breached his fiduciary duty

13    to the Tribe each year by failing to include the Tribe on

14    the statutorily mandated list of federally recognized

15    tribes, despite the fact that the Secretary currently

16    recognized that the Tribe's purported termination was

17    unlawful and that the Tribe otherwise met all the

18    requirements for being eligible to participate in the

19    special programs and services provided by the United States

20    to Indians because of their status as Indians.

21  84.  As a direct and proximate result of the Secretary's failure

22    to include the Tribe on the statutorily mandated list of

23    federally recognized tribes, the Tribe has been and

24    continues to be ineligible for the "protection, services

25    and benefits of the Federal government available to Indian

26    tribes by virtue of their status as tribes" pursuant to 25

27    C.F.R § 83.2

28  85.  The Secretary has continually breached his fiduciary duty

1   to the Tribe each year by failing to include the Tribe in

2   the various calculations in forming the Department of the

3   Interior's annual budget submission to Congress for the

4   Bureau of Indian Affairs and the Indian Health Service.

5 86.   As a direct and proximate result of the Secretary's failure

6   to include the Tribe in budget calculations, there is no

7   funding for services to the Tribe and the Tribe would not

8   be entitled to its "tribal shares". Indian Self

9   Determination and Education Assistance Act of 1975, Pub. L.

10   No. 93-638.

11 WHEREFORE, the Tribe prays for relief as set forth below.

12                    SECOND CAUSE OF ACTION

13   (Agency Action Unlawful Withheld or Unreasonably Delayed)

14 87.   The Tribe re-alleges paragraphs 1 through 74, and

15   incorporates those paragraphs herein as if set forth in

16   full.

17 88.   The Administrative Procedure Act ("APA") authorizes

18   judicial review for those suffering legal wrong because of

19   agency action. 5 U.S.C §702.

20 89.   An agency's "failure to act" constitutes "agency action"

21   *Id.* § 551(13). The APA therefore authorizes a reviewing

22   court to "compel agency action unlawfully withheld or

23   unreasonably delayed." *Id.* § 706(1).

24 90.   The Secretary's failure to publish a list of federally

25   recognized tribes that includes the Tribe's name

26   constitutes "agency action".

27 91.   Upon information and belief which is likely to have

28   evidentiary support after a reasonable opportunity for

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  further investigation or discovery, the Secretary currently
2  recognizes that the Tribe's purported termination was
3  unlawful and that the Tribe satisfies all requirements for
4  being eligible to participate in the special programs and
5  services provided by the United States to Indians because
6  of their status as Indians.

7  92.  As a direct and proximate result of the Secretary's failure
8       to include the Tribe on the statutorily mandated list of
9       federally recognized tribes, the Tribe has been and
10      continues to be ineligible for the "protection, services
11      and benefits of the Federal government available to Indian
12      tribes by the virtue of their status as tribes" pursuant to
13      25 C.F.R. § 83.2

14 WHEREFORE, the Tribe prays for relief as set forth below.

15                      **THIRD CAUSE OF ACTION**
16      **(Failure to Conclude a Matter Within a Reasonable Time)**

17 93.  The Tribe re-alleges paragraphs 1 through 74, and
18      incorporates those paragraphs herein as if set forth and
19      full.

20 94.  The APA provides that "within a reasonable time, each
21      agency shall proceed to conclude a matter presented to it"
22      5 U.S.C. § 552(b).

23 95.  Upon information and belief which is likely to have
24      evidentiary support after a reasonable opportunity for
25      further investigation or discovery, the Secretary has
26      recognized since at least 1987 that the Tribe's purported
27      termination was unlawful and that the Tribe satisfies all
28      requirements for being eligible to participate in the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

26

1   special programs and services provided by the United States

2   to Indians because of their status as Indians.

3   96.  Despite the foregoing, the Secretary has failed to publish

4        within a reasonable time a list of federally recognized

5        tribes that includes the Tribe's name.

6   97.  As a direct and proximate result of the Secretary's failure

7        to include that the Tribe on the statutorily mandated list

8        of federally recognized tribes, the Tribe has been and

9        continues to be ineligible for the "protection, services

10       and benefits of the Federal government available to Indian

11       tribes by virtue of their status as tribes" pursuant to 25

12       C.F.R. §83.2.

13  WHEREFORE, The Tribe prays for relief as set forth below.

### FOURTH CAUSE OF ACTION

### (Arbitrary and Capricious Agency Action)

16  98.  The Tribe re-alleges paragraphs 1 through 74, and

17       incorporates those paragraphs herein as if set forth in

18       full.

19  99.  The APA provides that a court must hold unlawful and set

20       aside agency action that is "arbitrary, capricious, an

21       abuse of discretion, or otherwise not in accordance with

22       law."5 U.S.C §706(2) (A).

23  100. The Secretary's failure to publish a list of federally

24       recognized tribes that includes the Tribe's name

25       constitutes "agency action."

26  101. Upon information and belief, which is likely to have

27       evidentiary support after a reasonable opportunity for

28       further investigation or discovery, the Secretary currently

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   recognizes that the Tribe's purported termination was
2   unlawful and that the Tribe satisfies all requirements for
3   being eligible to participate in special programs provided
4   by the United States to Indians because of their status as
5   Indians.

6   102. Therefore, the Secretary's failure to publish a list of
7   federally recognized tribes that includes the Tribe's name
8   is arbitrary, capricious, an abuse of discretion, and not
9   in accordance with law.

10  103. As a direct and proximate result of the Secretary's failure
11  to include the Tribe on the statutorily mandated list of
12  federally recognized tribes, the Tribe has been and
13  continues to be ineligible for the "protection, services
14  and benefits of the Federal government available to Indian
15  tribes by virtue of their status as tribes" pursuant to 25
16  C.F.R. §83.2.

17  WHEREFORE, the Tribe prays for relief as set forth below.

18                          **PRAYER FOR RELIEF**

19  WHEREFORE, the Tribe respectfully requests that this court enter
20  an order:

21  A.  Directing the Secretary to publish a list of recognized
22      tribes in accordance with section 104(a) of the Tribe List
23      Act, 25 U.S.C §479a-1(a), with such list to include the
24      Tribe's name;

25  B.  Declaring that the Tribe is eligible for the protection,
26      services and benefits of the Federal government available
27      to Indian tribes by virtue of their status as federally
28      recognized tribes;

C.   Directing the Secretary to immediately take into trust such lands owned and designated by the Tribe located within the historically aboriginal territory of the Mishewal Wappo Tribe of Alexander Valley ("Designated Lands"), with such lands to be considered as "Indian Country" as defined in 18 U.S.C § 1151 and "restored lands" as defined by 25 U.S.C §2719(b)(1)(B)(iii);

D.   Directing the Secretary, through the Bureau of Land Management and the Bureau of Indian Affairs, to identify and transfer to the Tribe, as trust lands with the land considerations as stated above, all public lands held by the Department of the Interior which are not currently in use and are available for transfer that are within the Tribe's historically aboriginal land.

E.   Directing the Secretary to initiate and supervise the installation of utilities on the designated Lands, with such utilities to be installed at the federal government's sole cost and expense;

F.   Provide funding for the Tribe to receive technical assistance in order to fully participate in federal programs, including health, housing, education, and tribal government administration.

G.   Awarding the tribe attorneys fees and reasonable expenses incurred in connection with this action; and

///
///
///
///

H.   Granting such other relief as the court deems just and
     proper.

Dated: June 2, 2009                    Respectfully Submitted,

                                       THE RYAN LAW FIRM


                                       _____
                                       Kelly T. Ryan
                                       Attorneys for Plaintiff
                                       The Mishewal Wappo Tribe of
                                       Alexander Valley