Official Tribal Document

February 13, 2009

Dear Interior Associate Deputy Secretary George Skibine,

On behalf of the members of the Mishewal Wappo Tribe of Alexander Valley in California, we would like to thank you in advance for facilitating our meeting with you. By this correspondence we request a meeting with you, Mr. Fleming Director of the Office of Federal Acknowledgement and Mr. Keep, Ms. Cohen, Mr. Roberts, of the Department of the Interior Solicitor's Office and whomever you deem necessary from the Bureau of Indian Affairs (BIA) to discuss our request for restoration of federal recognition.

In 1987 the California Regional Office reviewed the alleged terminated Tribes[1] by creating local committees and requiring certain criteria. Of those Tribes recommended by the California Regional Office for immediate restoration, the Mishewal Tribe of Alexander Valley was listed a number one. Further, the Advisory Council on California Indian Policy recommended "immediate" restoration of the Mishewal Wappo Tribe of Alexander Valley.[2]

Former Assistant Secretary of the Bureau of Indian Affairs, Department of the Interior Kevin Gover, testified that before the Agency would recommend restoration, several criteria were implemented. In his testimony before the House Resources Committee on May 16, 2000 he acknowledged that the Mishewal Tribe of Alexander Valley had met these criteria. Specifically he said,

"In 1992, Congress created the Advisory Council for California Indian Policy (ACCIP) to conduct a comprehensive review and analysis of many problems facing California Indians, including terminated tribes seeking restoration. In its report to Congress, the ACCIP recommended that: "the Wilton Miwok [Me-Wuk] Indian Community, the Federated Indians of the Graton Rancheria, and the Mishewal Wappo Tribe of Alexander Valley should be immediately restored by Congress."[3]

Finally, the California Regional Office, after consideration of the facts[4] has issued a letter recommending restoration to federal recognition status for the Mishewal Wappo Tribe of Alexander Valley.[5]

During our discussions with Congressional members and California BIA officials, we agree on the same conclusion: 1) Congress is not the vehicle by which the Tribe can

---

[1] After the Tillie Hardwick stipulated judgment that restored 17 Tribes.
[2] See Attachment A.
[3] See Attachment B.
[4] See Attachment C.
[5] See Attachment D.

Official Tribal Document

regain its rightful recognition status and the Tribe realizes that a pursuing legislative restoration is not only unfeasible given the political climate, but undesirable for the Tribe as it is generally outside the administrative process that caused the problem in the first instance, 2) the Tribe, according to the Office of federal recognition regulatory interpretation, is ineligible for the OFA process. We are hopeful that the current Administration would consider an administrative restoration in order to avoid the situation of Tillie-Hardwick and Scott's Valley.

Our legal representative and historian have accurately stated our terms for restoration as being: 1) restoration to federal recognition status, and 2) land that we have in fee within 25 miles of our previous Rancheria be automatically taken into trust as our homeland. We believe that discussions about past taxes; damages; water; sanitation, etc. would overcomplicate an administrative restoration, and therefore we are willing to waive those issues if we are restored with a land base.

Our membership has voiced its requests as being simply the two above. Mr. Assistant Secretary, our desire is to simply have returned to our people what was taken. We have managed to remain a single people and ask that the relationship with the United States be re-established as was before the unlawful termination.

Please accept this letter as a formal request to arrange a meeting with a small delegation of our Tribal Council to open negotiations for administrative restoration of the Mishewal Wappo Tribe of Alexander Valley. As we are not a wealthy group, we ask that we be given two weeks notice so we can collect the necessary contribution for travel, however we do ask that you grant this meeting request at your earliest convenience.

Mr. Assistant Secretary, the ACCIP and Former Assistant Gover recommended restoration of our federal recognition status when we are ready. On behalf of the Mishewal Wappo people of California, I tell you that we are ready.

Our attorney representative; Joseph L. Kitto will contact your Office to coordinate a meeting. Please feel free to contact him at (202) 378-7476 with any questions or for any further information. Thank you.

Respectfully,

Scott Gabaldon, Chairman
Mishewal Wappo Tribe of Alexander Valley
PO Box 1086
Santa Rosa, CA 95402

Attachments:

1.  Letter dated September 22, 1986 to Sacramento Area Director from CILS
    on behalf of Guidiville and Lytton Rancherias requesting tribal status
    and trust land acquisition.

2.  Letter dated February 17, 1987 to Sacramento Area Director from CILS
    pursuant to meeting held on January 17, 1987.

3.  Letter dated March 18, 1987 to the Sacramento Area Director from CILS
    regarding proposed settlement of the rancheria lawsuits.

4.  April 7, 1987 memorandum to Sacramento Area Director transmitting "new"
    Class Action Complaint entitled <u>Scotts Valley Band, et al., v. U.S., et al.</u>

5.  Commissioner's memorandum dated June 25, 1975 to the Sacramento Area
    Director, subject: California Rancheria Act.

6.  February 12, 1976 memorandum from Office of the Solicitor to Director,
    Office of Trust Responsibilities, subject: California Rancherias.

7.  Individual summary sheets for 18 subject rancherias with (1) distribution
    plans, (2) ownership reports and (3) determination re adequacy of Sec. 3(c)
    improvements pursuant to Rancheria Act.

*included:*
*Elis*
*Lytton*
*Scotts Valley*
*Guidiville* 4/14/38
*ef*

# Attachment A

AR 32

  5 1987

Area Director, Sacramento Area Office

Federal Recognition of Previously Terminated Dependent Members

Assistant Secretary - Indian Affairs
Attention:  Deputy to the Assistant Secretary - Indian Affairs (Tribal
            Services), MS-4160

Since the late 1960's, the United States has been involved in a number of
lawsuits brought before the courts seeking to set aside the "termination" of
certain California Indians pursuant to the California Rancheria Act of
August 18, 1958 (72 Stat. 619), as amended by the Act of August 11, 1964
(78 Stat. 390), or seeking monetary damages or other equitable relief for the
improper implementation of the Rancheria Act.  Without detailed analysis of
these cases in this memorandum, suffice it to say that, the United States has
lost on nearly every count with the result being restoration of tribal status,
restoration capability of lands into trust, restoration of eligibility for
Federal services and benefits, reimbursement for taxes paid and other damages
and attorneys fees.

By letter dated September 22, 1986, we were advised by Mr. Lester Marston,
California Indian Legal Services, that it was their position that all of the
"unterminated" dependent members of California rancherias were not only
entitled to receive BIA services (as individuals) but that they are also
entitled to have land taken into trust and to organize as tribal governments.
The following are the 15 rancherias which are subject of Mr. Marston's letter:

1. Alexander Valley              9. Mark West
2. Auburn                       10. Nevada City
3. Cache Creek                  11. Paskenta
4. Chico                        12. Ruffeys
5. Guidiville                   13. Scotts Valley
6. Graton                       14. Strawberry Valley
7. Indian Ranch                 15. Wilton
8. Lytton

Mr. Marston further stated that they had received inquiries as to the
possibilities for approval of trust land acquisition and recognition of tribal
governments from dependent members of six of the above-listed, namely:
Alexander Valley, Auburn, Chico, Guidiville, Lytton, and Scotts Valley.

As a consequence, Legal Services is requesting that the Bureau adopt a policy
that would allow both (1) former dependent members and (2) distributees of
these rancherias to acquire lands in trust when such lands are within the
former rancheria boundaries and that the Secretary shall extend Federal
recognition to each group.



INITIALING COPY

-2-

Legal Services filed an action on June 27, 1986 before the U.S. District Court, Sugar Bowl Association v. U.S., No. C-86-3660-WWS, on behalf of the Scotts Valley Indians. The Plaintiffs not only request restoration of Indian status but seek to require the Secretary to purchase "into trust" rancheria lands that have passed into non-Indian ownership and they are additionally seeking payment in the amount of $10,000 for each member of the class for damages resulting from their terminated Indian status.

By letter dated March 18, 1987, Legal Services advised that they were in the process of amending their Complaint to include the Chico Rancheria, and on March 23, 1987, the new Complaint was served which amended the Scotts Valley claims and added the Indians of the Chico Rancheria to the above-cited lawsuit. In the March 18th letter, Mr. Marston requested the appointment of a "settlement judge" in order to allow for the exploration of settlement of the Sugar Bowl case and to evidence their exhaustion of any possible administrative remedy on behalf of their clients.

On April 10th and 13th, staff of this Area Office and staff of the Central and Northern California Agencies met to discuss the subject proposal. As a result of our review of existing records and our discussion of the merits of the proposal, it is our recommendation that the proposal receive favorable consideration as to the following rancherias: (1) Alexander Valley, (2) Cache Creek, (3) Chico, (4) Graton, (5) Guidiville, (6) Indian Ranch, (7) Lytton, (8) Mark West, (9) Scotts Valley, and (10) Wilton.

The factors considered during our review are as follows:

- previous determination as to the adequacy of the water and sanitation facilities provided under Section 3(c) of the Rancheria Act (as implemented by Indian Health Service under P.L. 86-121);

- occupancy of rancheria prior to implementation of the Rancheria Act and the requested actions by the proposed distributees as reflected in the record and the distribution plan;

- whether there currently exists, or previously existed, a large Indian population on, or adjacent to, the rancheria;

- whether there were "dependent members" listed on the distribution plans whose Indian status was reinstated;

- whether previous court judgments held that all obligations of the U.S. were adequately discharged under the Rancheria Act; and

- whether rancheria lands are still, or believed to be, in Indian ownership.

-3-

A summary of the findings for each of the subject 15 rancherias along with the supporting documents are attached for your review.

The Auburn Rancheria poses a special problem as we know there is an Indian population on and/or adjacent to the rancheria and there are Indian-owned parcels, however, the Judgment entered in Audrey Taylor, et al., v. Hickel, et al., No. C-70-719-SW, decreed that:

"Upon payment to said trustees of said sum, the performance of all responsibilities and duties to plaintiffs and their class by the United States of America under the Rancheria Act (P.L. 88-419) shall be deemed completed and discharged . . .".

As in each of the other rancherias, the Indian status for each of the dependent members of the Auburn Rancheria was reinstated pursuant to the consolidated actions entitled Knight v. Kleppe and Ambrose Duncan v. Kleppe, Nos. C-74-0005 and C-73-0034. The Auburn Rancheria was included in the class action entitled Tillie Hardwick, et al., v. U.S., No. C-79-1710-SW, however, it was stipulated that their claims were dismissed on the grounds of res judicata. In spite of the Taylor decision, we believe there may be strong legal arguments that the dependent members are not only entitled to BIA services as individuals because of the subsequent Knight and Duncan decisions which reinstated their Indian status, but they may additionally have the right to organize.

As to the Nevada City and Paskenta Rancherias, "untermination" is not recommended as both were sold at the request of the sole occupants/distributees by BIA under the advertised sale procedures pursuant to Section 5(d) of the amended Rancheria Act. There were no dependent members included in the distribution plans for Nevada City or Paskenta. Both rancherias were included in the Hardwick suit, but their claims were dismissed without prejudice.

Likewise, recognition of the Ruffeys and Strawberry Valley Rancherias is not recommended as both were sold by the distributees soon after their receipt of title under the distribution plans. There were no dependent members included on the distribution plans. The distributees of both rancherias have been deceased for a number of years, and any claims on their behalf were dismissed without prejudice in the Hardwick action.

Information regarding the Chico Rancheria was recently provided to the Assistant Regional Solicitor in order that a response could be made to the new Complaint filed in Sugar Bowl v. U.S. We contemplate that California Indian Legal Services may amend the action to include the claims of any additional individuals who are descendants and/or dependent members from the remaining rancherias, and at this time, we realize that the legal position of the Justice Department as to the alleged claims will have an impact on any determination.

-4-

In summary, we are recommending that the Bureau recognize that through protracted and expensive litigation, both for the Indian people involved and the United States, that for the most part, the implementation of the Rancheria Act has been successfully reversed and certain ground rules for settlement have been arrived at for all but a small handful of rancherias included in the Act. We further recommend that the Bureau consider adopting these ground rules as a basis for settling "on a negotiated basis" current and planned cases of the remaining rancherias in order that there can be some equity between those rancherias that have had the legal capability to pursue legal action in the past and those which have not.

Should you feel that further discussion of these recommendations may be needed, please let us know. We look forward to your advice and direction on this matter.

/s/ *Maurice M. Babby*

Attachments

cc:  Superintendent, CCA
     Superintendent, NCA

FACIO/BABBY:cf   5/21/87

File ref:
  ISV 7
  600-02

AR 36

# Attachment B

TESTIMONY OF KEVIN GOVER

BEFORE THE

COMMITTEE ON INDIAN AFFAIRS

UNITED STATES SENATE

concerning S. 297

April 21, 2004

Mr. Chairman and members of the Committee, my name is Kevin Gover. I am a Professor of Law at the Arizona State University College of Law in Tempe, Arizona. I appear before you as an individual, and my testimony does not necessarily represent the views of Arizona State University or the College of Law. I am honored to appear before the Committee today, and I thank the Chairman for his introduction of S. 297 and for calling this hearing today.

## The Federal Recognition Process

As you know, I served as the Assistant Secretary for Indian Affairs at the Department of the Interior from November, 1997 until January, 2001. The Department and the Bureau of Indian Affairs face a number of vexing problems in their administration of the laws of the United States concerning Indian tribes. Aside from trust reform, perhaps the most visible of these problems is the administration of the process for determining whether an Indian group qualifies as an Indian tribe deserving of a government-to-government relationship with the United States.

The Committee's attention to this matter is extremely important. For too long, the program has relied entirely on the administrative authorities of the Department for both its process and substance. While I believe the Department has, in general, established the correct criteria for federal recognition and afforded due process in their application, clearly these are subjects that require the attention and authority of the Congress if the program is to have the legal and political credibility that we desire.

Moreover, the program's recent notoriety in the eastern press requires that the Congress set the record straight. Far too much of the reporting on the matter is ill informed and just plain wrong. The New York Times, for example, recently reported that investigations of the program revealed that decision-making is politically influenced. That is simply untrue. Neither the General Accounting Office not the Inspector General of the Interior Department found that decisions were influenced by political pressure, partisan or otherwise.

Contrary to the thrust of these reports, the federal recognition program is not about gaming. Most of the currently noteworthy petitions were filed well before the Indian Gaming Regulatory Act was passed. I have come to view the program as being primarily about justice.

1

AR 38

Those of us who are or have been in positions of authority in Indian affairs have few real opportunities to correct historic wrongs and make lasting improvements in the quality of life for tribal communities. The federal recognition program is one of the few undertakings in which the United States can definitively correct grievous historic wrongs and begin in an immediate way to undo the legacy of the genocidal policies of the past.

I must admit that when I entered government service in 1997, reform of the federal recognition process was not among my priorities. The federal recognition program is, after all, a minor undertaking of the Bureau of Indian Affairs in terms of the budget and personnel assigned to it. However, it soon became clear to me that the Assistant Secretary's decisions on these petitions are a crucial aspect of the overall responsibility of the Department for the execution of federal relations with Indian tribes. Moreover, because of the impact a newly-recognized tribe can have in its home region—that is to say, the impact that casinos can have on communities near the tribes—the federal recognition program had grown into one the most controversial activities of the Bureau.

From the petitioning tribes' perspective, the program is deeply troubled. It is a dense program, requiring an extraordinary amount of research, paperwork, and expense. It is an intrusive program, with its inquiry into, quite literally, the parentage and family backgrounds of hundreds or thousands of members of the petitioning tribes. And above all, it is a very, very slow program. Too many tribes have had petitions pending for more than twenty years. While accuracy and thoroughness are qualities that we all want in government work, I soon concluded that the pace of decision making in the program was indefensible and unacceptable. For petitioners qualifying as tribes, the program's delays deprive them of services and benefits that improve the lives of Indian people. Moreover, even petitioners that do not qualify for recognition deserve as much promptness as possible.

From the perspective of communities potentially affected by the recognition of a tribe in their region, the process allegedly offered too little opportunity for their concerns to be heard. I believe this concern to be somewhat overstated, because those non-Indians who seek to participate in the process and can demonstrate that the decision would affect them are allowed to participate. They are able to meet with staff, both formally and informally; they receive from the Department large amounts of information concerning the petitions; they are perfectly free to file their submissions and present their views; they are given extensions for the preparation of their submissions in opposition to recognition; they can appeal the Assistant Secretary's decisions to the Interior Board of Indian Appeals and the Secretary; and they are able to appeal the Department's final decision to federal court. They receive far more than due process demands.

Still, I believe that some of these non-Indian communities, like the tribal petitioners, have a valid point when they object to the expense of pursuing all of these procedural rights. There is no question that the phenomenon of developers funding tribal petitioners for recognition provides the tribes with resources that the creators of the federal recognition process never anticipated. I wish to be clear that I do not subscribe to the idea that gaming money has led to the recognition of undeserving petitioners. As to the allegations that expensive lobbyists exercise undue influence in the process, my experience was that lobbyists play no meaningful role in the

2

AR 39

process of acknowledgment. However, there is little question that the resources that a small minority of petitioning tribes can now devote to the process can seem overwhelming to members of the public who are affected by the recognition process.

These factors led me to take a much deeper interest in the recognition process than I thought that I would when I assumed office. What I found was a deeply problematic and fundamentally flawed program. It was distrusted by its constituent petitioners. It was underfunded and overwhelmed by the broad research tasks it had undertaken and by the need to respond to Freedom of Information Act requests. It was under fire in several federal courts for the delays in the process. It was missing one regulatory deadline after another and making little progress in reducing the large backlog of pending petitions.

On the other hand, I found that some of the accusations against the Branch of Acknowledgment and Research (now the Office of Federal Acknowledgment) were untrue. As mentioned above, I saw no evidence of improper lobbyist influence in BAR or in the office of the Assistant Secretary in the processing of petitions. Further, I saw nothing to indicate that BAR staff harbored any particular hostility or prejudice toward or in favor of any of the petitioners that came before me. And never, not once, did I hear BAR staff express concern about the budget implications for the BIA of recognizing additional tribes. I do not doubt that the work performed by BAR represented the staff's best efforts and honest judgments about the petitions.

## Structural Issues with the Federal Acknowledgment Program

As has been well documented, I did not always agree with the judgments and opinions of BAR researchers and the attorneys from the Solicitor's office who advised the BAR. I came to believe that the BAR and its attorneys had been essentially unsupervised for many years and that the Assistant Secretary's office had become little more than a rubber stamp for their recommendations. It is easy to see why this had happened. The length and complexity of the research that BAR conducted can easily overwhelm an Assistant Secretary, who inevitably has many other issues with which he or she must contend. When I first asked to see the technical reports supporting a proposed determination that came before me, BAR supplied nearly a thousand pages of research that it had produced. These "summaries" of the petition were alone overwhelming. There was simply no chance that an Assistant Secretary or his/her staff could or would actually review the several boxes of primary research materials accumulated by BAR to prepare those summaries.

By creating an avalanche of paper, the BAR effectively overwhelmed the office of the Assistant Secretary, and in so doing assumed an inappropriate degree of control over the program. The scholarly literature in Administrative Law refers to this phenomenon as "staff capture," meaning that agency staff essentially defies supervision by political appointees by overwhelming policy makers with information, while the public's access to the policy maker is severely limited. In this respect, the rule in 25 C.F.R. Part 83 that limits access to the Assistant Secretary for agency outsiders during final consideration of the petition gives OFA staff extraordinary power to control the outcome. The Assistant Secretary and his or her staff,

3

personally unable to plow through thousands of pages of research materials, has no one to turn to for help in discerning which are the key policy and factual issues in any given petition. That being the case, the urge is strong simply to sign off on the OFA recommendation. I grew well acquainted with this problem as proposed and final decisions on petitions were brought to me. To address this problem, I revised the Part 83 regulations to require BAR to present its review of the petition in a format that is more helpful to the Assistant Secretary. While I believe that was a worthwhile effort, more needs to be done.

Another troubling aspect of the program was the phenomenon of analytical tools employed by BAR hardening into rules of law. Two examples make the point. First, when applying the requirement that a tribe demonstrate the "continuous" existence of political influence of tribal leadership over the members, OFA looks to see that such influence existed in each ten-year increment of the tribe's existence. This is unobjectionable as an analytical approach, but it is in my opinion wrong and illegal to apply the "ten-year" approach as a rule of law. BAR maintained that if conclusive proof of political influence was absent during any ten-year period, continuity was broken and the petition had to be denied. I believe that, while the absence of such proof during any given decade might be some evidence of a break in continuity, it is not conclusive and it cannot fairly give rise to a presumption of a break in continuity. It may, for example, only reflect a gap in effective news reporting, record keeping, or record retention, not any actual gap in tribal existence. In my view, for the "ten-year" approach to be hardened into a rule of law, or even permitted to establish a presumption, it must go through notice-and-comment rulemaking under the Administrative Procedures Act, which it did not.

Similarly, BAR had developed a specific approach to evaluating whether the petitioner's membership consists of individuals who descend from a historical Indian tribe." BAR essentially asked whether 85% of a petitioning tribe's membership could prove descendancy. This 85% rule cannot be found in the regulations. While it may be a reasonable means of analysis, it cannot be administered as a rule of law without being subjected to notice-and-comment rulemaking.

Finally, the role of the office of the Solicitor presents difficulty. Certain individuals in the Solicitor's office were drafters of the Part 83 rules; participate in OFA's consideration of the petition; participate in OFA's drafting of recommendations to the Assistant Secretary; compile the administrative record behind each decision; advise the Assistant Secretary directly during his or her review of the petition; help to draft the decisions of the Assistant Secretary; litigate before the IBIA concerning the decision; advise the Secretary during reconsideration of decisions of the Assistant Secretary; and assist in the litigation in federal court that results from the Department's final actions. These individuals have an inappropriate degree of control, direction, and influence in the process. I believe that the work of these attorneys is essentially unsupervised in the Solicitor's office for the same reason that work of the BAR is essentially unsupervised by the Assistant Secretary: the Solicitor and his or her immediate advisors simply do not have the time to master the intricacies of the evidence because of its volume.

4

## S. 297

S. 297 recognizes the problems I describe and contains a number of good ideas to address these problems. I strongly endorse S. 297 and the Committee's ongoing efforts to improve the federal recognition process. I believe that the ultimate weighing of the evidence is the job of the Assistant Secretary, not the OFA. The OFA, to be sure, has a critical role in the process, but it does not have the role of decision maker. Nor is the subject matter of the OFA's work so conceptually difficult that it cannot be questioned by an Assistant Secretary, even one whose primary expertise is outside the social sciences. Indeed, I argue that an Assistant Secretary who happens to be an attorney is better qualified than the OFA to apply the law in Part 83 to the evidence submitted by the petitioner. I believe it is no coincidence that the only Assistant Secretaries who have disagreed with and overruled a BAR/OFA recommendation have all been attorneys.

Moreover, the job of the Assistant Secretary is to bring a broader policy perspective to all of the agency's decision making. Those of us who have served in the office may fairly be called experts in Indian affairs, and most of us had devoted many years of study and professional work to Indian history, Indian culture, Indian politics, and Indian law before assuming office. Thus, there is absolutely no reason why the work of the historians and anthropologists in the OFA should receive any more deference from the Assistant Secretary than does the work of the educators, social workers, peace officers, etc. who advise the Assistant Secretary on other important policy matters.

To be sure that the Assistant Secretary has the resources necessary to review OFA's work, S. 297 would establish an Independent Review and Advisory Board. I believe this to be an excellent solution to the problem of "staff capture" that I described. This independent expertise will go far in helping the Assistant Secretary identify the key factual, legal, and policy issues raised by any given petition and ensure that, with the advice provided by the Board and by comparing the Board's analysis to that of the OFA, the Assistant Secretary will be personally engaged in making those key decisions in each case.

My primary disagreement with BAR staff related specifically to the assignment of weight to specific evidence, the inferences that could fairly be drawn from the evidence, and the degree of certainty about historical facts required by the regulations. I believe that BAR staff, being trained as historians, anthropologists, and genealogists, applied too difficult a standard. I believe they sought near certainty of the facts asserted by petitioners. They dismissed relevant evidence as inconclusive, even though conclusive proof is not required by the regulations. Moreover, BAR staff seemed thoroughly unwilling to give evidence any cumulative effect. While any given piece of evidence might be characterized as weak, for example, many pieces of weak evidence, when considered cumulatively, can make a sound case. I do not believe that the BAR staff were dishonest in their analysis. I do believe that, in accordance with their training, they applied a burden of proof far beyond what is appropriate and far beyond what is permitted by the regulations. The creation of the Board will improve the process by permitting the Assistant Secretary to review the evidence effectively and apply the appropriate standard of review.

5

The authorization for grants to petitioning tribes and affected communities also will address important problems. Tribes often turn to developers for resources to pursue their petitions because they have little choice. If a tribe declines help from developers, it runs the risk that its resources in pursuing the petition will be inadequate. My experience indicates that the quality of technical assistance and representation provided to petitioning tribes by their consultants and lawyers is uneven. With the additional resources that would become available under this grant program, perhaps the quality of that assistance will improve. Moreover, the grant program will provide a petitioning tribe with a meaningful choice as to whether to seek the assistance of a developer. (I note that such grants are conditioned on a showing of need, and I assume from this that a tribe supported by a developer would be unable to make a showing of need.) While the grant program will not eliminate entirely the influence of developer resources on the process, it will help.

As for grants to affected communities, my support is more reluctant. I understand the need for fairness in the process, and I realize the need for political compromise on legislation of this sort, but I am troubled by the precedent of permitting scarce funds appropriated to the BIA, generally for Indian purposes, to be awarded to non-Indian communities. To the tribes, such a "raid" on BIA funding might be seen as yet another non-Indian misappropriation of resources intended for Indians – the essence of the colonialism that this Congress has decried. However, given that the grants are conditioned on a demonstration of need by the affected community, I believe that the grants may help the process to be more accessible to communities potentially affected by the recognition of tribes.

Another important idea in S. 297 is the definition of the "historical period" for determining the continuity of tribal existence as running from 1900 to the filing of the petition. My experience in evaluating petitions revealed that tribes very often could not provide the kind of documentary evidence BAR wanted for the period from roughly 1870 to 1930. As an Indian person and a scholar of Indian history, I found this unsurprising. As the Chairman well knows, this period was a bleak one for Indians. The United States sought a final solution for the "Indian problem," and that solution was assimilation, a deliberate assault on Indian tribalism. The United States sought to withdraw from its responsibilities to Indian tribes in many circumstances; other tribes suffered from benign neglect or were simply left for the states to deal with. Still other tribes, I believe, adopted a strategy of anonymity, believing it better not to be noticed than to come to the attention of federal and state authorities. Small wonder, then, that documentary evidence of some tribes in this period is sparse.

I believe that the date of 1934 well may be a better starting point. As you know, federal policy shifted radically at that point, and a number of tribal groups re-emerged at that time. Their re-emergence cannot fairly be described as the re-constitution of a community once scattered to the wind. Rather, communities that had long been underground were willing once more to reveal themselves to the light when federal policy toward tribalism became friendlier. BAR's interpretation of evidence in this period was consistently rigid and formalistic, taking little or no account of the larger historical context. I took a more generous approach, refusing to give new life and effect to the policies of an era that can only be called unenlightened.

6

### Suggestions for Amendments

As I have indicated, I would support the enactment of S. 297 in its current form. I would like to propose, however, three possible amendments that would further improve the process.

First, I strongly believe that certain petitioners, which already have been denied recognition, should be permitted another opportunity under the revised process established by this bill. I adopted a policy when I was Assistant Secretary that I would not revisit final determinations of my predecessors in office. While I believe that this was the right policy, I remain troubled to this day that justice was denied to certain tribes, particularly the Miami Tribe. Even some of the petitions I personally acted upon leave me wishing that this revised process had been in effect when I was in office. Into this category I would place the Mowa Choctaw. Finally, I remain convinced that the Chinook Tribe is deserving of federal recognition, and I believe that, if Assistant Secretary McCaleb had the resources provided by this bill available to him when he addressed the Chinook petition, the outcome well may have been different. There may be other tribes, such as the Duwamish and the Muwekma who should be eligible for reconsideration as well.

Second, I believe that fairness in the process will be enhanced by limiting the role of the Division of Indian Affairs in the Office of the Solicitor. I described above the pervasive influence of that division. I believe that such pervasive influence is pernicious to the process. I note that the Independent Review and Advisory Board will have two attorney members, and I believe that is wise. I urge that the Congress go a step further, however, and provide that, when a matter is assigned by the Assistant Secretary to the Board, no attorney from the Division of Indian Affairs be permitted to communicate with the Board. Further, to the extent the Board requires legal assistance from the Department, as it well may, that assistance should come from another division of the Solicitor's office. I suggest that the Division of General Law have this responsibility. Similarly, after the OFA has made its recommendation to the Assistant Secretary on the final determination of a petition, neither OFA nor the Division of Indian Affairs should have any further contact with the Assistant Secretary regarding the petition. In the alternative, Congress should provide that a petitioner must receive notice of the OFA's recommendation to the Assistant Secretary and have one last opportunity to appear before the Assistant Secretary and offer any rebuttal evidence it might wish. These suggestions are offered in order to further reduce the historic inappropriate influence that BAR and the Division of Indian Affairs have asserted over the process.

Third and finally, I suggest that the Committee more broadly address the issue of the significance of continuous state recognition of Indian tribes. While the existing regulations and the bill before the Committee indicate the significance of state recognition as evidence of historic identification of the tribe, I agree wholeheartedly with the Department's position that such continuous state recognition is also evidence of continuity of political influence. In its recent decision on the petition of the Schaghticoke Tribal Nation, the Department held that "the

7

historically continuous existence of a community recognized throughout its history as a political community by the state and occupying a distinct territory set aside by the state, provides sufficient evidence for continuity of political influence within the community." The proposition is unremarkable; indeed, it is obvious. When a state has maintained a relationship with an Indian group throughout the state's history, and when the group has occupied a state-recognized reservation throughout that time, these facts are evidence of ongoing political organization in the tribe. I support this holding concerning the evidentiary value of state recognition. Indeed, I believe it is the only sensible interpretation of the fact of continuous state recognition.

Mr. Chairman, thank you again for this opportunity to appear before you. I would be pleased to answer any questions the Committee might have.

8

# Attachment C

# APPENDIX A

The following is a comprehensive history of the hearings, reports and bills that preceeded the passage of the Rancheria Act in 1958.

Discussion of terminating the trust responsibility between the United States and Indian tribes began in earnest after the resignation of Commissioner John Collier in 1945. At hearings held by the Senate Committee on Civil Service in 1947, the BIA's Acting Commissioner testified that, "Bureau services could be curtailed or eliminated as to certain tribes and reservations, by groups." The Commissioner outlined four criteria for measuring a tribe's readiness for withdrawal of federal services: (1) degree of acculturation; (2) economic resources and condition; (3) the tribe's willingness to be relieved of federal control; and (4) the State's willingness to take over. Tyler, *supra* note 18, at 163-164. Applying these criteria, he segregated tribes into three groups: Group I could be released at once from federal supervision; Group II could be released in 10 years; and Group III in the indefinite future. [1]

Sensitive to Congressional pressure for withdrawal of services to Indians and curtailment of the Indian Office's bureaucracy, the BIA in 1948 set up a series of conferences in its regional offices. [2] The goal of these conferences was to formulate a long-range program, the objective of which would be "eventual discharge of the Federal Government's obligation, legal, moral, or otherwise, and the discontinuance of Federal supervision and control at the earliest possible time compatible with the government's trusteeship function." [3] This policy emphasized a procedure which would withdraw trusteeship on a measured, step-by-step basis.

In 1951, the California Legislature joined in the call for termination. It urged the President and Congress "to dispense with any and all restrictions, whatever their nature, whereby the freedom of the American Indian is curtailed in any respect, whether as to governmental benefits, civil rights, or personal conduct . . . ." [4]

The BIA's proposals for gradual withdrawal were unacceptable to forces in Congress. There was a suspicion that the BIA was only paying lip-service to termination goals, and that it had no desire to work itself out of a job. Accordingly, a resolution was passed in the House in 1952, which "authorized and directed" the Interior Committee to conduct a full and complete investigation and study of the activities and operations of the Bureau of Indian Affairs, with

---

[1] W. Zimmerman, Jr., "The Role of the B.I.A. since 1933." 311 The Annals, American Academy of Political Science 31, 36 (May, 1957).

[2] Id. at 166.

[3] Id.

[4] S. J. Res. No. 29, May 18, 1951, as set forth in Progress Report to the Legislature, California Senate Interim Committee on Indian Affairs, (January, 1955) at p. 17.

AR 47

particular reference to BIA's preparation for termination.  The resolution further required the Committee to prepare "a list of tribes . . .    qualified for full management of their own affairs," as well as "legislative proposals designed to promote the earliest practicable termination of all Federal supervision and control over Indians "[5]

A special subcommittee of the Interior Committee was appointed to carry out the mandate of H. Res. 698.[6]  In response to inquiries posed by that Committee, the Bureau produced an exhaustive report (1500 pages with maps and exhibits), which was published as House Report No. 2503.  The report treated all California tribes and groups as one entity, and slated all of them for termination.[7]

The first bills to terminate federal supervision over California Indians[8] were introduced in both the House and the Senate in 1952, with the support of the Interior Department and the California Legislature.[9]  These bills did not pass, but would have terminated the status of all California Indian tribes, except for the Agua Caliente band.

In 1953 the California Legislature renewed its call for BIA withdrawal from California.  It urged Congress "to take such steps as are necessary to effect a termination of the authority of the Bureau of Indian Affairs, particularly in the State of California."[10]

In that same year, Congress officially adopted a policy of termination.[11]  The express goal of termination was

to make the Indians within the territorial limits of the United States subject to the same laws and entitled to the same privileges and responsibilities as are applicable to other citizens of the United States, [and] to end their status as wards of the United States . . .

---

[5] H. Res. 698, 82nd Cong., 2d. Sess., July 1, 1952.

[6] See generally, Report with Respect to the House Resolution Authorizing the Committee on Interior and Insular Affairs to Conduct an Investigation of the Bureau of Indian Affairs. H.R. Rep. No. 2503, 82nd Cong., 2d. Sess., December 15, 1952.

[7] Id.

[8] S. 3005, H.R. 7490, H.R. 7491.

[9] 98 Cong. Rec. 3921-3923 (April 10, 1952); S. J. Res. No. 29, Cal. Stats. 1953, (April 30, 1953).

[10] Assem. J. Res. No. 38, Cal. Stats. 1953, reproduced in 1955 Progress Report to the Legislature by the Senate Interim Committee on California Indian Affairs (June 3, 1957).

[11] H. Con. Res. 108, 83rd Cong., 1st Sess., 67 Stat. B-132 (1953).

-2-

The Resolution further declared it "to be the sense of Congress that, at the earliest possible time, all of the Indian tribes and the individual members thereof located within the States of California, Florida, New York, and Texas . . . should be freed from Federal supervision and control . . .," and that the BIA should thereafter be abolished in those states. Congress slated at least five additional Tribes in other states for termination. Finally, the Resolution directed the Secretary to report his recommendations for terminal legislation to Congress before January 1, 1954.

In response, the Department of the Interior hastily prepared a legislative package to effect the termination of Indians and Indian Tribes mentioned in the Resolution.[12] These bills were introduced in January of 1954, and were the subject of lengthy joint hearings.

The draft legislation was . . . y in . . . . re, giving California tribes no choice about whether or not th... . . . . . . . .ated . . . . ed to all California Indians, except for the . . . . . . . Colorado River

Although six other terminat. . . . . . . . . . . . . . . . . . . . . . . g . . . eighty-third Congress, neither of the California bill. was . . . . . . . obably because the State of California and California Tribes vigorously opposed them.[13] One of th. . . . . . . . . . . . . . . . concern. . expressed by California officials and . . . . . . . . . . . . . . . . . . . . . . . . staff to perform . . . . y of the tasks which the bills mandated prior to conveyance o. . . . . . . . . . . . that tho.e duties would be thrust upon state agencies which were not adequately equipped to pc. . . . . . hem. State officials also objected to provisions which would have maintained the tax-exempt status of certain lands for various lengths of time.[14]

Shelving of the 1954 bills did not end consideration of termination proposals for California. The California Senate had already created an Interim Committee on California Indian Affairs, which undertook an exhaustive study of the problems associated with withdrawal of federal supervision.[15] In the latter part of 1954, that Committee held hearings, compiled a significant body of data on the termination problem, and issued a lengthy "Progress Report to the Legislature" in January of 1955.[16] The report contained a set of conclusions and recommendations which, among other things, emphasized the need for completion of physical improvements on Indian properties before their distribution to individual Indians. These

---

[12] Joint hearings on S. 2749 and H.r. 7322 Termination of Federal Supervision over Certain Tribes of Indians, 83rd. Cong., 2nd Sess., Senate and House Subcommittees on Interior and Insular Affairs, 1954, p. 42 (hereafter "Joint Hearings.")

[13] See, e.g., S. J. Res. No. 4, Cal. Stats. 1954; see also, Joint Hearings, p. 360.

[14] See Joint Hearings, p. 360.

[15] S. Res. No. 115, (June 10, 1953).

[16] Progress Report to the Legislature, supra note 10.

-3-

improvements were to include roads built "to such a standard as will make the same acceptable for maintenance by the counties," survey of the boundaries of trust lands (as well as individual parcels therein), and "the immediate completion of irrigation and other work projects deemed necessary on the trust properties in order that the same will be in reasonably usable condition at the time of termination."[17] Finally, the Committee recommended that any federal withdrawal legislation allow for separate consideration of each reservation or rancheria on a case-by-case basis.[18] The Senate Interim Committee gave extensive treatment to the withdrawal problem, and its report had a great impact on future termination legislation in Congress.

In 1957, four new "rancheria" bills were introduced in the House.[19] Later, another bill prepared by the California Senate Interim Committee on Indian Affairs was also introduced.[20]

These bills were referred to the House Subcommittee on Indian Affairs, which held hearings in May and June of 1957.[21] Nearly identical, each bill provided for the termination of several small rancherias, and directed the Secretary of the Interior to complete designated improvements prior to distributing any of a rancheria's assets. Each bill provided for the preparation of a plan for distributing the rancheria's lands and assets, whether by the Indians of the rancheria                    .ultation" with them. Indians unhappy with the proposed distribution were given a right of appeal to the Secretary. After ruling on appeals and making revisions to the preliminary distribution plan, the Secretary was required to submit the plan to a referendum vote of the Indians named therein as distributees. The plan would be implemented only after it had been approved by a majority of the listed distributees.

During the hearings, each of the bills was amended by a provision that became §10(b) of the Rancheria Act, which provided that, upon distribution of each rancheria's assets, the distributees and their dependents would lose their status as Indians under federal law and would become ineligible for benefits and services provided by the United States "for Indians because of their status as Indians." This amendment was opposed by Congressman Sisk, sponsor of one of the draft bills, who thought that the addition of the termination language was unnecessary and betrayed his agreement with constituent Indians as to the bill's form.[22]

---

[17] Id. p. 452.

[18] Id., pp. 458-459.

[19] H.R. 2576, H.R. 2824, H.R. 6364, and H.R. 2838.

[20] H.R. 9512; see also, Interim Committee on California Indian Affairs, "1957 Progress Report to the Legislature," 1957, at pp. 24-31.

[21] Hearings on H.R. 2576, 2824, 2838, and 6364, and those during the 85th Congress, 1st Session, appear in that Subcommittee's Serial 13, for 1957.

[22] Id. at pp. 97-100.

AR 50

The bills were thereafter consolidated into one committee bill.[23]  The consolidated bill named only 14 rancherias, rather than the 28 named in the four original bills.  This reduction resulted from withdrawal of their bills by Congressmen Sisk and Engle because of their dissatisfaction with the Committee's amendments.  The consolidated bill was passed by the House of Representatives on August 13, 1957.[24]

In the Senate, the California termination bill was passed on July 18, 1958,[25] with an amendment that increased the number of affected rancherias to 41.[26]  The House concurred in the Senate amendments on August 7, 1958, and H.R. 2824 was signed by the President on August 18, 1958.[27]

The 1958 Act differed from the 1954 termination bills, in three significant ways: (1) it did not affect all California Indians, unlike the 1954 bills; (2) it was permissive in nature, while the 1954 bills would have been mandatory; and (3) it required the Interior Department to complete improvements on the rancheria before ending supervision, while the 1954 legislation contained no such feature.

---

[23]  H.R. 2824.

[24]  104 Cong. Rec. 15205 (1957).

[25]  104 Cong. Rec. 15232.

[26]  S. Rep. No. 1874, 85th Cong., 2nd Sess., 1-2 (1958).

[27]  104 Cong. Rec. 16566; 104 Cong. Rec. 18234.

-5-

AR 51

# APPENDIX B
The Rancheria Act
Pub. Law 85-681
August 18, 1958[1]

| Tribes Listed in the Act | Current Status of Listed Tribe |
|---|---|
| 1. Alexander Valley (Mishewal Wappo Tribe of Alexander Valley) | Remains terminated. |
| 2. Auburn (United Auburn Indian Community) | Restored by legislation - Pub. L. No. 103-434, *codified at* 25 U.S.C. § 1300*l* et seq. |
| 3. Big Sandy (Big Sandy Rancheria of Mono Indians) | Restored by litigation - Big Sandy Band v. Watt, No. C-80-3787 MHP (N.D. Cal. 1989). |
| 4. Big Valley (Big Valley Rancheria of Pomo and Pit River Indians) | Restored by litigation - Tillie Hardwick v. United States, No. C-79-1710 SW (N.D. Cal.)(Stipulation for Entry of Judgment, filed Aug. 2, 1983). |
| 5. Blue Lake | Restored by litigation - Tillie Hardwick, *supra.* |
| 6. Buena Vista (Buena Vista Rancheria of Me-Wuk Indians) | Restored by litigation - Tillie Hardwick, *supra.* |
| 7 Cache Creek | Remains terminated. |
| 8 Chicken Ranch (Chicken Ranch Rancheria of Me-Wuk Indians) | Restored by litigation - Tillie Hardwick, *supra,* (Stipulation for Entry of Judgment, filed 3/14/89). |
| 9. Chico (Mechoopda Indian Tribe) | Restored by litigation - Scotts Valley Band, et al. v. United States, No. C-86-3660-VRW (N.D. Cal.) (Stipulation for Entry of Judgment, filed Jan. 6, 1992). |

---

[1] Tribes are listed as they appear in the Rancheria Act. If a tribe currently uses a different name, that name is included in parenthesis.

-1-

AR 52

| | |
|---|---|
| 10. Cloverdale (Cloverdale Rancheria of Pomo Indians) | Restored by litigation - *Tillie Hardwick, supra.* |
| 11 Cold Springs (Cold Springs Rancheria of Mono Indians) | Never terminated. |
| 12 Elk Valley | Restored by litigation - *Tillie Hardwick, supra.* |
| 13. Guidiville | Restored by litigation - *Scotts Valley Band, et al. v. United States,* No. C-86-3660-WWS (N.D. Cal.) (Stipulation for Entry of Judgment, filed Mar. 15, 1991). |
| 14. Graton (Federated Indians of the Graton Rancheria) | Remains terminated. |
| 15. Greenville (Greenville Rancheria of Maidu Indians) | Restored by litigation - *Tillie Hardwick, supra.* |
| 16 Hopland (Hopland Band of Pomo Indians) | Restored by litigation - *Smith v. United States,* 515 F.Supp. 56 (N.D. Cal. 1978). |
| 17 Indian Ranch | Remains terminated. |
| 18. Lytton | Restored by litigation - *Scotts Valley Band, et al. v. United States,* No. C-86-3660-WWS (N.D. Cal.) (Stipulation for Entry of Judgment, filed Mar. 22, 1991). |
| 19. Mark West | Remains terminated. |
| 20. Middletown (Middletown Rancheria of Pomo Indians) | Never terminated. |
| 21. Montgomery Creek (one of the land bases of the Pit River Tribe) | Never terminated. |

-2-

22. Mooretown (Mooretown Rancheria of Maidu Indians)

Restored by litigation - Tillie Hardwick, *supra.*

23. Nevada City

Remains terminated.

24. North Fork (Northfork Rancheria of Mono Indians)

Restored by litigation - Tillie Hardwick, *supra.*

25. Paskenta (Paskenta Band of Nomlaki Indians)

Restored by legislation - Pub. L. No. 103-454, *codified at* 25 U.S.C. § 1300m et seq.

26. Picayune (Picayune Rancheria of Chukchansi Indians)

Restored by litigation - Tillie Hardwick, *supra.*

27. Pinoleville (Pinoleville Rancheria of Pomo Indians)

Restored by litigation - Tillie Hardwick, *supra.*

28. Potter Valley (Potter Valley Rancheria of Pomo Indians)

Restored by litigation - Tillie Hardwick, *supra.*

29. Quartz Valley

Restored by litigation - Tillie Hardwick, *supra.*

30. Redding

Restored by litigation - Tillie Hardwick, *supra.*

31. Redwood Valley (Redwood Valley Rancheria of Pomo Indians)

Restored by litigation - Tillie Hardwick, *supra.*

32. Robinson (Robinson Rancheria of Pomo Indians)

Restored by litigation - Duncan v. Andrus, 517 F.Supp. 1 (N.D. Cal. 1977); Duncan v. United States, 667 F. 2d 36 (1981)(re: damages).

33. Rohnerville (Bear River Band of the Rohnerville Rancheria)

Restored by litigation - Tillie Hardwick, *supra.*

34. Ruffeys

Remains terminated.

35. Scotts Valley (Scotts Valley Band of Pomo Indians)

Restored by litigation - Scotts Valley Band, et al. v. United States, No. C-86-3660-WWS (N.D. Cal.) (Stipulation for Entry of Judgment, filed

-3-

## ACCIP TERMINATION TASK FORCE

*There was no formal task force assembled on termination.  George Freeman was the member of the Advisory Council who provided coordination on Termination issues.*

# TABLE OF CONTENTS

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.     The Historical Context of the Termination Policy in California . . . . . . . . . . . . . . . . . . 7

III.    History of the California Rancheria Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.     Implementation of the Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        A.      The failure to properly fund and plan the termination process . . . . . . . . . . . . . 13
        B.      The failure to ensure that the rancheria distribution plans actually met the
                Indians' needs and that water and sanitation facilities were provided
                as promised . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        C.      The failure to ensure that termination would not occur until the specific
                requirements of the Rancheria Act and the individual rancheria distribution
                plans had been met . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V.      The Trust Obligations of the Federal Government in the Termination Process . . . . . . . 16

VI.     Efforts to "Un-Terminate" or Restore California's Terminated Tribes . . . . . . . . . . . . 17

VII.    The Lingering Effects of Termination on California Tribes . . . . . . . . . . . . . . . . . . . 18
        A.      Effects on Tribes that Remain Terminated . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        B.      Effects on Restored Tribes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
                1.      The lack of a land base sufficient to support tribal housing and
                        economic development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
                2.      Difficulties encountered in reconstituting tribal communities under
                        a unified leadership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
                3.      The lack of supplemental "catch-up" funding to address newly
                        restored tribes' inability to effectively compete with tribes that
                        have never suffered termination . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
                4.      The lack of adequate technical assistance and support services to
                        guide and assist the tribes in the difficult process of restoration . . . . . . 22

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Endnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

AR 56

Appendix A: A Comprehensive History of the Rancheria Act

Appendix B: Status of Tribes Listed in the Rancheria Act

## LIST OF EXHIBITS

Exhibit 1: The Report of C.E. Kelsey to the Commissioner of Indian Affairs (1906).

Exhibit 2: Excerpts from the Deposition of Leonard M. Hill.

Exhibit 3: Excerpt from the Deposition of Maurice Babby.

Exhibit 4: Mem          ʾɯm of Sacramento Area Director to Area Indian Advisory Board, dated

Exhibit 5. Bu.ᴇ          ᴜᴅɪɑɴ ᴀɴɑɪʀs, "ᴅtudy of Wilton Rancheria."

AR 57

## Summary

The Termination Policy sought to end the special trust relationship between the United States and Indian people, which had been the cornerstone of federal-Indian relations since the United States' earliest years.  In light of the destitute living conditions of most California tribes, Congress intended termination of the trust relationship to take place only after specific services were provided to prepare them for the discontinuation of federal aid and supervision, and only after the affected tribe consented to termination.  In practice, however, the Executive branch achieved tribal consent through misrepresentation and undue influence, and then terminated federal status without providing the preparatory services.

Despite the fact that the termination policy has been expressly repudiated by both Congress and the Executive branch, some California tribes remain "terminated."  Moreover, those that have been restored have not received adequate federal assistance in reestablishing sovereign relations with the federal government, in strengthening their own governments, and in acquiring lands to replace those lost through termination.  This report addresses the historical context of the termination policy and the lingering effects of termination on California Indians, and contains recommendations for remedying the continuing effects of this failed federal policy.

AR 58

**Recommendations**

1.     **Congress should enact comprehensive legislation establishing a process for the expedited restoration of the remaining terminated California tribes, including modification of the criteria used to evaluate requests for tribal restoration.**

        Though termination has not been the official policy of the federal government since 1970,[1] there has not been a single comprehensive piece of federal legislation to restore the remaining terminated California tribes. This is particularly striking in light of the fact that the federal government has lost or settled all of the California rancheria un-termination cases litigated over the past quarter century. Certainly, Congress has shown its awareness of the need for restoration of terminated tribes by passing at least 12 individual restoration bills between 1973 and 1990.[2] It was not until 1993, however, that Congress finally acted to legislatively restore any terminated California tribes. The two tribes restored by Congress—the Paskenta Band of Nomlaki Indians and the United Auburn Indian Community—bring the total number of California tribes restored through litigation or legislation to twenty-nine.

        Today, of the 38 California rancherias terminated under the Rancheria Act of 1958, nine remain terminated.[3] Of these, at least three would meet the following criteria used by the Federal government in evaluating a terminated tribe's eligibility for restoration:[4]

        1.     there exists an ongoing, identifiable community of Indians who are members of the formerly recognized tribe or who are their descendants;

        2.     the tribe is located in the vicinity of the former reservation [or rancheria or other lands set aside for their use];

        3.     the tribe has continued to perform self-governing functions either through elected representatives or in meetings of their general membership;

        4.     there is widespread use of their aboriginal language, customs and culture;

        5.     there has been a marked deterioration in their socioeconomic conditions since termination; and

        6.     their conditions are more severe than in adjacent rural areas or in other comparable areas within the State.[5]

        Generally, Criteria 5 and 6 have not been an issue in the restoration of terminated California tribes because the effects of termination were so devastating, economically and socially. Moreover, despite the negative effects of termination on tribal organization and culture in California, most of California's terminated tribes do not have trouble meeting Criteria 4.[6] Criteria 1, 2 and 3, however, have proven the most difficult to meet for tribes seeking restoration.

        Criteria 2 and 3 should be modified or eliminated. Termination often resulted in the loss of land to creditors and tax sales. Moreover, the former rancherias were often located in economically depressed areas, and tribal members reasonably chose to move to more urbanized areas to seek employment. In addition, termination removed two major factors that contributed

AR 59

to the political cohesiveness and function of the tribal entity—tribal communal lands and the federal-tribal trust relationship. When the government distributed tribal lands per capita and severed the trust relationship, the focus of the tribal community naturally shifted from a communal self-governing function based on a common interest in tribal land and federal Indian programs, to individual survival. Tribal relationships receded from formal self-governing functions required by the common ownership of land and common interest in the benefits of the federal-tribal trust relationship to more subtle, less formal, social, economic, and religious interactions between tribal members. Thus, requests for restoration of terminated California tribes should be evaluated under criteria that take account of those factors inherent in the termination process which discouraged Indian people from remaining on their former lands and removed the incentive for them to continue to maintain a formal governing structure.

**2.      Congress should appropriate funds to assist those terminated California tribes seeking restoration.**

Terminated tribes seeking restoration must employ attorneys, anthropologists and other expert             them prove that they meet the government's criteria for restoration. To defray these and other costs of the tribal restoration effort, terminated tribes usually turn to charities and select public agencies, such as the Administration for Native Americans (ANA) and the State of California's Indian Assistance Program,[7] for seed money to begin the challenging process of initiating and coordinating the effort to restore tribal status through litigation or legislative advocacy. Unlike unacknowledged tribes seeking federal recognition, the terminated tribes have no access to technical assistance or support from the Bureau of Indian Affairs (BIA)[8] In essence, the tribe bears the entire administrative and financial burden of reversing the effects of a policy that the Federal government itself now recognizes as misguided.

A good example of the commitment and effort necessary to achieve restoration is the seven-year saga of the Scotts Valley Band of Pomo Indians, one of the rancherias terminated under the original Rancheria Act.[9] Beginning with only a handful of tribal members who had moved after termination to find employment in widely dispersed California counties, this small band held meetings in the homes of tribal members; relied on donations from tribal members to defray the expenses associated with organizing the community, updating its membership roll, and scheduling and conducting meetings; and used the resources of a local Indian Seniors' Center in Ukiah, California, to coordinate its efforts with those of three other terminated tribes. Assisted by the donated time of a local economic development planner, the Band developed a three-year budget and plan for restoration. These were eventually used as a model for allocation of special federal appropriations to the Band and three other tribes scheduled for restoration as part of the negotiated settlement in <u>Scotts Valley Band of Pomo Indians, et al. v. United States</u>.[10] Thus, with no financial resources and just a core group of tribal members who committed their time to the restoration effort, the Band was able to reverse its termination and begin the longer-term process of redressing the social and economic effects of termination.

-3-

3.  **Congress should appropriate supplemental "Restored Tribes" funding for newly restored California tribes.**

With respect to newly-restored tribes, the initial tasks faced by the tribes are the development and adoption of comprehensive governing documents, obtaining funds for land acquisition and essential tribal operations, and reestablishing a working partnership with the BIA and other federal agencies.  These essential tasks, which present problems to even well-established tribes, often threaten to overwhelm a newly-restored tribe because of the lingering effects of termination.  Without "Restored Tribes" or some other form of supplemental funding, newly restored tribes often lack the means to establish and minimally staff a tribal office as a base of tribal operations.  Though the challenges of operating tribal programs and exploring options for economic development are imposing even when funds are available, the difference is that, with supplemental funding, the tribe possesses the financial means to begin developing the capacity to carry out these self-governing functions.

The "Restored Tribes" funding is also a gesture of good faith and a sound investment by Congress in Indian tribes whose tenacity in seeking restoration will likely be replicated in pursuit of their status and interests as self-governing entities.

4.  **Congress should enact legislation (a) stating that it is the policy of the United States Government, in carrying out its public and other federal land management functions, to assist newly restored California tribes to identify and acquire public and other federal lands, which have been or may be classified as available for disposal under federal law, for the purpose of meeting tribal housing and economic development needs; and (b) directing federal agencies to consult with the tribes in identifying such public and other federal lands within or near the aboriginal territories of the tribes suitable for such purposes.**

The restored California tribes each have a very limited land base, or no land at all.  The lack of an adequate land base is the primary limiting factor in the efforts of restored tribes to reconstitute their tribal governments, provide housing for tribal members, and develop local economies.  Without the ability to acquire federal lands in trust, the primary means of funding tribal land acquisition for housing and economic development is the Department of Housing and Urban Development's Indian Community Development Block Grant Program.  In the past, this program has given many California tribes the funding they needed to acquire small parcels of private land, primarily for housing.  Its effectiveness today for this purpose is more limited.  This is due to the increasingly tight restrictions that the Secretary of the Interior has placed on the fee-to-trust land acquisitions, coupled with the State of California's heightened scrutiny of fee-to-trust transfers because of their potential to give the tribes the means of engaging in gaming operations, which have proven to be a successful vehicle for tribal economic development.  These factors have stalled tribal efforts to expand their limited land base and develop economically feasible operations capable of generating jobs for tribal members and revenues for provision of essential tribal governmental services, such as education, health care, housing, and reservation

-4-

infrastructure improvements.

California tribes, especially those which have had their federally recognized status restored, need affirmative action by Congress to simplify the transfer of federal lands for the creation or expansion of tribal homelands. The current federal land acquisition regulations and policies are simply not adequate to address the immediate needs of these tribes or, for that matter, most of California's recognized tribes. The restored tribes need a congressional remedy responsive to their unique situation, as well as that of the other landless or land-poor California tribes.

5.  **The Wilton Miwok Indian Community, the Federated Indians of the Graton Rancheria, and the Mishewal Wappo Tribe of Alexander Valley should be immediately restored by Congress. In addition, the other six tribes that remain terminated should receive special consideration, according to criteria modified as recommended above, when they are ready to seek restoration.**

The Wilton Miwok Indian Community, the Federated Indians of the Graton Rancheria, and the Mishewal Wappo Tribe of Alexander Valley meet the current criteria for restoration, and should thus be immediately restored.

6.  **Congress should enact legislation declaring that it is the policy of the United States to not interfere with decisions regarding enrollment and eligibility criteria for restored tribes, and that no federal agency should try to influence a restored California tribe to limit its membership to persons listed on the distribution roll prepared pursuant to the Rancheria Act, and their descendants.**

In its advisory capacity to newly restored tribes, the BIA often urges the tribes to confine their membership to persons appearing on the distribution list prepared during termination, and their descendants. This advice interferes with the tribes' exclusive sovereign power to determine tribal membership, sows conflict among different groups of potential members, and ignores the fact that many tribal members were arbitrarily omitted from the distribution list in the first place. However, because the advice also serves to limit the scope of the BIA's trust responsibility, it is unlikely that the BIA will abandon this practice without legislative direction to do so.

AR 62

## I.       Introduction

The Termination Policy sought to end the special trust relationship between the United States and Indian people that had been the cornerstone of federal-Indian relations since the United States' earliest years.  It represented another destructive Indian policy that reverberated throughout the smallest and most vulnerable of California's tribal communities.  Like the Allotment Policy of an earlier era, implementation of the Termination Policy in California set in motion a series of events that disrupted tribal institutions and traditions, ultimately resulted in the divestment of these small tribes and their constituent members of the majority of their lands, and left the tribes in a more desperate and impoverished state than before.

Through termination, Congress sought to wind up the affairs of certain designated tribes by terminating federal supervision over the tribes, their eligibility for federal benefits, and their coverage under federal Indian laws.[11]  Some supporters of the policy claimed it would liberate the Indians from excessive federal supervision, and finally bestow the full privileges of United States citizenship on them.[12]  The overriding effect of the Termination Policy, however, was the loss of Indian land to private, non-Indian ownership.  Any progress toward self-governance engendered among these tribes by the Indian Reorganization Policy of the 1930s and 1940s was reversed, and a ̀ ͘ ̄ ̀ ̀ ͘ ̀ ̀ ̇ peoples and cultures into the American mainstream became the ultimate goal.  The termination experiment, like the Allotment Policy, failed to improve the socioeconomic and political situation of the Indians affected.

While Congress and the Executive branch both have acknowledged the failure of the termination policy, they nevertheless have left unremedied most of the devastating effects of that policy.  Nationally, Congress has addressed the restoration of terminated tribes on a piecemeal, case-by-case basis.  It has never taken the initiative to legislate a comprehensive, national approach to the restoration issue, including remedial measures to redress the continuing effects of termination.  Instead, the burden remains on the very tribes that were financially and culturally devastated by termination to persuade Congress to reverse the misguided federal actions of an earlier era.  In the meantime, these terminated tribes have extremely limited access to government services and benefits, especially those that foster and support tribal self-determination; their lands are not secured by federal trust status for future generations of tribal members; and they enjoy less federal protection of their cultural heritage than recognized tribes.

While most of the terminated tribes in California have been restored to their status as federally recognized tribes through litigation or legislation, the effects of termination have not been reversed.  Termination ended the federal trust status of tribal lands and broke up tribal communal land holdings by distributing the lands per capita to selected tribal members—the "distributees"—and their families.  As a result, most of the rancheria lands passed into non-Indian hands within a relatively short period of time.  This process was accelerated by the extreme poverty and high unemployment among the Indians and the failure of the Bureau of Indian Affairs (BIA) to prepare them for state taxation and regulation of their lands.  In addition, the lack of adequate water and sanitation facilities decreased the utility and value of the rancheria lands and

-6-

AR 63

created health problems for rancheria residents. In most cases, the restored tribes have not fully recovered from the effects of termination, especially the loss of tribal lands. Some restored tribes remain without a land base at all. Overall, even the relatively small amount of private land that the restored tribes have acquired and placed in trust status for housing and economic development purposes has not been adequate. Where former rancheria boundaries have been restored by judicial fiat, the existence of privately owned parcels within the boundaries engenders resistance to tribal jurisdiction and authority.[13] In general, restored tribal governments continue to suffer the effects of the years during which their relationship with the federal government was severed, and thus are disadvantaged in competing for project funding with tribes who have well-established relationships with federal officials and broader experience in dealing with federal agencies.

This report examines the historical context of the termination policy and its implementation in California, details the lingering effects of termination on tribes that remain terminated and those that have been restored, and presents specific recommendations for remedial federal action.

**II.    The Historical Context of the Termination Policy in California**

In reviewing the Termination Policy as it was implemented in California under the Rancheria Act of 1958, one must keep in mind that its effects were cumulative—termination occurred in the larger context of a previous history of federal neglect and inconsistent policies toward the California Indians. Without an appreciation of that context, one cannot fully comprehend the impact that termination had on Indian people who witnessed the further erosion of their way of life, and the complete withdrawal of federal trust protection of their lands and people—all occurring under the guise of a federal policy that promised more, but rendered less, always less.

Federal Indian policy most closely resembles a pendulum that, once exhausted at the limit of its political arc, reverses course and swings to an equally extreme limit in the opposite direction, and so on. Federal policies with respect to the California Indians were no exception to this general pattern, but the effects of these pendulous swings on the California tribes were especially harsh due to the confluence of a number of unique historical events.

Pursuant to the 1848 Treaty of Guadalupe Hidalgo, all lands of California were ceded to the United States by the Republic of Mexico. Nine days before the Treaty was signed, gold was discovered at Sutters Mill on the south fork of the American River, setting off one of the greatest migrations in history.[14] This unprecedented influx of non-Indians totally disrupted the Indian way of life, dislodged most California tribes and bands from their aboriginal territory, and caused a drastic reduction in the Indian population. On September 9, 1850, California was admitted as a state to the Union.[15]

Between 1851 and 1852, eighteen treaties were negotiated with 139 Indian signatories. The treaties would have established an Indian land base in California of approximately 8.5 million

-7-

AR 64

acres. In reliance on the treaties, many Indians moved to the lands that were to be set aside. The treaties, however, were rejected by the United States Senate, leaving the Indian signatories without a protected interest in the lands ceded by the treaties or the purported reservations.[16] Because the Senate also sealed the file on these treaties, the tribes were not notified of the Senate's rejection of the treaties until 1905.[17]

By the turn of the century, the California Indian population had been reduced from an estimated 150,000 to approximately 16,500.[18] Despite Congress' attempt to protect the occupancy rights of California Indians,[19] 11,300 of those survivors had been displaced from their aboriginal homes, and had no land base.[20]

Following the publication of Helen Hunt Jackson's "A Century of Dishonor" in 1881,[21] public attention began to focus upon the destitute state of these so-called "landless" Indians. The Com··· ···ndian Affairs initiated an investigation in response to reports that the California Indians were literally starving to death. Congress thereafter authorized an investigation of the existing conditions of Indians in Northern and Central California, and directed the Commissioner to report to Congress "some plan to improve the same."[22] C. E. Kelsey, a San Jose attorney and officer of the Northern California Indian Association, was appointed Special Agent to the ···· ···ry out the Congressional mandate.

Six months from the date of his appointment, Kelsey completed his report and submitted it to the Commissioner of Indian Affairs. According to his report, Agent Kelsey "visited and personally inspected almost every Indian settlement between the Oregon line and the Mexican border."[23] Kelsey found that, for the most part, Indians in Northern California consisted of small, scattered bands and remnants of bands averaging about 50 in number. The Indians were forced to live on lands abandoned by settlers as unusable.[24]

Kelsey attributed the continuing decreases in Indian population in the state to the lack of a secure Indian land base. He noted that "[t]he entire Indian population of Northern California has decreased. . . by about 1,100 in the last three years, most of the decrease being in the landless bands."[25]

Kelsey emphasized the need for immediate relief for the homeless Northern California Indians.[26] He recommended that Congress buy small parcels of land for these destitute and displaced Indians, and indicated "that the land should be of good quality with proper water supply, and shall be located in the neighborhoods in which the Indians wish to live."[27] He also made specific recommendations for the improvement of the reservations in Southern California.[28]

On March 29, 1906, the Commissioner of Indian Affairs, after "a comprehensive review," approved Kelsey's report and ". . . strongly urge[d] that Congress be requested to make an appropriation of sufficient amount to enable the Department to carry out the plans proposed."[29]

The Senate acted on this recommendation by amending the Indian Office appropriation bill

AR 65

to include an additional appropriation of $100,000 to purchase lands for homeless California Indians. The House assented to the Senate amendment, and the bill was enacted as part of the Indian Office Appropriation Act of 1906.[30]

The 1906 appropriation was followed by similar appropriations on an almost annual basis through 1933,[31] just prior to the enactment of the Indian Reorganization Act (hereafter "IRA") in 1934.[32] That Act delegated specific authority to the Secretary of Interior to acquire land for Indians.[33] The land acquisition program for the homeless California Indians ultimately resulted in the creation or purchase of some 82 rancherias.[34] These rancherias, however, did not always provide proper homesites, irrigable land, a water supply, and other necessities. In fact, several rancherias were virtually uninhabitable due to the lack of a fresh water supply.[35] Thus, the main goal of ··      .i acquisition program—to provide homeless California Indians with a secure and usable land base—was not realized in most cases. Nevertheless, the lands that were acquired did provide a refuge, if only temporary, and limited means of subsistence to many California Indians. However, because of the poverty, low educational achievement, and the small, isolated nature of the rancheria communities, they became the most vulnerable targets of the termination policy.

III.     History of the California Rancheria Act

The IRA and other New Deal legislation generally encouraged tribal autonomy and self-determination of Indian tribes. Beginning in 1944, however, another change in federal Indian policy fur..    ....  ..  .   . :oblems on the rancherias. Forces within the BIA began to propose partial liquidation of the rancheria system.[36] At this early date, this recommendation was prompted, in part, by a sincere dissatisfaction with the inherent problems that existed as a result of the way the rancherias were acquired and managed by the federal government.

Following the resignation of Commissioner John Collier in February of 1945, those who favored the rapid, total and—if necessary—involuntary assimilation of Indians into the "mainstream" of dominant white society gained great influence with the BIA.[37] Shortly thereafter, termination became the focal point for Congress' federal Indian policy.

The BIA in California launched a massive effort to convince Congress that all of the California Indians residing on trust lands were ready for termination.[38] Many of those familiar with the situation of the Indians in California, including Felix Cohen, the great Indian law scholar, disagreed. The Association on American Indian Affairs (AAIA), joined by Mr. Cohen, registered strong dissents with Congress over the process outlined in the early bills for withdrawal of federal responsibility and services in California. The following statement by the AAIA, echoed in letters and statements from many of the California Indians themselves, illustrates the significant break from prior federal Indian policy that termination represented:

The legislation bears internal evidence of a marked change from the enlightened constructive Federal policy in Indian affairs of recent years. The former policy stood for honorable fulfillment of Federal obligations, constructive rehabilitation

-9-

AR 66

of impoverished Indian groups, and increasing Indian self-government and self-determination. The policy embodied in the proposed legislation is that the Federal government's only Indian concern is with restricted Indian property, and that it is exclusively for the Federal government to decide when and how to end its responsibilities in that regard. All other obligations toward the Indian, whether based on treaty, statute, charter, agreement, or common decency may be disregarded and forgotten. From this standpoint the proposed legislation is not only unwise and unsound, it is immoral and an affront to the dignity and honor of the United States.[39]

This assessment that federal withdrawal from California represented yet another breach of trust with the California Indians merely slowed the juggernaut of termination. Strong resistance from southern California's mission bands resulted in their eventual exclusion from the process; other, larger tribes, such as Round Valley, Hoopa and Tule River also prevailed in their resistance. Ultimately, it was the smaller, more isolated rancheria communities that became targeted for termination.

Congressional Committees, the BIA, and the California Legislature considered the issue of termination for several years,[40] until Congress officially adopted it as a broad national Indian policy in 1953 by Concurrent Resolution.[41] The express goal of termination was

to make the Indians within the territorial limits of the United States subject to the same laws and entitled to the same privileges and responsibilities as are applicable to other citizens of the United States, [and] to end their status as wards of the United States . . .[42]

The Resolution further declared it "to be the sense of Congress that, at the earliest possible time, all of the Indian tribes and the individual members thereof located within the States of California, Florida, New York, and Texas. . . should be freed from Federal supervision and control. . .," and that the BIA should thereafter be abolished in those states. Congress slated at least five additional tribes in other states for termination.[43]

That same year, Congress passed Public Law 280,[44] which transferred civil and criminal jurisdiction over Indian land to the States included in the Act.[45] California was the only State named in both the Concurrent Resolution espousing termination and Public Law 280. Shortly after the passage of these two Acts, the BIA drastically reduced services to all California Indians,[46] even though no California tribes were actually terminated until 1961.[47] In fact, federal health services for California Indians were completely discontinued by 1955.[48] This discontinuation of services continues to be felt in California, since federal agencies tend to base current funding on historic funding levels.

Around this time, there were roughly 500,000 acres of federally owned land held for the use and/or occupancy of California Indians, which the BIA considered to be of generally poor

-10-

AR 67

quality. Only 60,000 acres, mostly in Southern California, were considered suitable for irrigation and cultivation. Only 10,000-12,000 acres were actually under cultivation in 1952, and half of this acreage was located on a single reservation. In addition, the BIA had reduced its presence in California to one agency, staffed by 150 full-time employees, and its health and education services had been drastically reduced. The median family income among Indians residing on reservations in California was between $2,500 and $3,500 per year, and on many of the rancherias the median family income was much less. Moreover, on all of the rancherias there was a substantial need for improvements to roads, housing, water systems, irrigation and sanitation systems; and among the residents, a need for vocational education assistance, health care and social services, because of the poor economic conditions.[49]

Given the deplorable living conditions on many of the rancherias, the State of California and California tribes vigorously opposed early termination legislation that did not provide assistance to tribes to prepare them for the termination of federal supervision and benefits.[50] Their successful resistance to termination without adequate preparation for and funding of the process was short-lived.

Following several failed attempts at terminating California tribes, the Rancheria Act was passed by the House of Representatives on August 13, 1957.[51] In the Senate, the California termination bill was passed on July 18, 1958,[52] with an amendment that increased the number of affected rancherias from 14 to 41.[53] The House concurred in the Senate amendments on August 7, 1958, and H.R. 2824 was signed by the President on August 18, 1958.[54]

The California Rancheria Act of 1958[55] was aimed at terminating the trust relationship between the United States and the listed tribes only after the affected Indians had been prepared for the end of federal supervision and benefits. Thus, a central feature of the Act provided that physical improvements were to be made to the listed rancherias, so that the Indian distributees would receive marketable title. "Before making the conveyances authorized by this Act," the Secretary of Interior was directed:

1. to make such land surveys of the rancherias as were necessary to convey marketable title to the lands comprising the rancherias;

2. to construct or improve roads serving the rancherias (e.g., access roads) to the standards of the counties where the rancherias were located and transfer the roads to the county road systems upon termination; and

3. to install or rehabilitate such irrigation and domestic water systems as the Secretary and the Indians affected agreed should be completed.[56]

In addition, the Secretary was:

authorized to undertake . . . a special program of education and training designed

-11-

to help the Indians to earn a livelihood, to conduct their own affairs, and to assume their responsibilities as citizens without special services because of their status as Indians.[57]

Another distinctive feature of the Act was that termination was not to be imposed on the listed tribes without their consent. "Section 2(b) manifests the clearly *permissive* character of any execution of the plan, mandating that the plan be carried out only if approved by a majority of the Indians voting in a referendum."[58] Sections 1 and 2(a) made the formulation of a plan mandatory, but section 2(b) gave the Indians the choice of either accepting or rejecting it. There was nothing in the Act which required the Indians of a rancheria eventually to accept a plan, or which gave the Secretary of the Interior any authority to override their vote to reject a plan.[59]

By the Act of August 11, 1964,[60] Congress materially amended the 1958 Rancheria Act. The Act's provisions were extended to all rancherias and reservations "lying wholly within the State of California." Except in the case of the original 41 rancherias named in section 1 of the 1958 Act, however, the process of developing a distribution plan could only be started after distribution had been "requested by a majority vote of the adult Indians of a rancheria or reservation . . .". This amendment allowed the Indians to veto termination at the very outset of the process.[61] The significance of this modification is underscored by the fact that it appears that only two tribes elected to proceed with termination under the amended Rancheria Act.[62]

Despite the permissive nature of the Rancheria Act, for the most part it was presented to the California tribes targeted for termination as a *fait accompli* and their best chance of obtaining some measure of federal assistance before the BIA withdrew entirely from California. From the very outset, it was a process skewed heavily toward ending the federal trust responsibility to as many California tribes as possible in the least costly manner. It is not surprising, then, that the mandates of the Rancheria Act were violated regularly and with impunity by overzealous bureaucrats intent on achieving the overarching goal of assimilating tribal communities into the social and economic mainstream of American life by withdrawing all special protections afforded Indian people and lands under the federal Indian laws.

## IV.   Implementation of the Act

The government's implementation of the Rancheria Act can only be described as a resounding failure. In fact, in every case where a court reviewed the government's actions taken pursuant to the Rancheria Act, the court found the termination to be unlawful, and that the trust responsibility owed to Indian people had been breached.[63] Indeed, in the majority of these cases, the government itself admitted that termination was unlawful, and chose to litigate only those issues related to the question of what was an appropriate remedy.[64] Thus, there is no question that the government failed to properly implement the Act. This, however, does not end the inquiry. An understanding of what the basic obligations of the government were under the Act, and how it failed the Indian beneficiaries in its discharge of these obligations, is essential to a complete understanding of the continuing consequences of termination.

-12-

AR 69

Pursuant to the Rancheria Act, the affected tribes consented to termination in reliance on representations that the U.S. government would provide the tribes with the education and physical improvements necessary to break the tribes' dependence on government programs. Thus, the tribes agreed to relinquish the limited federal aid they had received in the hope that their standards of living would finally improve. The government, however, consistently failed to provide the services mandated by the Rancheria Act and promised in the termination agreements. Thus, rather than liberating Indians from government control and dependency on federal benefits, the government's unfulfilled promises, coupled with the simultaneous withdrawal of federal services, guaranteed that living conditions would only get worse.

The implementation of the Rancheria Act took place in three phases. First, a plan for distribution of the assets of the particular rancheria was developed, and the persons deemed eligible to participate in the distribution (so-called "distributees") voted to approve or reject the plan. Second, the improvements mandated by the Act and set forth in the distribution plan were to be provided by the BIA and the Indian Health Service (IHS). Finally, the BIA Sacramento Area Director was to submit a completion statement to the Secretary for approval and, if approved, the Secretary would publish a termination proclamation in the Federal Register. The Secretary delegated his authority to approve distribution plans and termination proclamations to the Commissioner of Indian Affairs.

Major problems with implementation of the Rancheria Act can be attributed to the fact that the Secretary did not promulgate any regulations governing the preparation of distribution plans or the provision of the improvements promised in the plans and mandated by the Act. Nor were there any regulations governing the determination of when improvements had been satisfactorily completed. The only written policies developed by the Interior Department to implement the Act provided a procedure for obtaining approval of a proposed distribution plan by the distributees and by the Secretary of the Interior.[65]

As the following discussion demonstrates, the Bureau's presentation of termination as a *fait accompli* compromised the consensual aspect of the distribution plans. In its rush to conclude the termination process, the BIA failed to adequately consider the Indians' needs and to prepare them and their property for the full imposition of state and local taxing and regulatory jurisdiction. The consequences of the government's failure to fulfill its statutory and fiduciary obligations to the Indians at each stage of the termination process were devastating.

A.     The failure to properly fund and plan the termination process

Under the 1958 Act, a plan to distribute the assets of the rancheria was to be devised for each rancheria named in the Act.[66] Immediately after the Act was passed, the BIA notified all listed rancherias that it intended to develop distribution plans for them as rapidly as possible.[67] Since no regulations governing the preparation of distribution plans were ever promulgated, the Commissioner of Indian Affairs approved distribution plans based solely on the plan itself and the recommendation of the Sacramento Area Director.

-13-

Pursuant to the Rancheria Act, the affected tribes consented to termination in reliance on representations that the U.S. government would provide the tribes with the education and physical improvements necessary to break the tribes' dependence on government programs. Thus, the tribes agreed to relinquish the limited federal aid they had received in the hope that their standards of living would finally improve. The government, however, consistently failed to provide the services mandated by the Rancheria Act and promised in the termination agreements. Thus, rather than liberating Indians from government control and dependency on federal benefits, the government's unfulfilled promises, coupled with the simultaneous withdrawal of federal services, guaranteed that living conditions would only get worse.

The implementation of the Rancheria Act took place in three phases. First, a plan for distribution of the assets of the particular rancheria was developed, and the persons deemed eligible to participate in the distribution (so-called "distributees") voted to approve or reject the plan. Second, the improvements mandated by the Act and set forth in the distribution plan were to be provided by the BIA and the Indian Health Service (IHS). Finally, the BIA Sacramento Area Director was to submit a completion statement to the Secretary for approval and, if approved, the Secretary would publish a termination proclamation in the Federal Register. The Secretary delegated his authority to approve distribution plans and termination proclamations to the Commissioner of Indian Affairs.

Major problems with implementation of the Rancheria Act can be attributed to the fact that the Secretary did not promulgate any regulations governing the preparation of distribution plans or the provision of the improvements promised in the plans and mandated by the Act. Nor were there any regulations governing the determination of when improvements had been satisfactorily completed. The only written policies developed by the Interior Department to implement the Act provided a procedure for obtaining approval of a proposed distribution plan by the distributees and by the Secretary of the Interior.[65]

As the following discussion demonstrates, the Bureau's presentation of termination as a *fait accompli* compromised the consensual aspect of the distribution plans. In its rush to conclude the termination process, the BIA failed to adequately consider the Indians' needs and to prepare them and their property for the full imposition of state and local taxing and regulatory jurisdiction. The consequences of the government's failure to fulfill its statutory and fiduciary obligations to the Indians at each stage of the termination process were devastating.

A.    The failure to properly fund and plan the termination process

Under the 1958 Act, a plan to distribute the assets of the rancheria was to be devised for each rancheria named in the Act.[66] Immediately after the Act was passed, the BIA notified all listed rancherias that it intended to develop distribution plans for them as rapidly as possible.[67] Since no regulations governing the preparation of distribution plans were ever promulgated, the Commissioner of Indian Affairs approved distribution plans based solely on the plan itself and the recommendation of the Sacramento Area Director.

-13-

Once the distribution plan had been approved, a prescribed notice was required, after which any Indian could submit to the Area Director any objections to the plan.[68] After reviewing objections, the Secretary was required to hold a referendum election among the distributees. If approved by a majority of the distributees, the plan became final.[69]

In the implementation of the Rancheria Act, the Secretary of the Interior and the BIA secured the tribes' approval of the termination/distribution plans through misrepresentation and undue influence. The tribes agreed to termination in reliance on the government's promises to make desperately needed improvements to the rancherias. It appears, however, that the BIA knew at the outset of this process that the promised improvements would never be made. Under the terms of a secret agreement with some members of the Congressional subcommittee that reviewed the legislation, the BIA agreed not to seek any special appropriation to carry out the specific obligations imposed on the government under the Rancheria Act.[70] As a result of this agreement, the BIA funded its implementation activities entirely out of its regular appropriations for California, hence the gross under-funding of the termination program (and the benefits promised to the Indians under the Act). Moreover, this action diverted the already inadequate funding of BIA programs for those California reservations and rancherias not included in the legislation, to support the termination process. Thus, implementation of the termination policy had far-reaching effects that extended beyond the rancherias, and impacted California tribes that had not even been slated for termination.[71]

In addition, the BIA failed to inform the tribes that the physical improvements and educational programs offered in exchange for termination were already available through 42 U.S.C. §§ 2004a and 2004b, which sought to improve conditions on Indian trust land in regards to roads, sewers, water supply, and educational opportunities. The BIA also used undue influence to secure each tribe's approval of the distribution plan by representing that agreement to termination was the only way to secure needed improvements, and dropping from the tribal rolls members who opposed termination.[72]

Even more importantly, however, the BIA failed to disclose the economic, social and cultural consequences of termination, including its effect on future members of the community in areas such as religion, Indian education programs, and tribal sovereignty. Generally, termination of a tribe's status resulted in the transfer of tribal lands held in trust to private ownership, transfer of jurisdiction over tribal lands from the federal government to the state, and discontinuance of federal services arising from the trust responsibility.[73] Thus, terminated tribes lost all protection of their traditional way of life. Being classified as "Non-Indians" by the government meant the loss of religious rights granted only to Native people, loss of access to special Indian education programs for tribal children, and the loss of the ability to be heard at the federal and state level as Native American people. These issues were not even raised, let alone discussed, with the tribes proposed for termination; on the contrary, the government presented the Rancheria Act as if it would solve the tribes' economic problems and improve Rancheria infrastructure without altering their cultural and political identity.

-14-

B.    The failure to ensure that the rancheria distribution plans actually met the Indians'
needs and that water and sanitation facilities were provided as promised

After a tribe approved a distribution/termination plan, both the Secretary and the BIA
failed to execute the duties arising under that plan and under the Rancheria Act itself. Despite the
Congressional mandates and authorization for a $509,235 appropriation to carry out the
provisions of the Act, virtually none of the promised improvements were ever made, nor were any
educational programs provided.

The Secretary did not promulgate regulations, or even establish Department policies, to
govern the provision of the improvements mandated by the Act. Thus, no uniform standards were
established for determining a rancheria's needs, and there was nothing to ensure that the
improvements provided would comply with the state and county standards. The BIA took the
position that such compliance was unnecessary.[74] This position was contrary to Section 3 of the
Act, and created difficulties for the rancheria residents after termination, when the state and
counties acquired jurisdiction over the rancherias.[75] On the Redwood Valley Rancheria, for
example, the BIA installed shallow wells operated by hand pumps. The houses lacked any indoor
plumbing, including flush toilets. After the deeds were distributed, county health officials cited
the houses because the absence of indoor plumbing violated the Mendocino County health code.
The residents were given thirty days to install adequate sanitation facilities, at their own expense,
to avoid condemnation of their houses.[76]

Nor did any regulation or policy require that distribution plans detail the improvements to
be provided under the plans. Rather, the plans generally described existing conditions on the
rancheria and the improvements requested by the distributees in conclusory terms. For example,
the plan for the Graton Rancheria described the need for water as follows: "Domestic water is
obtained from a stream which runs through the property. A need for the development of an
adequate domestic water system exists."[77] Accordingly, the plan required the BIA to "Develop a
domestic water system, either by providing individual wells or by construction of a water
distribution system or a combination thereof . . ."[78] These provisions of the Graton Plan are
typical of those plans which found that a need for water works existed.[79] None of the distribution
plans sent to the Commissioner for approval provided the specifications to be used in making any
of the Section 3 improvements requested in the plans.

The BIA did adopt several informal policies, however, that established limits on the extent
of the improvements that would be provided. Specifically, the BIA refused to install indoor
plumbing in any house, and refused to provide water to parcels of rancheria property upon which
a house was not constructed.[80] This resulted in poor sanitation, including potential contamination
of existing water sources, and imposed an immediate limitation on the individual distributee's
ability to use or develop the land as a homesite. In the absence of a water distribution system,
there was little motivation, much less money, to use the land for residential purposes.

-15-

C.   The failure to ensure that termination would not occur until the specific requirements of the Rancheria Act and the individual rancheria distribution plans had been met

Other than the general requirement that the Secretary determine that the provisions of a distribution plan "had been carried out to the satisfaction of the Secretary,"[81] there were no formal written rules or regulations governing the procedure for determining whether the improvements were adequate, prior to publishing a termination proclamation in the Federal Register.  In practice, the Area Director would consult informally with the personnel responsible for each improvement (e.g., road engineer, irrigation engineer), and when he was told that the improvements had been completed, "... then somebody sat down and wrote the completion statement."[82]

The completion statements generally contained conclusory language that all provisions of the distribution plan had been completed.  The statements contained no details about the alleged improvements.  For example, the completion statement for the Graton Rancheria states: "A domestic water system was provided by developing a well and constructing a water distribution system."[83]  The Graton completion statement, like its distribution plan, is typical of the completion statements prepared for the other terminated rancherias.

The Commissioner of Indian Affairs approved the publication of the termination proclamations for each rancheria.  No regulations were in place to govern his determination, and in practice the Commissioner based his decision solely on his review of the completion statement. After approval of the completion statement by the Commissioner, the Secretary published the termination proclamation in the Federal Register, declaring those persons listed in the proclamation to be ineligible for benefits and services available to Indians based on their status as Indians.[84]

V.   The Trust Obligations of the Federal Government in the Termination Process

The trust relationship between the United States and the California Indians pre-existed the passage of the Rancheria Act and was acknowledged and confirmed in the Act itself.[85]  "The federal government has long been recognized to hold, along with its plenary power to regulate Indian affairs, a *trust status toward the Indian—a status accompanied by fiduciary obligations.*"[86]

As the trustee for the Indians affected by the Rancheria Act, the Secretary of the Interior was bound to deal with the beneficiaries of that trust according to the same rigorous standards which govern relations between private trustees and beneficiaries.[87]  Judicial interpretations of the Rancheria Act establish that the fiduciary obligations of the United States toward the Indian people under the Act were to continue in full force until the termination process had been completed.[88]  Thus, until the moment of actual termination, federal actions taken to implement the Rancheria Act were bound and constrained by the trust duties of the United States to Indian

-16-

people.  The un-termination cases make it clear that the Secretary and the BIA failed to fulfill their fiduciary responsibilities in implementing the Rancheria Act.[89]

In addition, based on the standards announced by the United States Supreme Court in Morton v. Ruiz, 415 U.S. 199 (1977), the Secretary and the BIA were required to promulgate substantive standards, in conformity with the procedures required by the Administrative Procedure Act (APA),[90] to establish a rational basis for providing services under Section 3 of the Act.  Thus, the Secretary's failure to promulgate such standards was a violation of the APA.

While the government's breach of trust with the California Indians in the termination process is confirmed in the government's own records and admissions, and in the litigation brought to restore the terminated rancherias,[91] the government has never remedied many of the effects of termination.

## VI.   Efforts to "Un-Terminate" or Restore California's Terminated Tribes

Thirty-eight of the 41 tribes listed in section 1 of the Rancheria Act were terminated according to the process described above.[92]

Pursuant to the terms of the Rancheria Act, lands were distributed in fee to individual Indians, but the water and sanitation facilities promised the Indians under the terms of the Act were, in every circumstance, either inadequate or simply not provided.  Moreover, the BIA did not even address the Indians' need for adequate housing.  As a consequence, the rancherias at the time of termination had inadequate or nonexistent water and sanitation systems, inadequate roads, no housing or housing that was in serious disrepair, and no economic base to support employment and provide the wages needed to pay property taxes and make the necessary capital improvements to bring rancheria housing and infrastructure into compliance with local county housing, zoning, and other ordinances.  Due to the government's failure to live up to the Rancheria Act, it was not long before distributed lands were transferred out of Indian ownership pursuant to tax sales, to satisfy debts incurred by the Indians, and, in some cases, as a result of fraudulent or questionable actions by the non-Indian purchasers.[93]  This situation persisted until the late 1960s when California Indian Legal Services (CILS) was established.  Commencing in 1967, CILS led the effort to reverse, through litigation, the termination of the California rancherias and to restore the recognition and services that the termination policy had stripped from the California tribes.

Initially, the cases challenging the government's conduct pursuant to the Rancheria Act sought to compel the government to comply with its fiduciary and statutory duties, and thus complete the improvements mandated by the Rancheria Act and the distribution plans.  As the Indian people began to realize the full consequences of termination, however, restoration of tribal status became the primary goal of litigation.  Where tribes achieved restoration through litigation, the remedies generally included: restoration of rancheria boundaries and the status of rancheria lands as "Indian Country"[94]; restoration of tribal status, making tribal members eligible for federal benefits based on their status as Indians, and allowing tribal entities to organize and be recognized

-17-

as sovereign authorities[95]; and those lands that had been distributed in fee to individual Indians were eligible to be returned to trust status.[96] Damages were also awarded,[97] though in some settlements tribes accepted physical improvements to Rancheria lands instead of monetary damages.

Judgments and settlements in the un-termination cases usually stipulated a time limit for actions that had to be taken to secure a privately owned parcel's eligibility to be held in trust.[98] While these time limits seemed reasonable when entered, it soon became clear that many rancheria residents were confused about these requirements. The BIA's refusal to accept fractional interests created additional problems. In cases where the reservation boundaries had not been restored, any delay by the BIA in accepting lands into trust caused problems for the residents, as many counties continued to assess taxes on Indian-owned fee lands. Thus, even after restoration was achieved through litigation, tribes and individuals were forced to litigate against counties to prevent further diminishment of their land base through tax sales.

During the past quarter century, judicial decisions and settlements have restored 27 of the 38 rancherias that were terminated under the original Rancheria Act.[99] Two additional tribes, the United Auburn Indian Community and the Paskenta Band of Nomlaki Indians, were restored by Acts of Congress in 1993.[100]

## VII.   The Lingering Effects of Termination on California Tribes

Since President Nixon first declared it to be a failure in 1970, both Congress and the Executive Branch have repudiated the misguided policy of termination.[101] However, despite its complete rejection of the termination policy, the Federal Government has failed to take the necessary step of providing a comprehensive legislative solution to the continuing problems of restored tribes and the remaining terminated tribes.

It has been almost forty years since passage of the Rancheria Act. Still, the Advisory Council on California Indian Policy is compelled to ask questions that should have been anticipated, and to which answers should have been provided, long before termination was accepted as policy, and long before the first California distribution plan was prepared. What were the human and economic costs involved in the dismantling of rancheria communities? What was the risk of loss of Indian homes and lands, however meager or unproductive, to creditors, tax sales, and fraudulent transactions once the protection of federal trust status was withdrawn? Was termination simply another chapter in an established pattern of federal neglect and malfeasance toward the California Indians? What were the effects of withdrawing all federal Indian programs and benefits from Indian communities mired in poverty and high unemployment? The real tragedy is that many of these questions *were* asked, and a substantial amount of information was compiled on the conditions of the California Indians before the enactment of the Rancheria Act.[102] Despite the knowledge that most of the targeted Indian communities were not prepared for termination, the government nevertheless carried out the policy. Indeed, it was implemented in a way that left the Indians with no real control over the process and ultimately deprived them of the very

-18-

AR 76

inducements they were offered in return for their "consent."

Though it would not be possible to accurately quantify the effects on the tribes terminated under the Rancheria Act, there is no doubt that these Indian communities suffered severe deprivation when federal trust protections were withdrawn from their lands and water, sanitation and other services were not provided as promised.[103]  In addition, individual terminated Indians were denied access to federal Indian programs and benefits and lost certain immunities from state taxation and regulation based on their previous status as reservation Indians.  Courts have quantified some of the economic costs of these illegal terminations in damages awarded against the United States in cases arising out of the BIA's failure to properly discharge its statutory and fiduciary obligations under the Rancheria Act.[104]  Yet, the "intangible" costs of termination, such as the loss of community identity resulting from the policy goal of dismantling tribal land holdings and institutions in favor of individual land ownership and self-interest, will never be known.  Viewed from the hindsight of the current struggles of restored tribes to reconstitute their communities and reach consensus on community goals, we can conclude that these costs were substantial and have been borne by the Indian people and tribes themselves.

In identifying the continuing effects of termination on California tribes, a distinction needs to be made between restored tribes and those that remain terminated.  For those that remain terminated, two major factors limit their means of recourse to reestablish a government-to-government relationship with the Federal government—the lack of financial resources, and the dispersion and disintegration of their communities which occurred because of termination.  These factors also limit the ability of restored tribes to move quickly to reestablish themselves within the community of federally recognized tribes.   Still, the restored tribes have a major advantage over the terminated tribes, because their status as federally recognized tribes affords them the potential to access funds for tribal organization and self-governance, land acquisition, and economic development.  In short, they have the *potential* for a brighter future.

A.      Effects on Tribes that Remain Terminated

The California tribes that remain terminated have virtually no voice in the formulation of federal Indian policy.  They have no land base that is secure by virtue of its being held in trust by the United States for the benefit of the tribe.  Moreover, many statutes apply only to federally recognized tribes and their members, and members of terminated tribes receive none of the protections and benefits provided by these statutes.  Even where Congress intends a broader application of a particular statute, the federal agencies charged with implementing Indian programs invariably hold that only federally recognized tribes and their members are eligible to participate.[105]  Thus, terminated tribes are generally unable to participate in traditional activities on federal lands, such as gathering plants for ceremonial use and other cultural activities.  The graves of their ancestors and their cultural artifacts are not protected under the Native American Graves Protection and Repatriation Act (NAGPRA) and other laws designed to protect Native American cultural resources.[106]  In effect, almost the entire body of federal law aimed at protecting and preserving Native American cultures and fostering tribal self-determination has no application to

-19-

terminated tribes and their members.

B.     Effects on Restored Tribes

Restored tribes experience problems of a different character because they have reestablished their government-to-government relationship with the United States.  Many of their problems are related to their inability to take full advantage of their self-governing status because of the lack of established governing institutions and procedures, inadequate financial support for essential tribal operations, stiff competition with other federally recognized tribes for limited federal program funds, an inadequate or nonexistent land base, and the BIA's inability to provide the technical and financial support necessary to overcome the disabling effects of termination.

     1.     The lack of a land base sufficient to support tribal housing and economic development

Because significant portions of the rancheria land base had passed into private hands following termination,[107] it was usually impossible in the restoration process to acquire and return these lands to tribal trust status.  Thus, the restored tribes have either a significantly reduced land base or no land at all.  Of the 29 restored California tribes, seven have fewer than 50 acres in tribal ownership and 16 have no tribal land base at all.  The other six restored tribes each have less than 160 acres in tribal ownership.

Even where rancheria lands were restored and the original rancheria boundaries reestablished, private ownership within reservation boundaries has made assertions of tribal jurisdiction difficult.  Private landowners often resist and challenge the exercise of tribal authority, and local governments simultaneously attempt to exercise jurisdiction.[108]  These jurisdictional challenges deplete limited tribal resources and complicate tribal planning and economic development initiatives.

     2.     Difficulties encountered in reconstituting tribal communities under a unified leadership

Attempts to develop a tribal governing document often falter in the intra-tribal strife between different interest groups and factions over issues such as tribal membership, election procedures, and the allocation of tribal power between tribal and general councils.  Tribal communities that were split and dispersed by termination and the distribution of lands per capita find themselves struggling to renew and reestablish the bonds of community and to place the tribe above individual self-interested goals.  The termination policy's focus was just the opposite—on individual land ownership and self-interested economic behavior—and effectively discouraged the continuation of tribal hierarchical and communal structures.  Thus, restored tribal governments often find themselves grappling with the political and social residue of the termination policy.

Too often the BIA exacerbates the problem by carrying forward some of the paternalistic

-20-

attitudes of the termination era. In its role as federal trustee, the BIA often urges terminated tribes to confine their membership to lineal descendants of the distributees and dependent members listed in the distribution plans prepared under the Rancheria Act. This advice, while serving the BIA's interest in confining its trust responsibility to a smaller Indian service population, also sows the seeds of conflict among different groups of potential tribal members. Moreover, this artificial limitation ignores the fact that the distribution plans prepared in the process of termination frequently and arbitrarily excluded tribal members who objected to the distribution plans or who resided off the rancheria. Often, the numbers of excluded tribal members exceeded those of rancheria residents.[109] Restoration of tribal membership through the exclusive use of distribution plans thus perpetuates the arbitrariness that characterized the original termination process, leaves many Indian people disenfranchised, and sparks dissension within restored tribes at a time when tribal cohesiveness is most needed.

Similarly, efforts to identify lands for acquisition in trust and to fund and reestablish essential tribal operations are often delayed or completely thwarted during the early post-restoration stages, for a variety of reasons. Where some original rancheria lands remain, disputes frequently arise between those who remained on the rancheria during termination and those who left the grinding poverty of these rural enclaves to seek a better life elsewhere. With limited means of resolving these disputes, either through traditional peacemaking or more formal processes,[110] these tribes often find themselves mired in conflict at the very time when they most need cooperation in the difficult process of reversing the legacy of termination—the loss of lands and services, and the dismantling of tribal institutions.

3.      The lack of supplemental "catch-up" funding to address newly restored tribes' inability to effectively compete with tribes that have never suffered termination

Even in the one area where restoration should bring the support and resources necessary for the restored tribe to gradually "catch up" for the years lost by termination, the California tribes have not fared well.[111] Although restoration makes a tribe eligible for assistance from the BIA, this new status is a mixed blessing. Newly restored tribes must immediately compete with all other tribes for increasingly limited public funds. Competition is stiff, and frequently one-sided, because the more established tribes have the personnel and administrative capacity to maintain a competitive advantage in fund-raising. This undermines the restoration process by impeding development of the political and administrative capacity necessary for the newly restored tribe to function as a government. Providing multi-year[112] "catch-up" funding on a per tribe basis, as a supplement to the funds for which each tribe would be eligible under existing public programs, could reduce or eliminate this disadvantage.

AR 79

4.    The lack of adequate technical assistance and support services to guide and
assist the tribes in the difficult process of restoration

When restoration occurs, the BIA assumes new trust obligations to the restored tribe and
new demands are made on the BIA's resources. Thus, in California, restoration forces under-
staffed and under-funded BIA agencies to take on new responsibilities at a time when Congress is
determined to downsize the BIA and transfer most of its programs into the Tribal Priority
Allocation (TPA). Restored tribes that need intensive technical assistance and support services in
reconstituting their tribal governments, completing their base rolls and conducting their first post-
restoration tribal elections, contracting for programs and services under Indian Self Determination
and Educational Assistance Act, and initiating and completing fee-to-trust land acquisitions, are
under-served, even where the BIA extends its best efforts. For example, at the time of restoration
of the four Scotts Valley tribes, the BIA Central California Agency's service area encompassed
more than 50 federally recognized tribes with lands distributed across 21 California counties.[113] It
is, therefore, not surprising that the BIA is invariably unable to meet deadlines imposed in
restoration statutes, whether they involve completing tribal rolls, reviewing constitutions, holding
elections, or adopting plans for tribal economic development. This stalls tribal development,
fosters dissension in tribal communities, and encourages political challenges that weaken and
distract fragile interim governments. These failures are without remedy and can make a tribe
vulnerable to extra-tribal interests that can derail or prevent responsible, planned tribal
development.

**CONCLUSION**

The termination policy, as implemented in California, was a policy of expediency designed
to terminate federal benefits and services to most of California's smaller tribes, as quickly and as
cheaply as possible. It failed in its touted goal of assimilating these tribal peoples into the
American social and economic mainstream—putting them on an equal footing with other
Americans. Instead, it thrust most of them into greater poverty, and divided their most essential
asset—the tribal homeland, by ending its protected federal status. Although all branches of the
federal government have now acknowledged its failure, Congress has not acted to reverse the
continuing effects of the termination policy on the California tribes. Restoration of tribal status is
only a beginning. Congress must act to provide the restored California tribes with the means,
including adequate financial and technical support, to reestablish their tribal homelands and
communities and to fully exercise their self-governing powers.

-22-

AR 80

## ENDNOTES

1. See Message from the President of the United States Transmitting Recommendations for Indian Policy, H.R. Doc. No. 363, 91st Cong., 2nd Sess. (1970).

2. See, e.g., Menominee Restoration Act, 25 U.S.C. §§ 903 et seq.; Paiute Tribe of Utah Restoration Act , 25 U.S.C. §§ 761 et seq.; Restoration of the Wyandotte, Ottawa, Peoria and Modoc Tribes of Oklahoma, 25 U.S.C. §§ 861 et seq.; Cow Creek Band of Umpqua Tribe of Indians Recognition Act, 25 U.S.C. §§ 712 et seq.; Grand Ronde Restoration Act, 25 U.S.C. §§ 713 et seq.; Coos, Lower Umpqua, and Siuslaw Restoration Act, 25 U.S.C. §§ 714 et seq.; Klamath Indian Tribe Restoration Act, 25 U.S.C. §§ 566 et seq.; Siletz Indian Tribe Restoration Act, 25 U.S.C. §§ 711 et seq.; Coquille Restoration Act, 25 U.S.C. §§ 715 et seq.; Ysleta Del Sur Pueblo Restoration Act, 25 U.S.C. §§ 1300g et seq.; Alabama and Coushatta Indian Tribes of Texas Restoration Act, 25 U.S.C. §§ 731 et seq.; Ponca Restoration Act, 25 U.S.C. §§ 9893 et seq.

3. In addition, the two rancherias that were apparently terminated pursuant to the 1964 amendments to the Rancheria Act remain terminated.  See Appendix A.

4. The three tribes are the Wilton Miwok Indian Community, the Federated Indians of the Graton Rancheria, and the Mishewal Wappo Tribe of Alexander Valley.  Other tribes may also meet these criteria, but the authors do not have direct knowledge of the state of those tribes.

5. See S. Rep. No. 330 to accompany S. 1747, A Bill Providing for the Restoration of Federal Recognition to the Ponca Tribe of Nebraska, and for Other Purposes, 101st Cong., 2nd Sess. 1990 (Testimony of Eddie F. Brown, Assistant Secretary - Indian Affairs).

6. Criteria 4 was not an issue in the 1994 legislative restoration of either the Auburn Indian Community or the Paskenta Band.

7. The California Indian Assistance Program (CIAP) is part of the Community Affairs Division of the California Department of Housing and Community Development (HCD).  Located in Sacramento, CIAP is involved primarily in rural areas assisting *both* federally recognized California Indian tribal governments and California Indian communities that are not federally recognized, including terminated California tribes.

8. See 25 C.F.R. § 83.3(e).  Unacknowledged tribes can request technical assistance pursuant to 25 C.F.R. § 83.5(c).

9. Three other terminated tribes (the Guidiville Indian Community, the Lytton Indian Community and the Mechoopda Tribe of the Chico Rancheria) eventually joined this effort and were restored along with the Scotts Valley Band in Scotts Valley Band of Pomo Indians v. United States, No. C-86-3550 VRW (N.D. Cal. 1992).

10. Id.

-23-

11. Robert N. Clinton et al., American Indian Law, (3rd Ed. 1993), 158; see H. Con. Res. 108, 83rd Cong., 1st Sess., 67 Stat. B-132 (1953).

12. See Wilkinson & Biggs, The Evolution of the Termination Policy, 5 Am. Indian L. Rev. 139, 152 (1977).

13. See, e.g., Governing Council of Pinoleville Indian Community v. Mendocino County, 684 F.Supp. 1042 (N.D. Cal. 1988).

14. Cary McWilliams, California: the Great Exception, (Peregrine Smith, Inc., 1976) at 25-26.

15. 9 Stat. 452 (1850).

16. Cong. Globe 32nd Cong., 1st Sess. 2103. In most cases, the tribes' aboriginal title was extinguished by the Act of March 3, 1851 ch. 41, 9 Stat. 631 (1851), which required every person "claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government" to present their claims within two years. Most tribes failed to assert their aboriginal title within the two-year period, largely because the Indians were not notified of the Act and were not aware of its applicability to their claims. In the case of the parties to the unratified treaties, those tribes did not know until 1905 that the treaties they signed were not ratified, and thus had no idea that they needed to protect their aboriginal title.

17. H.R. Rep. No. 801, 103d Cong., 2nd Sess, 2 (1994).

18. Id. at 1-2.

19. In 1853 Congress passed the Act of March 3, 1853, to provide for the survey of the Public Lands of California. Section 6 of that Act stated that Indian tribes then in possession of any tract of land would be protected from losing their occupancy rights to non-Indians under the Homestead and Preemption laws of 1841. 10 Stat. 244.

20. See the report of C.E. Kelsey to the Commissioner of Indian Affairs (hereinafter "Kelsey Report"), attached hereto as Exhibit 1, at 2.

21. Helen Hunt Jackson, A Century of Dishonor, (originally published by Harper and Brothers in 1881, now available from the University of Oklahoma Press, 1995).

22. Act of March 3, 1905, 33 Stat.1048, 1058.

23. See Kelsey Report at 2.

24. Kelsey reported that if the Indians were able to make the land productive, they faced eviction by nearby non-Indian landowners:

It is not strange that the Northern California Indians have ceased to try to have

-24-

> gardens, when any appearance of thrift is warrant for their ejection from the
> premises.  Indeed, most of them at the present time are living on land where, for
> lack of water or worthlessness of the soil, gardens are impossible.  Most of the
> Indians have now been crowded out of anything like good soil and are found in
> waste places not having value enough to attract anyone else.  It is now a matter of
> difficulty for an evicted Indian to find any place of refuge, except in other Indian
> settlements already overcrowded.

See Kelsey Report at 9.

25. Id. at 15.

26. Id.: "It seems clear to your special agent that the Northern California Indians have not had a
'square deal,' and that it is not too late to do belated justice.  The landless Indians cannot be
placed in status quo ante, but they can be given what is sometimes expressed as 'a white man's
chance,' and it ought to be possible to put an end to the periodical wiping out of Indian children."

27. Id. at 23-24.

28. Id. at 16-22, 23-24.  Many of these reservations had been created by the Mission Indian
Relief Act of 1891, 26 Stat. 712.  See also H.R. Rep. No. 801, 103d Cong., 2nd Sess., 2 (1994).

29. Letter from the Secretary of the Interior, dated April 2, 1906, to the Senate Committee on
Indian Affairs.

30. 34 Stat. 325 (1906).

31. See the Act of April 30, 1908, Pub. L. No. 60-104, 35 Stat. 70, at 76; the Indian
Appropriation Act of March 3, 1909, Pub. L. No. 60-316, 35 Stat. 781; the Indian Appropriation
Act of April 4, 1910, Pub. L. No. 61-114, 36 Stat. 269, at 273; the Indian Appropriation Act of
March 3, 1911, Pub. L. No. 61-454, 36 Stat., 1058, at 1062; the Indian Appropriation Act of
August 24, 1912, Pub. L. No. 62-335, 37 Stat. 518 at 523; the Indian Appropriation Act of June
30, 1913, Pub. L. No. 63-4, 38 Stat. 77 at 86; the Appropriation Act of August 1, 1914, Pub. L.
No. 63-159, 38 Stat. 582, 589; the Appropriation Act of May 18, 1916, Pub. L. No. 64-80, 39
Stat. 123, at 132.  Subsequent annual appropriations through 1933 totaled approximately
$290,000 for the purchase of land for homeless California Indians.

32. 25 U.S.C. §§ 461 et seq.

33. 25 U.S.C. § 465.

34. See, "Reservation Data, California, 1951," reproduced in Hearings: A Review of California
Indian Affairs, House Committee on Interior and Insular Affairs, Subcommittee on Indian Affairs,
85th Cong., 1st Sess., May 24, 1963, Serial No. 10, pp. 186, et seq.

AR 83

35. See Sherburn F. Cook, The Population of the California Indians, 1769-1970 (University of California Press, 1976), 62, 67. See also, C.H. Merriam, The Indian Population of California, American Anthropology, 594-596 (1905).

36. See, e.g., "The Status of the Indian in California Today, a Report by John G. Rockwell, Superintendent of the Sacramento Agency to the Commissioner of Indian Affairs," Sacramento Indian Agency, 1944.

37. See, e.g., S. Tyler, A History of Indian Policy, (Washington: Government Printing Office, 1973), 147, 151-88. See also, Deposition of Leonard M. Hill, taken in Duncan v. U.S.A., No. 10-75 (Ct. of Cl.), and Duncan v. Andrus, No. C-71-1572 WWS (N.D. Cal.), on September 2, 1975, at 23, 29-34, excerpts of which are submitted herewith as Exhibit 2 (hereafter, "Hill Deposition").

38. In a document (National Archive Record Group 75, CCF 1940-57, 59A-643—Records for 1953-54) entitled "General Withdrawal Programming, Sacramento Area," dated July 1, 1952, the BIA outlined in detail its plan for withdrawal from California and concluded: "It is our opinion that all groups in California are ready for complete withdrawal of Bureau responsibility, assuming that these responsibilities and services [currently being provided by the BIA] will be transferred to the Indians themselves, local or state governments or to other auspices and that safeguards provided in the pending California Withdrawal Bill are retained." (Emphasis added.) Id. at 83.

39. Statement, dated June 13, 1952, by Oliver La Farge, President, AAIA, on legislation (S. 3005, H.R. 7490, and H.R. 7491) "To Facilitate the Termination of Federal Supervision Over Indian Affairs in California," at 9.

40. A more comprehensive history of the hearings, reports and bills that preceded the Rancheria Act is set out as Appendix A.

41. H. Con. Res. 108, 83rd Cong., 1st Sess., 67 Stat. B-132 (1953).

42. Id.

43. See United States v. Burland, 441 F.2d 1199, 1202 n. 4 (9th Cir.), cert. denied, 404 U.S. 842 (1971) (listing termination statutes passed subsequent to H.R. Con. Res. 108).

44. The Act of August 15, 1953 is widely known as "Public Law 280" because it was originally enacted as Pub. L. No. 83-280. It is now codified at 18 U.S.C. § 1162 and 28 U.S.C. § 1360.

45. The States originally included in Public Law 280 were Alaska, California, Minnesota, Nebraska, Oregon, and Wisconsin.

46. See State Advisory Commission on Indian Affairs, "Final Report to the Governor and the Legislature," (1969), at 9: "The special Johnson-O'Malley funds for Indian education were withdrawn over a five-year period, but other federal services to Indians were terminated by

-26-

AR 84

1955."

47. The first Termination Proclamation published pursuant to the Rancheria Act appeared on April 11, 1961, and applied to Buena Vista, Cache Creek, Mark West, Paskenta, Ruffey's Rancheria, Strawberry Valley, and Table Bluff. See 26 Fed. Reg. 3073.

48. See State Advisory Commission on Indian Affairs, *supra* note 46, at 22.

49. See excerpt from the Deposition of Maurice Babby, attached hereto as Exhibit 3, at 99-100; see also Progress Report to the Legislature by the Senate Interim Committee on California Indian Affairs (June 3, 1957) for further background information on conditions of the individual rancherias slated for termination.

50. In its report to the California Legislature, the special Senate Interim Committee on California Indian Affairs set forth specific problems that needed to be addressed and resolved prior to termination. (Progress Report to the Legislature by the Senate Interim Committee on California Indian Affairs (June 3, 1957), 14-21.) The Committee's concern that the government make full disclosure of the effects of termination is reflected in its recommendation that "[a] statewide education and orientation program should be undertaken under the direction of qualified educators to fully inform all Indians as to the nature and extent of their rights and to orient them to special problems which will be presented to them in the event of termination of federal supervision." Id. at 15.

51. 104 Cong. Rec. 15205 (1957).

52. 104 Cong. Rec. 15232 (1958).

53. S. Rep. No. 1874, 85th Cong., 2nd Sess., 1-2 (1958).

54. 104 Cong. Rec. 16566; 104 Cong. Rec. 18234.

55. Pub. L. No. 85-671, 72 Stat. 619 (1958).

56. See id., § 3(a)-(c). The 1964 Act transferred some of the section 3(c) duties from the Interior Department to the Department of Health Education and Welfare (HEW) (now Health and Human Services), and required that sanitation systems (in addition to water facilities) be installed before termination. In 1959, Congress had authorized, but not required, HEW to complete sanitation and domestic water systems on Indian reservations. Act of July 31, 1959, Pub. L. No. 86-121, 73 Stat. 267, 42 U.S.C. § 2004(a). The effect of the 1964 amendment was to retroactively mandate the installation of sanitation facilities on the affected rancherias. Rancheria Act § 10(b).

57. Pub. L. No. 85-671, § 9 (1958).

58. Duncan v. Andrus, 517 F.Supp. 1, 3 (N.D. Cal. 1977).

-27-

59. The Act's permissive nature was further clarified by its legislative history and subsequent court decisions. See id.; Duncan v. United States, 667 F.2d 36 (Ct. Cl. 1981); Table Bluff Band of Indians v. Andrus, 532 F.Supp. 255 (N.D. Cal. 1981); Smith v. United States, 515 F.Supp. 56 (N.D. Cal. 1978). The Department of the Interior (DOI) initially concurred in this interpretation of the Rancheria Act as being non-mandatory. See DOI Solicitor's memorandum to the Commissioner of Indian Affairs, dated August 1, 1960, stating (at page 4) that, "[t]he bill as enacted is not mandatory." DOI later reversed its earlier interpretation of this aspect of the Rancheria Act, however, when it promulgated new regulations to govern the termination process in 1965. See, e.g., the former 25 C.F.R. § 242.3(d), n. 1 (1977). These regulations were voided in Kelly v. Department of the Interior, 339 F. Supp. 1095 (E.D. Cal. 1972), on the ground that they were promulgated in violation of the Administrative Procedure Act.

60. Pub. L. No. 88-419 (1964).

61. See, e.g., H.R. Rep. No. 1305, 88th Cong., 2nd Sess. at 3 (1964).

62. See Appendix B.

63. See, e.g., Smith, 515 F.Supp. at 60; Duncan v. Andrus, 517 F.Supp. 1, 6 (N.D. Cal. 1977); Duncan, 667 F.2d at 44-45; Table Bluff Band of Indians, 532 F.Supp. at 259.

64. See Smith, 515 U.S. at 57; Duncan v. Andrus, 517 F.Supp. at 4; Duncan v. United States, 667 F.2d at 44; Table Bluff Band of Indians, 532 F.Supp. at 258.

65. These regulations were first published June 9, 1959, and codified at 25 C.F.R. Part 242. Though the regulations contemplated that proposed distribution plans would be prepared by the Indians affected by the plan, in practice BIA personnel prepared all of the distribution plans. In 1965, successor regulations were promulgated to implement the 1964 amendments to the Rancheria Act, but were subsequently voided. See Kelly, supra note 59.

66. See Pub. L. No. 85-671, § 2, 72 Stat. 619 (1958).

67. Defendants Watt, Smith, Finale and Burcell Answers to Plaintiffs' Second Set of Interrogatories, filed September 8, 1981, in Tillie Hardwick v. United States, No. C-79-1710 SW (N.D. Cal.)(3/14/89), at 2, Answer No. 1.

68. 25 C.F.R. §§ 242.4-242.5 (1977).

69. 25 C.F.R. § 242.6 (1977).

70. Hill deposition at 34-36; see also, Memorandum of Sacramento Area Director to Area Indian Advisory Board, dated October 8, 1976, (attached hereto as Exhibit 4) regarding a meeting held on August 26, 1976, concerning Area Office funding, and accompanying Transcription of August 26th Meeting. The Memorandum states that "[m]oney spent in completing distribution plans of rancherias being terminated came from the area's regular annual budget, even though Congress

-28-

authorized appropriations for termination costs under the Rancheria Act of 1958 and the amendment in 1964." Id. at 1.

71. Id. at 3: "The BIA never went in for money under that authorization [under the Rancheria Act], so in effect what the BIA did during this period was to take program money from the nonterminated Rancherias and spent them [sic] on terminated Rancherias reducing the amount of dollars available for those reservations and rancherias that were not in the process of terminating."

72. See, e.g., Bureau of Indian Affairs, "Study of Wilton Rancheria, Nov. 1952," attached hereto as Exhibit 5.

73. See Rennard Strickland, ed., Felix S. Cohen's Handbook of Federal Indian Law, 1982 ed., (Charlottesville, Va.: The Michie Co., 1982), 174-175.

74. Hill deposition at 65-69.

75. Hill deposition at 67. The BIA installed water systems and subdivided the rancherias under section 3(c). The Indian Health Service (IHS) installed plumbing and waste disposal facilities under Pub. L. No. 86-121 prior to 1964, and under Section 3(c)after 1964, which made mandatory the provision of such facilities to terminating rancherias. In every case, however, the IHS installed inside plumbing and septic systems after the BIA had conducted their surveys, without conforming lot sizes to local health code requirements. Therefore, notwithstanding the IHS Policy to construct the facilities according to state and local sanitary code requirements, the IHS was powerless to change a lot's size if it was inadequate under local requirements to accommodate a septic system's leach lines. Thus, the IHS policies could not remedy the BIA's failure to consider local requirements.

76. Declaration of Evangeline Duncan in Support of Plaintiff's Motion for Summary Judgment, submitted in Tillie Hardwick v. United States, No. C-79-1710 SW (N.D. Cal.)(3/14/89), at 5-6.

77. "A Plan for the Distribution of the Assets of the Graton Rancheria, According to the Provisions of Public Law 85-671, Enacted by the 85th Congress, Approved August 18, 1958," at 1.

78. Id. at 2.

79. See, e.g., the plans for the Potter Valley, Redwood Valley, North Fork, Pinoleville, Scotts Valley, Wilton, Rohnerville, Smith River, Picayune, and Indian Ranch Rancherias.

80. Hill deposition at 55, 74.

81. 25 C.F.R. § 242.10.

82. Babby deposition at 80.

AR 87

95. See, e.g., id. at 261.

96. See, e.g., Smith, 515 F. Supp. at 61.

97. See, e.g., Duncan v. United States, 667 F.2d at 47-49; Smith, 515 F. Supp. at 60.

98. See, e.g., Stipulation for Entry of Judgment filed in Tillie Hardwick v. United States, No. C-79-1710 SW (N.D. Cal.) (7/21/83), at 4.

99. See Appendix B.

100. See Auburn Indian Restoration Act, Act of October 31, 1994, 108 Stat. 4533, 25 U.S.C. §§ 1300l et seq.; and Paskenta Band Restoration Act, Act of November 2, 1994, 108 Stat. 4793, 25 U.S.C. §§ 1300m et seq.

101. See Message from the President of the United States Transmitting Recommendations for Indian Policy, H.R. Doc. No. 363, 91st Cong., 2nd Sess. (1970); see also 25 U.S.C. § 2502 (f) ("Congress has expressly repudiated the policy of terminating recognized Indian tribes and has actively sought to restore recognition to tribes that previously have been terminated.")

102. The State of California, realizing that the Indians were ill-prepared for termination and that termination of federal supervision without adequate planning and financial support would impose increased social and economic burdens on the State, took the extraordinary step of creating a special legislative committee with broad investigative powers to study and report to the California Legislature on these matters. See Resolution No. 115 of the 1953 Regular Session of the California Legislature, as amended by Senate Resolution No. 33 of the 1953 Regular Session; see also Senate Resolution No. 124 (Senate Journal, June 10, 1953, Page 4125).

103. See Duncan v. Andrus, 517 F. Supp. at 4, 6; Smith, 515 F. Supp. at 60, 62; Table Bluff Band of Indians, 532 F. Supp. at 259.

104. See, e.g., Smith v. United States, No. C-74-1016 (N.D. Cal.), Order entered May 5, 1988, awarding damages for denial of BIA housing assistance and state and local sales taxes; see also, Duncan v. United States, No. 10-75 (U.S. Cl. Ct.), Settlement Agreement, January 9, 1991, wherein the United States agreed to pay money damages to individual rancheria residents, provide new housing subject to stated conditions, and to construct water supply and wastewater disposal facilities.

105. See § I of the ACCIP Trust and Natural Resources Report.

106. See, e.g., the Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001, and the National Historic Preservation Act, 16 U.S.C. § 470w.

107. See note 93, *supra*.

AR 88

108. See, e.g., Governing Council of Pinoleville Indian Community v. Mendocino County, 684 F. Supp. 1042 (N.D. Cal. 1988).

109. For example, in the case of the Paskenta Rancheria, only two distributees and dependent members were listed in the distribution plan, but subsequent information obtained during the tribe's restoration process identified at least 60 tribal members who resided elsewhere. These tribal members had moved away from the Rancheria in order to hold down regular or seasonal employment. Though residing off the Rancheria, many of them returned to hunt, fish, bury their dead, and attend annual tribal gatherings.

110. See § VIII of the ACCIP Community Services Report (discussing the lack of tribal courts in California).

111. In 1993, 10 years after entry of the judgment in Tillie Hardwick v. U.S.A., No. C-79-1710-SW (N.D. Cal.), "un-terminating" 17 California rancherias, the Hardwick tribes collectively organized to petition Congress for supplemental base level funding, which should have been provided at the time of their restoration, to assist them in completing the process of reconstituting their tribal governments and administering essential tribal governmental programs in the areas of education, housing, land acquisition, natural resources protection, and for other programs. The tribes requested $7.5 million to be distributed over three years. Ukiah Daily Journal article entitled "$7.5 million sought by California Indian Tribes," March 29, 1993. In 1994, the tribes finally succeeded in obtaining a supplemental congressional appropriation of $1,700,000 to establish adequate base level funding for their governments using a tiered approach based on the population size of each tribe.

112. The four tribes restored under the judgments entered in Scotts Valley Band, et al. v. U.S.A., No. C-86-3660 VRW (N.D. Cal.), received $600,000 in FY 1991, $538,000 in FY 1992, and in FY 1993, requested $600,000. See February 12, 1992 letter from Assistant Solicitor Scott Keep to Stephen Quesenberry, California Indian Legal Services.

113. A November 1972 Department of the Interior report entitled Functions of the Bureau of Indian Affairs, Sacramento Area discussed creation of the Central California Agency, with broad geographic and tribal trust responsibility, in these terms: "... the central portion of the State, now known as the California Agency, and for which it is proposed to establish an agency, in fact has 50 per cent of the Indians living on trust lands; 43 per cent of the total membership of bands or tribes; 47 per cent of the reservations and rancherias and 50 per cent of the public domain allotments and purchased properties in the State." Id. at 62.

AR 89