LEANN G. BISCHOFF - 161198
JAY B. PETERSEN - 111130
MAUREEN GEARY - 143119
L. NICOLE MIANI - 184288
STEPHEN V. QUESENBERRY - 63423
MICHAEL S. PFEFFER - 88068
CALIFORNIA INDIAN LEGAL SERVICES
510 - 16th Street, Suite 301
Oakland, CA 94612
(510) 835-0284

Attorneys for Indian Custodian and
De Facto Parent, Tamara Martinez

IN THE SUPERIOR COURT OF CALIFORNIA

COUNTY OF SACRAMENTO

(SITTING AS JUVENILE COURT)

| | |
|---|---|
| In re Pulido/Young Minors | ) Case No. 208647-654 |
| | ) |
| | ) |
| | ) ORDER APPOINTING COUNSEL, |
| | ) GRANTING INTERVENTION |
| | ) AND INVALIDATING PROCEEDINGS |
| | ) (Indian Child Welfare Act, |
| | ) 25 U.S.C. § 1901 et seq.) |

Upon reviewing the petition for appointment of counsel, intervention and invalidation of proceedings filed by Tamara Martinez, de facto parent of V████ P., and her declaration in support of said petition, and finding no cause to reject such petition, the court makes the following **FINDINGS AND ORDERS**:

(1) V██ P. is an "Indian child" under the Indian Child Welfare Act. (25 U.S.C. § 1903(4).)

(2) Tamara Martinez is and has been the "Indian custodian" of V████ P. under the

1

Indian Child Welfare Act.  (25 U.S.C. § 1903(6).)

(3) The instant action is a "child custody proceeding" governed by the Indian Child Welfare Act as well as state law.  (25 U.S.C. §§ 1901 et seq., 1903(1).)

(4) Tamara Martinez is indigent.

(5) Ms. Martinez is entitled to court-appointed counsel under 25 U.S.C. § 1912(b) and is entitled to intervene in this proceeding under 25 U.S.C. § 1911(c).

[OPTIONAL] (6) Tamara Martinez is likewise an indigent de facto parent of V███ P., and due process requires that counsel be appointed to represent Ms. Martinez.

(7) The court hereby GRANTS Tamara Martinez' petition for court-appointed counsel and appoints _____ counsel for Ms. Martinez.

(8) The court clerk shall certify this appointment of counsel under 25 U.S.C. § 1912(b) and relay information of said appointment to the Secretary of the Interior forthwith.

(9) The court hereby GRANTS Tamara Martinez' petition for intervention under 25 U.S.C. § 1911(c).

(10) The court clerk shall provide Ms. Martinez' court-appointed counsel a complete copy of the court's case file, and add her counsel to the service list.

(11) The court likewise GRANTS Ms. Martinez' petition for invalidation of these child dependency proceedings concerning the minor V███ P., on grounds that relevant provisions of the Indian Child Welfare Act (at 25 U.S.C. § 1912) have been violated.  (25 U.S.C. § 1914.)

/////////////////

/////////////////

2

AR 91

(12)  Social Services is hereby ORDERED to return the minor, V█████ P., to Ms.

Martinez immediately.

Dated:_____          IT IS SO ORDERED.


By:_____

Judge/Referee _____

3

Mar 15, 1991).

| | |
|---|---|
| 36. Smith River | Restored by litigation - Tillie Hardwick, *supra*. |
| 37. Strawberry Valley | Remains terminated. |
| 38. Table Bluff (Table Bluff Rancheria of Wiyot Indians) | Restored by litigation - Table Bluff Band v. Andrus, 532 F.Supp. 255 (N.D. Cal. 1981). |
| 39. Table Mountain | Restored by litigation - Table Mountain Rancheria Ass'n. v. Watt, No. C-80-4595 MHP (N.D. Cal. 1984). |
| 40. Upper Lake (Upper Lake Band of Pomo Indians) | Restored by litigation - Upper Lake Pomo Ass'n. v. Watt, No. C-75-0181 SW (N.D. Cal. 1979); See also Upper Lake Pomo Ass'n v. Andrus (1977). |
| 41. Wilton (Wilton Miwok Indian Community) | Remains terminated. |

## 1964 Amendments to the Rancheria Act

The El Dorado Rancheria and the Mission Creek Reservation were apparently terminated pursuant to the 1964 Amendments to the Rancheria Act. See 31 Fed. Reg. 9685 (1966) (El Dorado), and 35 Fed. Reg. 11272 (1970) (Mission Creek).

Several unoccupied Rancherias were sold following the 1964 Amendments: Colfax, Likely, Lookout, Strathmore, and Taylorsville. These sales did not affect the status of any tribe.

AR 93

Aug. 8, 1905 -cdd

Hon. Commissioner of Indian Affairs,
Washington, D. C.

Sir:

In the matter of the condition of the California Indians, I have the honor to report as follows: The Act of Congress approved June 30, 1905, contained the following provision:

That the Secretary of the Interior is hereby authorized to investigate, through an inspector, or otherwise, existing conditions of the California Indians, and to report to Congress at the next session some plan to improve the same.

Pursuant to the said provision the undersigned was duly appointed to make the investigation. The letter of instructions was received on the 6th day of August, 1905. Two days later the actual work in the field began and has been prosecuted uninterruptedly /sic/ to the 8th of March.

The work necessary to secure complete and accurate data has proved to be much greater than was anticipated, and has required the services of your special agent practically day and night during the whole time. About December 25, 1905, your special agent received further instructions to investigate conditions pertaining to the Southern California reservations, a duty which was duly performed. As there are marked differences in the situation there and in Northern California, the Northern and Southern fields will be taken up separately in the order of official instructions.

Your special agent has visited and personally inspected almost every Indian settlement between the Oregon line and the Mexican Border, and has used every effort to make his inquiry complete and exhaustive.

California has sixty counties, fifty-five of which have Indian settlements. It has required a little less than 12,000 miles travel to visit these settlements, and as most of them are not near railroad lines, it proved impossible to hurry the inquiry beyond the speed of a horse.

The Act of Congress which provides for this investigation requires a report at the present session. This allows less than three days per county, and some of the counties have hundreds of Indians. It is therefore to be regretted that time was not available to make a hut to hut canvass, as that seems the best way to insure complete accuracy.

-2-

Your special agent has made a family census of the Indians north of Tehachapi, which he believes to be as complete as possible under the circumstances. Working under a great pressure as to time and being of necessity dependent upon third persons in a large measure for information, it is not expected that every Indian in the State has been enumerated.

Your special agent finds an Indian population in California of a little more than 16,500, of which 5,200 are reported as living upon reservations. Thirty-five hundred of these are in Southern California. There is thus a non-reservation population of about 11,300. Your special agent has examined their situation and cannot see that their condition is such as to be a matter of satisfaction either to the Government of the United States, or to the people of California. The Indian population of California a century ago cannot be stated accurately, as data for an accurate estimate are wanting. The census estimate of 1850 was 100,000. The estimates for 1800 vary all the way from 100,000 to 750,000. No well informed person estimates less than 150,000.

(Dr. C. Hart Merriam)

Dr. Hart Merrian of the Biological Survey, whose opportunities for examination have been exceptional, estimates 260,000. Every locality has its tale of hundreds of Indians fifty or even thirty years ago, where there is one now, and making due allowance for exaggeration, your special agent is inclined to believe Dr. Merrian's estimate well founded. A decrease in the Indian population of 94 per cent in a single century, and mostly within 40 or 50 years, is certainly exceptional and would seem to be a fact in which we can neither take pride nor escape responsibility.

In order to understand the present state of affairs, it is therefore necessary to go somewhat briefly into the history of Indian matters in this State. California is a very attractive land to us today, and it was equally attractive to our aboriginal predecessors. The food supply was abundant and the population probably larger than all of the rest of the United States. There was also a conglomeration of Indian races. More than 200 more or less distinct dialects were spoken, classified by ethnologists into 22 or 23 distinct linguistic stocks, as distinct from each other as the Chippewas are from the Sioux, or the Iroquois from the Narragansetts. Two of these distinct stocks disappeared prior to the American occupation, and one other is now confined to Oregon. Representatives of all of the remaining stocks survive to this day, as shown in the census schedule accompanying this report. The different stocks are almost without exception antagonistic and were formerly in a state of perpetual warfare. The California Indians were not very warlike, and their wars were very small affairs in comparison with those of the Indians of the plains. Indians speaking dialects of the same stock were usually friendly. Each California village was independent of all others, and there seems to have been but little idea of tribal organization.

The Mission period began in 1769, and ended with the secularization of the missions by the Mexican Government in 1834. The region covered by the missions extended from the Mexican line to Santa Rosa, and from the Pacific Ocean to the San Joaquin Valley. The completion of the great work done by the Franciscan Fathers in civilizing the Indians was not allowed by the Mexican Government. The Indians had complained bitterly of their state of dependence,

-3-

and yet when the dependence ceased they proved utterly unable to maintain themselves. Upon the spoilation of the missions a scramble took place for lands, and a feeble attempt was made to reserve some land for the Indians, which proved ineffective.

In the year before the secularization, 1834, the mission records showed some 34,000 converts in the mission strip. There were probably some unconverted Indians termed gentiles. Only about 3,000 descendants of these Mission Indians are alive today. Most of the decrease is understood to have taken place between 1834 and 1849. A few of the Indians who had come from the San Joaquin Valley returned there. In Southern California those who were able to return to the mountains thus saved themselves from extinction, but the great body of the Mission Indians undoubtedly perished where they had lived. Most of them died during the Mexican period, and not under that of the United States.

The Treaty of Guadalupe Hidalgo, which ceded California to the United States, guaranteed Mexican land titles in the ceded territory as they stood at the time of the transfer. Under Spanish and Mexican law Indians had certain rights to the lands they occupied and could not legally be evicted from them. It would (sic) seem that this right was an interest in land and one entitled to protection under the provisions of the Treaty of Guadalupe Hidalgo.

The Act of Congress which provided for the settlement of the titles to Spanish and Mexican grants imposed upon the commission appointed to make the settlement the duty of first setting apart for Indian use all lands occupied by them. It may therefore be assumed that Congress considered that the Indians had substantial rights. It was the duty of the commission to investigate and confirm the Indian title wherever Indians occupied lands included within the limits of a Spanish or Mexican grant.

Your special agent has found but two cases out of several hundred grants where this was done, Pauma and Santa Inez, and in the latter case the terms of the settlement were so uncertain that an action is now pending in the state courts in regard to it. The new owners of the Spanish grants had to rely upon the Spanish law to sustain the validity of their titles, but were prompt to appeal to the American law to evict the Indians,—something they could not legally do under the terms of their grants. It is needless to say that the Indians were evicted, the most recent instance being Warner's Ranch.

Four-fifths of the California Indians, however, were not affected by Spanish grants, nor did they come under Spanish or Mexican influence, and their undoing began with the great gold excitement of 1849. When the United States came into full legal ownership of California in 1848, the Spanish or Mexican laws relating to Indians were not adopted, as has been erroneously stated. The policy of the United States adopted toward its new Indian wards

-4-

in all the ceded territory was exactly the same as everywhere else.  The
Indian ideas of land ownership are radically different from ours.  Our Govern-
ment has never acknowledged that the Indians owned their lands in fee simple,
and in view of the Indian idea of land ownership, this is correct.  But the
United States has always recognized, and the Supreme Court has held, that the
Indians have a right to occupy the land, which right is termed the Indian
right of occupancy, a right which can be cancelled only by mutual agreement.
All Indian lands in the United States, except in a portion of California, have
been acquired by the Government of the United States, and acquired only by
payment therefor.  Even the land ceded by the Sioux after the great outbreak
were paid for.  The Indian right of occupancy was in the beginning recognized
in California.  The Government sent out a commission which made treaties with
nearly all the Indian tribes in the State.  Sixteen treaties were negotiated
in Northern California and two in Southern California.  These treaties were
all very similar in text.  The Indians agreed to cede their lands to the
United States and to keep the peace, and to accept certain reservations de-
scribed by metes and bounds in the treaties.  The Government agreed to reserve
forever for Indian use the lands described in the treaties, and to pay a
certain specified price, payable in a great variety of things, such as
provisions, live stock, and miscellaneous goods.  The value of the goods thus
promised the Indians in Northern California was about $1,500,000, and the
land reserved was about 5,500,000 acres, worth at the Government price of
$1.25 per acre, about $7,000,000.  In Southern California the goods promised
were worth about $500,000, and about 2,000,000 acres of land was reserved,
worth at $1.25 per acre, about $2,500,000.  Some of these reservations were
laid out in the mining districts, and were strongly opposed by the miners.
At that time, in 1851, Indian treaties were submitted to the Senate for ratifi-
cation.  As California had gathered men of influence from all over the land,
the miner's protest carried such weight that the Senate rejected not only
those treaties that affected the mining districts, but all the treaties.  No
effort seems ever to have been made to make new treaties, or in any way to
acquire the Indian title from that day to this, nor have the California Indians
ever received one cent for their rights in the lands which they have lost.
The Osages, Cherokees, and other eastern tribes have received millions for
precisely the same rights in land, not nearly so valuable, and no reason has
been advanced why the California Indians alone, of all the Indians of America,
should receive no compensation for their lands, except that as Spain did not
acknowledge the land rights of any Indians who had not accepted the sovereignty
of the King of Spain, and as we have come into the Spanish title through
Mexico, therefore the United States is not bound to acknowledge the land rights.
Though why the Indians should be bound by the laws of Spain now when they never
were during the period of Spanish dominion is inexplicable to your special
agent.  The United States has, however, already acknowledged the Indian right
of occupancy of nine-tenths of the Indians of the territory ceded by Mexico,
and the Supreme Court seems to have settled the status for all Indians in the
said territory in Pueblo cases.  Moreover, the laws of Spain as to Indian
land rights in the territory acquired via Mexico were precisely the same as
in the territory of Louisiana in the lands acquired from Spain via France.
The laws of France as to Indian lands in American did not differ essentially

-5-

from those of Spain, or for that matter of England though the English Colonists early discovered the practical advantages of buying the Indian rights.  Just why this comparatively small band of Indians in California should be selected as the only one in the United States to be deprived of their land rights is still unexplained.  The Indians did not understand the intricacies of our Governmental system, or the meaning of Senatorial ratification of a treaty.  The Indians certainly understood that they had made a solemn agreement with the United States; and that they had sold their lands for a price.  The Government has taken their lands and their reservations and paid nothing, and from an Indian standpoint, this constitutes a deliberate breach of faith, without palliation or excuse.

The consequences of this violation of faith have been disastrous to the Indians.  The reservation system of today is an evil which we trust will be eliminated in time, but which had the merit of protecting the Indians from the first fierce on-rush of a frontier population.  Deprived of such protection in California, the Indians were at a serious disadvantage, greatly increased by the fact that there was no legal way in which an Indian could acquire title to the land he occupied.  For nearly forty years after the American conquest of California, that is from 1846 to 1884, an Indian could not acquire land under the Federal land laws.  He was not a citizen and therefore could not take up land.  He was not an alien and therefore he could not be naturalized and become a citizen.  Hence the settlers had what might be termed a "cinch" on the Indian, and by the time the Indian allotment act was passed in 1887, there was no land left to allot, except in the extreme northern and eastern parts of the State.  Something concern-ing Indian allotments will be said hereafter in this report.

In 1849, the great gold rush began.  Within a year or two a considerable portion of the State was overrun by probably two hundred thousand miners.  They were mostly the strongest and most vigorous type, well armed and masterful.  A majority of them had inherited the prejudices and the stories of two hundred years of border warfare with the Indians.  A large number of the Argonauts had come over land and had had desperate conflicts with the warlike Indians of the plains.  They were, therefore, in no mood to acknowledge that Indians had any rights whatever, and as a rule acted consistently upon this theory.  Opposed to the miners was a practically defenseless people (they had no fire-arms), and the entire Indian population of the mining regions could not have mustered 30,000 warriors..  Under the circumstances, it is not strange that one of the most shameful chapters of American History ensued..  Among the Argonauts there were some desperate characters, who were as willing to commit an outrage upon an Indian as upon any one else.  The Indians would retaliate in the aboriginal fashion by killing the first white man they met, then followed swift and sure retribution.  The miners would organize and the offending village would be "wiped out."  Sometimes, especially east of the Sierras, conflict would arise from attacks upon caravans.  The most frequent cause of these conflicts was the accusation that the Indians had stolen stock.  The accusation was not always proved, but the nearest band of Indians usually suffered for it.  Sometimes the charge was well founded and the Indians had made away with the stock.  The Indians had no conception of private ownership of domestic animals or of private ownership of food and did not realize at first that different rules prevailed among the whites.  In time the Indians learned to let the white man's effects alone, and the miners began to understand the comparatively harmless character of the California Indian.

The modus operandi of these affairs was very much the same. The Indian camp would be surrounded and rushed, usually at dawn, and men in ambush would shoot every Indian that appeared. At first few were spared, but as no one wished to kill the children, they were usually sold into slavery. Quite a number of raids are reported, especially into the Coast Range, their sole object, it seems, having been to secure slaves. Some Indians are reported to have been so held even after the legal extinction of slavery in the United States. More than 100 of these affairs between whites and Indians have been reported, and there is scarcely a locality from Yuma to Yontocket that has not its story of an Indian "battle." If all the stories told could be believed, they would indicate that more than 15,000 Indians were killed in these affairs, but the suspicion is strong that the white participants in telling the tale afterwards may have exaggerated the number of Indians involved as they did the dangerous character of the clubs and bows and arrows which constituted about the only weapons the Indians at that time possessed.

This state of affairs was not wholly unknown to the National Government. At first there were Government agents who made due reports to headquarters, and one of them issued a strong appeal to the people of California, but the agents were soon legislated out of office, and thereafter the Federal Government had little knowledge of the California Indians. The State Government also disclaimed any responsibility for them. An Indian could not sue in the state courts and his evidence was not admissible in a court of justice until 1872. As might be expected, the Indian spirit was soon crushed, and no Indian now dreams of attempting to protect his own rights in any way. There are no legal discriminations today against the Indians in California, but the temper of white juries in many counties is such that an Indian can seldom obtain justice.

One noticeable effect of the white settlement of California has been the introduction of many diseases theretofore unknown to Indians, and from the effects of which they are not free to this day. Smallpox has been very destructive to them in the past, and tuberculosis is prevalent among them now. Thousands of Indians have died of all sorts of these imported diseases, and the sanitary and other conditions under which Indians live, and which will be referred to hereafter, are such that death usually follows closely upon the attack of disease.

Another feature of civilization unknown among Indians prior to their acquaintance with the white race is the use of intoxicating liquors, and as the thirst for liquor seems innate among Indians, the problem of handling the liquor traffic among them is difficult.

The State of California has an excellent law against selling liquor to Indians, which law was enforced in some counties and disregarded in others. It is to be regretted that the recent decision of the Supreme Court of the United States has removed practically all the Indians in Northern California from the scope of the Federal laws. A large increase in open liquor selling is noticed, and the remnants of some bands seem to be trying to drink themselves to death before the law is changed. It is a pleasure to find that a majority of the California Indians are sober. The Indians who are addicted to liquor are apt

to hang around the towns, and thus fill a much larger place in the public eye than the sober Indians, who usually stay at home and are seldom seen. If a recommendation upon this subject is allowable, your special agent would earnestly recommend that the Act be amended so as to meet the suggestions raised by the Supreme Court. It may also be feasible to provide for the summary cancellation of the Federal liquor license when the holder thereof shall be convicted of the offence of selling liquor to Indians, in any court of the United States, or of any state or territory. It is not expected that this would put an end to illicit liquor selling, but it would tend to throw the traffic out of the hands of the saloon-keepers who have friends on juries and political influence, into the hands of go-betweens who are not usually so circumstanced. It is not fair to say that a majority of the California saloon-keepers obey the law, but there are usually one or two in each locality who are willing to take the risk.

But neither the open slaughter of the California Indians in the period of "war," nor the ravages of disease, nor the effects of drunkenness, considerable as they all are, can explain the tremendous decrease of 84 per cent in the number of California Indians in but a little over one generation. We are so familiar with the idea that the Indian race is fading away before our own that inquiry is seldom made into the details of the process by which we fade them. In the case of the California Indians, the most potent factor has been, in the opinion of your special agent, the gradual and sure aggression on the part of the whites, the progressive absorption of the Indian's every means of existence. Perhaps this requires some explanation. In aboriginal days the California Indians were more nearly sedentary than any other Indians of the United States, other than the Pueblo Indians. Each tribe was restricted within narrow limits. Usually each band had a strip of territory reaching from the mountain tops down to some fish-bearing stream, or the ocean, and they seldom or never went beyond these limits. Game was abundant, but did not hold a very great part in their bill of fare, as they had no fire arms, and were restricted to what they could kill by means of bows and arrows and pit-falls. Fish formed a much greater share of their diet, and all the California tribes were large fish eaters. Hardly a band was without its source of fish supply. The Indians also made a large use of edible roots. Grass seeds and larvae and pupae of some insects, and also grasshoppers were often on the bill of fare, and angle worms were resorted to in times of scarcity /sic/, as they are occasionally today. The largest single item in their menu was composed of acorns and other nuts. The Indians grind the acorns, leach out the bitter principle and make various forms of mush and bread, both nutritious and palatable. These sources of food supply may be averaged about as follows: Acorns and other nuts 55 per cent; fish 25 per cent; game 15 per cent; roots, etc., 20 per cent; and grass seed and miscellaneous 5 per cent. Of course, the proportion varies in different parts of the State, and the figures given are only approximate.

The first effect of the occupation of the land by the miners was the muddying of the streams by the mining operations and the killing or frightening away of the game, thus cutting off the Indians' fish and game supply. The mining population soon needed gardens, and about the only land suitable was that where the edible roots grew. The stock industry followed very soon, and even the oak trees were fenced in and forbidden to the Indians, as the acorns were needed for hogs. Later the era of wheat came and arable lands passed into

-2-

private ownership. The Indians were thus reduced from a state of comparative comfort to one of destitution. Very few white families would not feel the pinch of poverty if they lost one-half or three-quarters of their subsistence, and it is not strange that the Indians suffered. This absorption of the Indian's means of making his living did not take place simultaneously all over the State, but everywhere there has been the same steady, sure occupation by whites of everything that will yield a living to a human being. It is not to be expected that a savage people could at once adapt themselves to such changed conditions, or that they should at once see the necessity, or reason for any change at all. There was little or nothing available to take the place of what the Indian had lost. Very few people in those days wanted Indian labor on any terms, and there was very little work to be done at that time which an Indian fresh from barbarism was competent to do. Generally speaking, the California Indians have been not far from the line of destitution ever since, and few have been able to rise above their environment.

All this could not have occurred had the promises made by the Government in rejected treaties been given effect in any form, however modified. Why the Government never made any further attempt to require the Indian right of occupancy has not been stated. It is suspected that interested parties had more influence at Washington than the Indians did. The Indian Bureau did, it is true, attempt for a time to protect the Indians and several small reservations were set aside by Executive Order. Some of these were decided to be within the limits of Spanish grants and thus not available for reservations. Others were occupied by settlers who had political influence enough to have the reservations cancelled. One or two were abolished by Act of Congress, apparently because they contained timber which was desired by some lumber concerns. Only three reservations in Northern California were finally saved to the Indians. The Hupa Reservation and the Klamath strip became Indian land as a result of an expensive Indian war brought on by encroachments on their lands. The Round Valley Reserve was confirmed to the Indians as a result of similar trouble hardly important enough to be called a war. These three reservations have a total population of about 1,550 Indians. The Tule River Reserve and the reserve near Jackson, formed subsequently, have about 170 Indians. The rest of the Northern California Indians who have kept the peace and killed nobody have received nothing but writs of eviction.

At first, and before the country was thickly settled, if a land-owner objected to the presence of Indians he could move to some adjacent tract, but very soon the land in the greater part of the State was practically all taken up. Then as the lands became more valuable there was less tolerance of Indian occupancy. Had it been possible for Indians to take up Government land, much misery would have been saved them. In many instances the Indian arranged with some white friend to take up the land, upon the promise that the Indian should remain there as long as he desired. This promise was usually kept by the white man as long as he lived. When he died his successors were very apt to evict the Indian. Some of the evictions were from Spanish grants, and some distressing occurrences of this kind in Southern California attracted the attention of Helen Hunt Jackson and others, and as a result of their agitation reservations were assigned to the Indians of Southern California. Since that time the situation in Southern California and the problems arising there have been different from those arising in Northern California, and will be discussed hereafter in this report.

AR 101

-9-

At first the Indians occupied pretty fair land and had usually neat little gardens and orchards, especially of peach trees. These tiny little places would attract the attention of some frontiersman who would then file on the place and summarily kick the Indian out. Several hundreds of such cases have been reported. One man still in middle life has been evicted seven times in this matter. It is not strange that the Northern California Indians have ceased to try to have gardens, when any appearance of thrift is warrant for their ejection from the premises. Indeed, most of them at the present time are living on land where, for lack of water or worthlessness of the soil, gardens are impossible. Most of the Indians have now been crowded out of anything like good soil and are found in waste places not having value enough to attract anyone else. It is now a matter of difficulty for an evicted Indian to find any place of refuge, except in other Indian settlements already overcrowded.

The Indian Allotment Act did not come in time to be of much use to the greater number of California Indians, though its value has been great in the Northern and eastern part of the State, notwithstanding some defects in the application. There have been issued in California 2,058 Indian allotments, of which 261 have been cancelled for one cause or another, leaving 1,797 now valid and outstanding. Of these 1,797 allotments now outstanding, 1,439 are in the counties of Modoc, Lassen, Plumas, Shasta, and Siskiyou in the northeastern corner of the State, leaving but 358 for the rest of the State. Every allotting agent sent out by the Department seems to have visited this corner of the State and hardly any other. Two or three visited Humboldt County, and one is reported in the Southern Sierras, but almost their entire attention seems to have been concentrated on this one section of the State.

The allotting agents first sent out were from the east, and to them California conditions were an insolvable enigma. Some seem to have come expecting a soft snap. When it became evident that allotting the lands to Indians required arduous labor in the mountains in all sorts of weather (there was suspicion that some of them did not know how to run a section line), they preferred the much easier plan of making the allotments from the map.

The Golden State is widely known as a land of fruit and flowers and mild climate. It does not seem to be well understood that a considerable portion of the State of California, larger than most eastern states, has a severe winter climate with heavy snow-falls, and that there are also extensive deserts. The allotments referred to are in this portion of the State. Over 300 allotments are absolute desert, being sage brush plains without water or the hope of water. Six hundred more allotments are located in the Sierra Nevada Mountains where the land, or rather rocks, incline up at an angle of 45 degrees or more, and the snow falls often 30 or 40 feet deep, and lies from October to June. It would seem that even a special agent from the Atlantic Littoral ought to have known better than to allot either kind of land to anyone for a home, and yet that is just what was done. More than three-fourths of the allotments in that section are absolutely unfit for human habitation, and it is not strange that the Indians have been unable to do anything with them. The small number of allotments which are fit to live upon have been the salvation of the Indians there, and the distress, disease and death which follows in the wake of eviction has been unknown among them. If the Allotment Act had nothing more to its credit than the saving of these Indians, its enactment would be justified. This, however, does not help those Indians who have received the worthless allotments. The present allotting agents

AR 107

in the field are competent, but they cannot create land or undo the mistakes of
their predecessors. The desert allotments have some scanty pasturage and could
probably be sold to sheep or goat men. Five acres of good land with water (land
without water is worth very little), is worth more than an entire quarter section
of desert land. I would recommend that the Government buy enough land with adequate
water supply to give each family five acres of land, and exchange these five-acre
tracts for the quarter section allotments of desert land. This would require a
nominal appropriation of from $25,000 to $30,000, but it would be only nominal,
as the value of the land received in return at the Government price of $1.25 per
acre would probably exceed the value of the land purchased.

The mountain allotments referred to, some 500 in number, are in much
the same situation as the desert allotments, except that most of them have more
or less timber, and some of them very good timber, indeed. This fact has kept
the Indian allottees in hot water most of the time. There is a constant succession
of squabbles over the efforts of claim-jumpers and timber syndicates to get hold of
the timber. All sorts of schemes have been devised, with as yet no very great
success. The Allotment Act specifically provides than an Indian may select his
allotment "upon any surveyed or unsurveyed lands of the United States, not other-
wise appropriated." Hence there seems little doubt but that the Indians are
entitled to hold the land. If these allotments were fit for human habitation,
your special agent would be inclined to stand by the Indians at all cost as
against the timber speculators, who are usually eastern gentlemen with large
experience in absorbing timber land, or their California agents who sometimes
seem to be selected for their supposed unfamiliarity with the ten commandments. ✓

The time has gone by when either the desert allottees or the mountain
allottees can secure other allotments from the public domain. Hence, your special
agent would recommend action in favor of the mountain allottees similar to that
proposed for those on desert lands. The Government has held these lands at
$2.50 per acre. These with timber on are worth much more. The Government would
be a large gainer in exchanging the allotments in question for the small allotments.
Land can be had in the mountain valleys much cheaper than in most of California.
It would also require a nominal appropriation of an amount which cannot be stated
exactly without further examination, though probably not to exceed $40,000. Of
the mountain allotments referred to, about one-third are within the limits of
the forest reserves, and none of the others are more than three or four miles
from the reserve boundaries. Most of these lie in the territory between the
Diamond Mountain and the Plumas Forest Reserve, which should, apparently, be
included in these reserves. There would therefore seem to be no good reason
why all the allotments over which so much controversy has arisen should not be
put into the forest reserves and the Indians given something in exchange which
they can use, or at least live upon more than three months in the year.

There is a defect, apparently, in the allotment system as developed
in California in that no provision seems to be made for protecting an allottee
after he has received the allotment either in the use of the land itself, or,
what is more important, the water supply when there is one. As it stands now,
anyone can jump an Indian's allotment, and there seems no practical remedy, or
anyone can move the fence over onto the Indian's land, or divert his water, and
it is not even a misdemeanor. Theoretically, the Indian can appeal to the State
Courts. Practically, such remedy is illusory. The Indian would have to pay
court and attorney fees, often jury fees, and would have to put up a bond for
costs, all beyond the power of most Indians. The same is true of encroachments

upon an Indian's water supply. Many cases have been reported to your special agent where white men have deliberately diverted a stream of water from the Indian with full knowledge of the Indian's priority of right, but secure in the knowledge that the Indian was helpless, and that the offence could be committed with impunity. The Indian could do nothing but watch his trees die and his garden dry up, and be forced to abandon his holding.

There is very little use in giving an Indian an allotment if anyone who is a little loose in morals can deprive him of the use of it. The Indian has no confidence in the white man's courts, and it must be confessed that in times past he has had little reason to have any. The title to the land in these allotments is still in the United States, and it is the United States that is technically the party interested. It therefore seems entirely within the province of the Federal Government to interfere and to see that its interests are not wantonly injured.

Your special agent would therefore recommend additional legislation for the protection of Indian allottees; that trespassing or encroaching upon an Indian allotment be made a misdemeanor; and that it shall be made the duty of the United States Attorney for the district to appear whenever the boundaries, title, or possession of the land or water appertaining to an Indian allotment is in question.

Very few Indians have been able to rise above the distressing conditions they live under and to acquire land by purchase. Still there are a number of Indian communities owning land in common. Indianola, Humboldt County, Upper Lake, Lake County, Potter Valley, Coyote Valley, Pinoleville, Guidiville, Carroll, in Mendocino County are all inhabited by Indians who own their own land, though it was purchased by white friends in most cases. The conditions in these settlements are far from satisfactory. They are sadly overcrowded, and are becoming more so as the Indians evicted elsewhere join the communities. At Potter Valley, 52 Indians are living upon 14 acres of land that would not support a single white family. At Coyote Valley 36 live upon seven acres, and at Guidiville 59 live upon five acres. At Upper Lake they have 160 acres of land, of which but 25 is level enough to build a house on. The hill land is good grazing land, but the whole place would not be large enough for more than one white family. One hundred and seventy-seven Indians live there, and there are more than 250 in the band. There are also three communities living upon land owned by religious or private associations; one near Chico owned by the Presbyterian Board of Missions; one near Kelseyville owned by the Roman Catholic Church; and one near Manchester owned by the Northern California Indian Association. In these three settlements conditions are much better, as they are not so overcrowded, and there is some attention paid to the welfare of the Indians themselves.

An interesting experiment has been under way at Fort Independence, Inyo County, which seems to be giving much better satisfaction than the allotments under the General Allotment Act. The old military reservation at Fort Independence has been turned over to the Indian Bureau, and has been allotted, or rather apportioned among the Indians of that settlement. There are 20 tracts, of from 2-1/2 to 5 acres per family, and 43 families, or 122 souls, have homes on the tract. The land is of good quality and the water supply ample. The Indians are making good use of the land and the conditions among them seem excellent. In fact, the experiment is so successful that your special agent suggests it for consideration as a model in the proposed relief of the Northern California Indians.

AR 104

There are also quite a number of Indians located within the boundaries of the forest reserves. According to the figures of your special agent, they number 1,194. They have, of course, no title to the land they occupy, and since the establishment of the forest reserves, it is uncertain whether the lands within the boundaries can legally be allotted to them. These bands have mostly been in their present location from time immemorial, and there seems to be no occasion for any action in respect to any of them. The Forest Reserve Officials do not seem to object to the Indians, though some of them desire to extend their hold by means of leases or permits which it is proposed to have the Indians secure to entitle them to reside upon the reserve. This seems hardly necessary, and any rules or regulations for Indians alone are objectionable. There is no apparent reason why the Indians should be upon any different basis from other people, and any attempt to enforce arbitrary rules is sure to result in friction. Your special agent would therefore recommend that no action be taken in respect to Indians on the forest reserves until action seems more necessary than at present.

In the matter of schooling for their children, the Indians in California have not been much favored. For many years all Indian children were refused admission to public schools, and today, in a majority of school districts where Indians live, public sentiment is against their admission. About the only districts in which Indian children are welcome are those small ones which are likely to lapse if the Indians do not attend. It is impossible to give exact figures as to the number of Indian children attending the public schools, as the school registers do not distinguish them and only partial statistics could be obtained. As near as can be estimated, the number is about 500 out of a possible school population of 2,700. The laws of California in regard to school matters make no distinction as to race or color. The trouble has been in local public sentiment. All counties have for years drawn the full quota from the State School Fund for the education of the non-reservation Indian children, but most of the counties have refused the Indian children admission to the schools, seemingly with no conception of the morals involved in drawing money from the State Treasury for one purpose and using it for another. The method of school apportionment has, however, been changed recently, and hereafter no money can be drawn for Indian children unless they actually attend the district school. The National Government has to a limited extent entered the educational field, and is now maintaining reservation boarding schools at Hupa and Round Valley, training schools at Greenville and Fort Bidwell, and day schools at Bishop, Big Pine, Independence, Ukiah, and Manchester. These have a capacity of about 560, and the attendance of non-reservation children has not exceeded 350. Private schools have about 50 more non-reservation children. There are thus at least 1800 Indian children without opportunity of any schooling whatever.

In endeavoring to ascertain the present condition of the Indians of Northern California, your special agent has availed himself of all information offered from any and every source, but he has preferred to rely chiefly upon his own investigations, and for that purpose has visited almost every Indian settlement in Northern California. He feels in a position to speak with some degree of assurance in regard to what he has seen. The most surprising feature of the situation is the absolute ignorance of 99 per cent of the inhabitants of California in regard to the Indians in their own neighborhoods. Very few persons really know much about Indians in their person or in their circumstances, or in their manner of living. Those who are best informed are usually the store-keepers with whom the Indians trade, and whose information is usually accurate.

-15-

Your special agent finds considerable diversity in the Indian condition in different localities, they being usually in better condition in the Northern part of the section, and worst off in the Central Valleys and along the southwest flanks of the Sierras. The Indians are for the most part settled in little villages called in California rancherias. These little settlements contain all the way from 20 souls up to 250, the usual size being about 50. A schedule or census accompanying this report gives the location of each such settlement and the names of each head of a family and the number dependent upon him. These Indian settlements are for the most part located upon waste or worthless land as near as possible to their ancestral home. These remnants of each stock or tribe or band occupy today almost exactly the same territory their ancestors did a century ago.

In the native religion of the Indians a sort of shamanism, inter-communion with the spirit of the dead is one of the chief features. The Indians continually make offerings to the manes of their deceased ancestors and friends, especially at the annual feast of the dead, and they expect to receive in return protection from all manner of spiritual and earthly terrors. The desire of the Indian to remain by the bones of his ancestor is therefore much more than a mere sentiment, and the feeling is still strong, even among those who have been Christians for a generation or so. An Indian will endure great extremities rather than abandon his locality, a trait that has not always been given proper weight in attempting to handle Indians.

The sanitary condition of the Indian rancherias is bad, but the feeling of helplessness and despair is worse. Most of the Indians seem to have lost all hope of escape from their present situation and have become familiar with the idea that they will all die off soon any way. It is evident that if the Indian is to keep alive he must have some means of making his living. He must do so by his own labor, either for himself or for others. Most of the Northern California Indians being landless, the opportunity to work for themselves is wanting, and they must of necessity work for others. If the supply of labor for Indians was sufficient in all localities and well distributed during the year, the problem would be light, but in many localities the labor is not to be had in sufficient amounts, and the Indians thus suffer great straits in endeavoring to keep alive.

Your special agent estimates that 1,700 families with nearly 6,000 souls are dangerously near the famine line. This does not mean that they are all suffering at the same time, or all times, or every year, but each of the landless bands is liable to suffer a time of famine, and during such a season the old people and children die. The healthy and ablebodied can survive a period of starvation, but in the weakened state caused by insufficient nutrition, almost any disease, even common colds, will carry off most of the children in the settlement. North of Tehachapi there are hardly any of the old people left, and the proportion of children is small, although births are numerous. The people of almost any locality who do not know the Indians well are apt to deny that their Indians ever suffer. Other Indians do, but their's do not, and it is a striking fact that the less work there is for an Indian in a locality, the more firmly convinced his white neighbors are that he has all the work that any well regulated Indian could desire. The store-keepers, however, generally know better, and quite a number have told me that in employing an Indian it was necessary to feed him up for two or three days before he was able to work satisfactorily; and that the Indian scale of living was so low that the Indians were often weak /sig/ from lack of proper food. The Indian is not competent for all kinds of work and usually is

AR 106

-14-

restricted to the roughest labor. The need of industrial instruction is great, and the need of field matrons to teach ordinary household economy and common sanitation is even greater.

Your special agent will take pleasure in recommending 25 or 30 places as proper locations for industrial instructors or field matrons. It can hardly be expected, however, that either can teach very much while the Indians are subject to eviction at any time or are being harrassed /sig/ from place to place. It can hardly be claimed that the non-reservation Indians are advancing very much, or that any very effective steps are being taken to improve their condition or to teach them anything that an Indian must know if he is to take any part in our civilization. There are missions at Fall River, Chico, North Fork, Helseyville, and Carroll. These with the Government work at the schools, altogether do not reach 20 per cent of the non-reservation Indians. The reservation Indians are all fairly well cared for. Your special agent would therefore recommend an increase in the number of day schools in Northern California, and especially an increase in the number of field matrons and industrial instructors. He will, if desires, submit reports hereafter specifying locations and giving more details than seem proper in this report.

The California Indian both north and south has a good reputation as a hard working, trust-worthy, honest laborer. His greatest defect is that he will sometimes leave his work without regard to the position in which it leaves his employer. In some localities the Indians have all the work they can do. In more localities a very curious race prejudice, different from that against Asiatics, militates against their employment. In other places there is very little work of any kind to be had, and the Indian often has to go 50 or 100 miles to work. Then he can work but a short time, picking fruit or hops. This is often all the work they get in the year, and how these bands live is a mystery to their neighbors.

In making the family census of the Indians of Northern California, a very puzzling question was the status of the half-breeds or mixed-bloods. The number recorded by the census is much fewer than had been expected. It has been found impossible to classify them strictly according to blood. With those half-breeds who are brought up, educated and acknowledged by their white fathers, little trouble is experienced, but the majority of the mixed-bloods never knew their white ancestors, and have grown up in the Indian camps. They are more intensely Indian in sentiment than the Indians themselves. They consider themselves Indians, and it is difficult to deal with them upon any other basis. About two-thirds of the half breed men marry full-blood Indian women, and 20 per cent of the half-breed women marry Indian men who are full-bloods. Where the children are thus three-fourths Indian, they are Indians to all intents and purposes, and are so recorded in the census. A considerable number of half-breeds intermarry among themselves. These form a class apart, not being recognized by whites and looked upon with suspicion by the Indians. The mere statement of mixed-blood therefore, does not indicate whether or not they are to be considered Indians, and a separate list has been made for mixed-bloods, status undetermined. Just what ought to be done with them your special agent is not able to decide, as it will take a more minute examination of each individual case than he has had time to give. People of mixed blood, more than half white, are not usually enumerated at all.

—15—

The responsibility of the National Government for the present condition of the non-reservation Indians of California seems clear. Had the Government given these Indians the same treatment as it did other Indians in the United States, their condition today would be very different. Those Indians of California who have received land, if not increasing in numbers, are at least not decreasing very fast. Most of the landed bands are about stationary in numbers. The entire Indian population of Northern California has decreased as closely as your special agent can estimate by about 1,100 in the last three years, most of the decrease being in the landless bands.

It should be remembered that the Government still owes these people considerable sums of money, morally at least, but the Government owes more than money. No amount of money can repay these Indians for the years of misery, despair, and death which the Governmental policy has inflicted upon them. No reason suggests itself to your special agent why these Indians should not be placed in the same situation as all other Indians in the United States; why they should not receive a minute portion of the lands which they have not as yet ceded to the United States. It seems clear to your special agent that the Northern California Indians have not had a "square deal," and that it is not too late to do belated justice. The landless Indians cannot be placed in status quo ante, but they can be given what is sometimes expressed as "a white man's chance," and it ought to be possible to put an end to the periodical wiping out of Indian children. It seems that we are under the necessity of civilizing the Indian whether we like the job or not, or whether the Indian wants to be civilized or not. We are therefore under obligation to make at least a decent effort to accomplish the task without injury to the Indian.

Your special agent is inclined to object strongly to anything in the nature of reservations for these people. The day has gone by in California when it is wise to hard the Indians away from civilization, or to subject them to the stinting influences of reservation life. Some of the past reservation experiences in California have been so harrowing that the Indians fear reservations above all things. Moreover, the expense of establishing reservations, and more especially maintaining them, would be enormous. Reservations, therefore, seem out of the question. It should, however, be feasible and comparatively inexpensive to give these Indians allotments, and there would be no expense connected with the allotments after they are once made. It would, however, be necessary to buy a considerable amount of the land, as there is very little land in the public domain left to allot them. Almost everything relied upon for this purpose has been included in the forest reserves. The expense of buying land to allot these Indians is not so great as would appear at first sight. Your special agent is not in favor of giving them farms. They would be unable to use farms. Small tracts, not exceeding ten or fifteen acres, if the land is good land, will be ample, and in many places five acres per family, or less, will be sufficient. It is not necessary that the Indians should be made rich. All that is proposed is that they shall have mere footholds with fixity of tenure. This will not change their present status as laborers, but will give opportunity to teach them some of the common every-day lessons which they need so much. I would therefore recommend the appropriation of a sufficient sum for the purchase of land in the immediate localities where the Indians live, to be allotted or assigned to them in small tracts under such rules as the Secretary

AR 108

-15-

of the Interior may prescribe. It may take several years to complete the work. Hence it is not necessary that the entire appropriation shall be available the first year.

The Indian Appropriation Bill for the fiscal year 1905, contained an item providing for this investigation, and appropriating the sum of $10,000 to cover the expenses, and for the support and civilization of the Northern Indians of California, for 1905. Your special agent would recommend that the unexpended portion of this appropriation be re-appropriated in such form that it can be applied to the purchase of land.

It seems to be the belief of many persons that there has existed in California a considerable body of "Citizen" Indians. This is an illusion. Until allotment times there never were any Citizen Indians in California. There are none new except of comparatively recent make. The Indians who are supposed to be Citizens, or most of them, were so neither in law nor in fact and were for all those years unable by reason of legal restrictions to appeal to the courts of either state of Nation. Their rights and their citizenship were denied by both state and nation, and to speak of anyone in such position as a Citizen is absurd.

There are, however, some really Citizen Indians in California. At the present time about 1,250 Indian men are, by virtue of the Allotment Act, entitled to vote, or would be if they could pass the educational qualifications imposed by the constitution of California. Comparatively few of them have ever voted, and those few are usually educated mixed bloods. The 1,250 men may be said to represent an Indian population of about 4,000. These may fairly be considered citizens. It should be understood that for these Citizen Indians no relief is asked and in the opinion of your special agent none is needed other than some re-adjustment of allotments mentioned heretofore in this report.

## Southern California.

Although the troubles of the Indians of Southern California arise from the same initial wrong as those of the Northern part of the State, yet, the Government has here attempted to repair the wrong, and has assigned more or less barren reservations to substantially all the Indians in the southern section of the State. This action came late, as usual, and there was very little land of any value remaining in the public domain which could be given to the Indians. The unsatisfactory condition on some of the reservations arises from the character of the reservation, and therefore requires remedies different from those to be applied in Northern California.

Your special agent has visited nearly all of the reservations in Southern California, and has had a bird's-eye view of some of the others, and has made a careful investigation of the situation there. Those reservations which seem to require attention will be considered in order:

## Campo.

Campo has occupied a considerable place in the public mind for the past 18 months by reason of reports current as to conditions there. It is to be regretted that the sensational press has exploited the matter in such shape as to give the

-17-

idea that all Indians in Southern California were in the last stages of starvation. The situation at Campo was bad enough without exaggeration. There is no question as to the extremity to which the Indians of the Campo reservation were reduced. Your special agent has no doubt as to the fact that the Indians were in great straits, and that only the timely relief saved them, or most of them from death by starvation.

There are five reservations usually known as the Campo reservations, as follows: Campo Proper, area 240 acres, population 25, elevation about 2,500 feet; Manzanita, area 640 acres, population 59, elevation 3,000 feet; La Posta, area 239 acres, population 19, elevation about 3,200 feet; Cuyapipe, area 830 acres, population 44, elevation about 3,800 feet; and Laguna, area 320 acres, population 5, elevation about 4,500 feet. The areas given are their areas on paper. Most of the land is the most barren description. The actual areas of arable lands are as follows:

| | |
|---|---|
| Campo, | 40 acres |
| Manzanita, | 35 " |
| La Posta, | 30 " |
| Cuyapipe, | 30 " |
| Laguna, | 70 " |

There are about 20 of these Indians not living on any reservation. The rainfall is scanty, and grain and hay are about the only crops that can be raised without irrigation. There is no water for irrigation on any of the reservations, and barely enough water for household use. The entire five reservations would not support more than one or two white families, and yet 40 Indian families are expected to make their living there. The surrounding country for fifty miles in every direction is thinly settled, and mostly a cattle country where there is very little work for Indians outside of the reservations.

Now Indians require some means of making a living the same as anyone else. To place Indians upon a reservation where they cannot make a living, either by working for themselves or for others, is to invite exactly what occurred at Campo, starvation. The immediate cause of the hard times at Campo was a succession of three or four bad years when crops failed.

Your special agent saw no evidences of present suffering at Campo. The relief extended by the people of Southern California was timely and generous. Since the Government has taken charge of the situation there has been no occasion for suffering. Last year was a favorable one, and the present promises to be likewise, but so far no remedial steps have been taken to prevent a recurrence of the trouble which any bad year may bring forth.

In relieving the distress, the people of Southern California have contributed two four-horse wagon loads of supplies, the value of which cannot be less than $2,000. There was also contributed in cash, through the Sequoyah League, which also handled the contribution of goods, the sum of $3,075, and through other persons, $533.17. The Government has itself spent $748.80 in cash, a total of $4,156.97 in cash and at least $2000 in goods. This for 165 Indians. Starving our Indians seems to be quite expensive both for the Government and the surrounding people. The amount of cash alone spent in the last 18 months is the interest on $83,219 at 5 per cent, and at the rates the Government pays, the principal would be much larger.

All humanitarian questions aside, it would seem to be cheaper as a business proposition to put these Indians in a position where they can earn their

AR 110

own living than to allow present conditions to continue and have a scandal of this kind every few years. Your special agent estimates that a proper place can be secured in a neighborhood with a proper water supply, and would recommend an appropriation to provide more and better land for the Indians of the five Campo reservations. It is not expected that all the Indians will wish to remove from the old reservations, and I therefore recommend that the present reservations be retained and used in connection with the proposed new tracts.

The amount contributed by the people of Southern California and by the United States seems a large one for the purpose, and yet it is not quite as large as it appears at first sight. $4,155.97 is only $1.40 per month per head for the 18 months. A report has gained considerable currency in the public press that the Campo Indians are being supported in idleness and luxury. $1.40 per month per head will not buy many luxuries for anyone, nor will it buy an undue quantity of necessaries. The relief was not all doled out by the month to be sure, but was given in the nick of time when needed. Yet it is still evident that the Campo Indians, notwithstanding the considerable assistance received, have themselves, by their own labor, furnished the major portion of their subsistence.

## Pala.

The new reservation at Pala is undoubtedly the best in Southern California. There is a large area of good land and a fine water supply. Some 450 or 500 acres are now being irrigated. The land under the new ditch, about 400 acres, is sub-irrigated, well drained, free from alkali, and with the surface irrigation from the new ditch ought to be very productive. The situation is certainly much better than that formerly occupied by the Indians on Warner's Ranch. It is not to be expected that the old people will ever be satisfied with any other place than Warner's Ranch, but the able-bodied young men are finding the value of the new location. They probably would not be so willing to return to the old site, if it were possible. Your special agent has no desire to criticise severely those Government officials at Pala who did the best they could in a time of great stress, yet, there are certain things in connection with the making of the Pala reservation that are valuable in showing some things to be avoided in trying to improve the situation at Campo and other places. There seems to have been a considerable waste of Government funds, and, as usual, no one is willing to shoulder the responsibility.

The new irrigation ditch has cost nearly $18,000, or about $45 per acre of land irrigated. It cannot be used to irrigate any other land anywhere. The ditch is well built, with a proper grade and fine curves. About three-quarters of a mile of it is cemented. There are some criticisms that might be made as to money spent in a diverting dam of which very little is to be seen now and to other expenses necessitated by locating the upper end of the ditch parallel to the torrent. The capacity of the ditch is given as 1,700 inches of water, and the land to be irrigated about 400 acres. The duty of water under the San Diego Ditch and Flume Company, the largest irrigation enterprise in that part of San Diego County, is 1 to 6, that is, 67 inches of water would irrigate 400 acres of land. If we take the lower duty of 1 to 4, 100 inches of water would be sufficient. Or to put it another way, the ditch of 1,700 inches capacity would irrigate from 6,800 to 10,200



acres of land.  These are minimum figures, however.  It would be perfectly
proper to make the ditch larger than necessary for the minimum amount of water.
Four times the minimum or from 300 to 400 inches would have been ample as the
capacity of the ditch.

Your special agent has in former years visited Pala in the summer
time, and he has seen the amount of water in the San Luis Rey River at that
point.  He doubts very much if the said river ever carries one-fourth of the
amount of the ditch in question during the irrigation season.  The commission
which examined the various sites prior to the purchase of Pala, state in their
official report to the Secretary of the Interior that they measured the San
Luis Rey River at the point of diversion and found a flow of 142 inches.  Just
why it should have been necessary to build the ditch a dozen times larger than
there is land to irrigate, or water to irrigate with, is a query which an inspec-
tion of the premises does not enable one to answer.  This big ditch contrasts
strongly with the ditch recently completed on the Rincon reservation under the
direction of the agent, planned to irrigate 200 acres of land, and which cost
a little less than $800.

The matter of houses for the Indians who removed from Warner's Ranch
to Pala was a vexed question of the times immediately after the removal.  The
suggestion was made that the Indians be at once set to work building adobe houses.
This particular band had been making adobe, building adobe houses, and living in
adobe houses for more than 100 years, and the adobe house was the one kind of
house they knew all about.  Adobe as a building material has some defects, but
it also has some excellent qualities.  It is suited to the climate, being warm
in winter and cool in summer.  It is wind proof, dust proof, and even when the
roof was of thatch, the Indian houses were usually water proof.  But for some
reason the adobe idea did not meet with favor.  It was said to take too much
time.  This objection was also made against the project of buying rough lumber
for the Indians to build into houses, and things were rather at a standstill
until the brilliant idea was evolved of getting temporary houses for the Indians
to live in permanently.  The Indians were inclined to be mutinous and openly
threatened to return to Warner's Ranch.  There was evident need for haste, so
fifty portable houses were ordered by telegraph—from New York.  The order seems
to have been filled in due course of business, and the delay in coming by freight,
more than 4,000 miles, were no greater than usual with transcontinental freight,
but as a time-saving device, it was hardly a success.  It was nearly six months
before the Indians got into the houses.  The expense was double what wooden
cabins built on the spot would have been, and about four times the cost of adobes.
There would be less room to cavil at this purchase if the houses were fairly adapted
to the purpose for which they were bought.  The houses are well enough constructed
for the purpose for which they are advertised and sold, that is for a temporary
house, or wooden tent.  As a permanent dwelling place for human beings they are
far from satisfactory.  Being composed of but a single thickness of board three-
quarters of an inch thick, they are hot in summer and cold in winter.  The Califor-
nia sun has sprung the narrow strips composing the panels and made cracks in about
every panel.  The sun has also warped the roof panels and injured the tarred paper
which constitutes the rain-shedding part.  The houses are neither dust-proof, wind-
proof, nor water-proof, and are far inferior to the despised adobes.

AR 112

California has no winds comparable to the eastern cyclones, and yet not long ago a stiff breeze unroofed 14 houses and made kindling wood of another. Nearly every house in the settlement is more or less wracked and twisted.

In moving the Indians to Pala, one mistake was made which, though of small dimensions, is illustrative of a class. The Indians of Agua Caliente Village speak a dialect of Shoshonian stock. The little village at San Filipe, also evicted at the same time and moved to Pala, are of Yuman stock. Not a single word is alike in the two languages. Between these two diverse races of Indians there are generations of warfare and hatred, and though there has been no open war between them for a long time, a great deal of the old animosity still survives. The San Filipes removed to Pala number but 34, a mere hand-full, surrounded by an overwhelming number of their hereditary enemies, and among whom they are unwelcome. The San Filipes are outraged in their feelings, or possibly in their prejudices, and will never be satisfied at Pala. They have said little on the subject for they have all of a child's helplessness of making anyone understand. The Government seems to learn very slowly that Indians are not all alike, and that different stocks or races of Indians ordinarily cannot be put together. We may consider their ideas or antipathies to be childish, yet, if we wish to be successful in dealing with them we must necessarily take some account of the human characteristics of the Indian. I would therefore recommend that the San Filipe Indians be allowed to remove to Santa Ysabel where most of their friends and relatives are. More than half have left Pala already.

### Pachanga.

The Pachanga reservation is one of the poorest in Southern California. On paper it has 3,360 acres, which looks large. Actually, there is less than 300 acres that can be plowed, and this is so dry and sandy that the grain crop, about all that can be raised, is very scanty and often a failure. There is no water supply even for domestic purposes. At the Government school there is a well which furnishes some water for two or three months during the rainy season. The rest of the year all water has to be hauled from three to five miles, and at the school they have not even water enough to wash the children's faces. The contrast is strong between Pachanga and Pala with its good land, abundant supply of water for irrigation, and water for household purposes piped to each Indian house. There is a fine spring two or three miles up the canon from Pachanga which can be brought down in pipes at an expense estimated by the agent as $4,000. The land the spring is on is Government land, and that and the land between it and the reservation should be added to the reservation. The Pachanga Indians really ought to have some land that is good enough for gardens. The expense would not be great, probably less than $5,000. I would therefore recommend the purchase of such land.

### San Pascual.

The maps show an Indian reservation named San Pascual, but actually there is no such reservation. A reservation was selected for these Indians comprising certain descriptions of land in township 12 south, range 1 west, in San Diego County. By some inexcusable error, the land was actually reserved in township 11 south, range 1 west. None of the San Pascual Indians ever lived on the land actually reserved, as that was considered to be Shoshonian territory, and the San Pascual are Yuman. Both pieces of land are barren and of little value. The Indians actually occupied the land in township 12. In the years that have past,

AR 113

-21-

all the land in the intended reservation worth filing on has been taken up
in the usual manner, - it being open to settlement. The result is that the
San Pascual Indians have no reservation, and all through errors not of their
own making. I would therefore recommend an appropriation to buy a small tract
of land for the San Pascual band.

## Los Coyotes.

Los Coyotes is a large reservation on paper, being nearly a township
of land. It is quite elevated, being from 4,500 up to 8,000 feet. The reservation
is nearly all barren mountain tops, and the agricultural land is confined to
narrow strips in the San Ysidro and San Ignacio canons, about 275 acres in all.
A large part of this is owned by a white man and was patented before the reservation
was established. There are also two valleys or hallows in the mountains which
have some feed for cattle, and are also patented land. The Indians say that the
Government promised them to buy this patented land. Whether such a promise was
made your special agent does not know. It is a fact that the Government did buy
out one white homesteader in the San Ysidro canon. These Indians are the only
ones I have found in California who are inclined to be belligerent. They have
been frightened by the fate of their neighbors on Warner's Ranch, and have deter-
mined to allow no white man on their reservation. They have occupied the patented
lands, and show a disposition to hold them by force. If the owners insist upon
their rights, a small sized Indian war is likely to result. It seems to your
special agent that the Indians' demand for this land is just. It was a rancheria
site, and as such could not be filed upon without something closely approaching
perjury. The patents are now issued, however, and the title has passed to parties
who acquired it in a legitimate manner—I believe upon a mortgage. I would there-
fore recommend an appropriation to buy this land.

## San Manuel.

This reservation of 640 acres is about the most absolutely worthless
that I have seen anywhere in California, being steep, barren dry hills, and yet
it immediately adjoins one of the most fertile pieces of land in Southern
California. The Indians should have a little land fit for gardens.

The little reservation of Pauma has the use of a fine stream of water
from the Pauma Creek, but the stream is apt to be very scanty in summer when it
is mostly needed. Some means of conserving the supply is much needed. The
reservoir site is so gravelly and sandy that cementing is necessary. The Indians
have promised to do all the work if the Government will furnish the cement. I
would recommend that they receive the cement.

## Coahuilla.

On the Coahuilla reservation a storage reservoir and irrigation system
is about half completed. It is estimated that $1,000 will complete it. Without
the irrigation system the Indians can raise very little, as their reservation is
mountains, and contains of very little agricultural land, and that little needs
water to produce anything.

## Morongo.

The Morongo reservation, near Banning, has quite an area of arable
land, but the land is desert and without water will raise nothing. There is
also a fair water supply if it were developed and brought to the land. The
water comes from two cienegas, or spring spots, the sources of which are upon
the reservation. But one of these ciene, as is at present used. It is likely
the flow from these cienegas could be increased. The water brought from this,
the upperone, has sufficient fall to pump water from the lower cienega into
the ditch for irrigation. The water supply could thus be largely increased
and the area of land cultivated, it is believed, could be more than doubled.
I recommend an appropriation for this improvement.

## Desert Reservations.

On the Colorado Desert are several small reservations known as Torres,
Martinez, Alamo Bonito, San Augustine, Agna Dulce, 29 Palms, and Cabazon, the
latter being near Indio.

On two or three of these reservations artesian wells have been bored
by the Government, the water from which is used by the Indians for irrigation.
They make good use of the water. I would recommend the boring of more wells.
The cost is from $300 to $500 per well, and the benefit is great. With the
water the Indians are self-sustaining, and without it they are perpetually
menaced by famine. I recommend an appropriation for this purpose.

At the Palm Springs reservation, sometimes called Aguacaliente number 2,
there is a small stream of water, the right to which is claimed by outside parties.
It would seem that the Indian rights are prior and should be supported. If the
white contestants are willing to sell for a reasonable price, it would probably
be cheaper to buy them out. I would recommend an appropriation to determine the
water rights, or buy out the contestants, as may be found the more advisable.

## Rincon.

The Rincon reservation, 14 miles from Pala, has four or five hundred
acres of arable land, more than there is water to irrigate. A ditch has recently
been constructed taking its water from the San Louis Ray River and expected to
irrigate about 200 acres. A syndicate is making preparations to build a large
dam across the San Louis Rey River a few miles above the Rincon for a storage
reservoir and power plant. Steps should be taken to protect the Indian rights
to their water. It is believed that if the matter is attended to now the matter
can be amicably arranged without in any manner embarrassing the great enterprise.

## Boundaries.

One of the most troublesome questions in regard to Southern California
reservations arises from the looseness with which the reservation boundaries are
laid down. From every reservation comes a complaint as to the boundaries and of
encroachments upon the boundaries of Indian reservations. One reservation line
is said to have been moved in over 1,100 feet. Another is said to have been moved
over onto the reservation three separate times. It seems as if each successive
owner of land adjoining a reservation is unable to resist the temptation to grab a
little Indian land, and they seem able to work this kind of a graft with impunity.

The farcical character of some of the California surveys plays directly into the hands of this class of landgrabbers. If a man steals $50, it is a penal offence. If he steals $5,000 worth of Indian land he gets the land as a reward for his nerve. Encroachments upon Indian lands are likely to continue until it is made a penal offence for anyone to establish the boundary line of an Indian reservation except in conjunction with a duly appointed officer of the Government. There is one thing which, in the opinion of your special agent, should be done, and at once: A commission of competent surveyors should establish the boundaries of every California reservation, and mark the boundaries so as to endure for all time. Fence them if necessary. Your special agent would earnestly recommend an appropriation to determine and mark the various reservation boundaries.

Two reservations, Inyaha and the Conejos division of Capitan Grande, should, in the opinion of your special agent, be enlarged by the addition of certain adjoining tracts of Government land. This is advisable chiefly to protect their water rights. The little reservation called Cosmit I found fenced in and used as part of a cattle ranch. There is said to be a deed extant from a senile old man belonging to the tribe, purporting to convey the property to a white man. The deed is worthless, of course, but such attempted transfers are met with in various places in California. The Indians do not care to live on the Cosmit reservation, as the village of Cosmit was, by one of the usual mistakes, not located upon the description set aside as the reservation. The Cosmit Indians can be taken care of on the Inyaha reservation.

The Indians on the remaining reservations in Southern California are in fair condition. At least no facts were observed which require special attention in this report. No other Southern California Indians have been shown to your special agent as having been in as bad a state as those at Campo, but several other bands must have been very close to the line as a result of the bad years. The present year is a favorable one, and no Indians are reported to be destitute, other than a few old people who are without relatives to support them and for whose support the Government makes a small contribution.

The plan of relief for the Indians of California which your special agent ventures to recommend is briefly:

## Southern California.

That those Indians who have been placed by the Government in such position that they cannot earn their own living shall receive such pecuniary aid as to put them in shape so that they can do so; that this aid take the form of land of good quality with ample water supply, the same to be held in the same manner as their present lands; that this land shall be purchased by a commission appointed by the Honorable Secretary of the Interior, and a majority of which shall be experienced in Southern California land conditions; and that provision be made to extend the irrigation facilities of the reservations mentioned in the body of this report.

## Northern California.

That those Indians who are landless through past acts of omissions of the National Government, shall receive land in lieu of any claims they may have against the Government, moral or otherwise; that the land shall be of good quality

-24-

with proper water supply, and shall be located in the neighborhoods in which the Indians wish to live; that this land shall be given under some such plan as that pursued at Fort Independence, each family being assigned not exceeding ten acres of land, or such smaller tract as the conditions may warrant; and that this land be purchased and assigned by a commission appointed by the Honorable Secretary of the Interior, a majority of who are expert in Northern California land conditions.

That these Indians who have received worthless desert allotments shall have the privilege of exchanging them for allotments of the same size and character as proposed for the landless Indians of Northern California, and that the allotments surrendered shall be restored to the public domain; that those Indians who have received mountain or timber allotments shall have the privilege of exchanging them for allotments of the same size and character as these proposed for the landless Indians of Northern California, and that the allotments so surrendered be added to the forest reserves; that the exchange of allotments and the purchase of the land for exchange where necessary be placed in charge of the same commission as that which handles the other proposed Northern California allotments; and that the unexpended portion of the appropriation for the support and civilization of the Northern Indians of California, 1906, be re-appropriated in such form that it may be used in the purchase of land.

Recommendations common to both Northern
and Southern California.

That further legislation be passed for the protection of the land and water rights of Indian allottees; that provision be made for an increase in the number of field matrons and industrial instructors; that the number of day schools be increased; that additional legislation be passed placing Indian allottees within the scope of the laws against selling liquor to Indians; and that the boundaries of the various reservations of California be determined and marked.

The appropriations recommended are as follows:

| | |
|---|---:|
| Purchase of land at Campo, | $50,000.00 |
| Purchase of land for Pachanga, | 5,000.00 |
| Water supply for Pachanga, | 4,000.00 |
| Purchase of land for San Pascual, | 5,000.00 |
| Purchase of land for Los Coyotes, | 3,000.00 |
| Purchase of land for San Manuel, | 3,500.00 |
| Water system at Morongo, | 5,000.00 |
| Water system at Coahuilla, | 1,000.00 |
| Water system at Pauma, | 500.00 |
| Artesian wells for Torres, San Augustine, Cabazon, etc., | 5,000.00 |
| For determining rights at Agua-Caliente or purchase of land, | 1,500.00 |
| Determining rights at Rincon, | 5,000.00 |
| For determining and making reservation boundaries, | 10,000.00 |

Respectfully submitted,
(Signed) C. E. Kelsey
Special Agent for California Indians.

March 21, 1906.

A1ET
0+3

1 IN THE UNITED STATES COURT OF CLAIMS

2

3 MABEL DUNCAN, et al.,   )
            )
4      Petitioners, )
            )
5 vs.         )  CASE NO. 10-75
            )
6 THE UNITED STATES,   )
            )
7      Respondent. )

8

9 UNITED STATES DISTRICT COURT

10 FOR THE

11 NORTHERN DISTRICT OF CALIFORNIA

12

13 MABEL DUNCAN, et al.,   )
            )
14      Plaintiffs, ) Consolidated Actions:
            )
15 vs.         ) CASE NO. C-71-1572 RFP
            ) CASE NO. C-71-1713 RFP
16 ROGERS C. B. MORTON,  )
 et al.,         )
17      Defendants. )

18

19

20 DEPOSITION OF LEONARD M. HILL,

21 taken pursuant to notice and stipulation entered into by and

22 between the parties, by and through their respective counsel,

23 in Room E-2753, Federal Building, 2800 Cottage Way, City and

24 County of Sacramento, on Tuesday, the 2nd day of September,

25 1975, A.D., commencing at the hour of 10:05 o'clock a.m.

26 thereof, before C. RONALD DAY, Notary Public in and for the

27 County of Sacramento, State of California.

28

AR 118

1  you defined what dependent member meant?

2  A.      Well, I think we have some kind of a definition, I

3  don't recall any specifics on it.

4  Q      Now, how did the Bureau personnel people that work

5  under you in the area office go about checking the accuracy

6  of information given to them by, say, Indians on the rancheria

7  regarding who was related to whom in putting them into the

8  distribution plan?

9  A.      I don't think we did much checking.  We took the

10  word of the adult members.

11  Q      Wasn't any kind of a detailed form that had to be

12  filled out by each individual who was an adult member who was

13  living in their household and that kind of thing?

14  A.      I think it was mostly an informal inquiry thing.

15  We just wrote down what they told us.

16  Q      Before the land was deeded on any rancheria, it is

17  my understanding that the Bureau appraised the value of the

18  property as of the time that the deeds were to go out, is that

19  true?

20  A.      Yes.

21  Q      Did you have a practice routinely of hiring quali-

22  fied appraisers to do this?

23  A.      No, we didn't hire them.  We had them on our staff.

24  Q      I see.  You actually staffed people that knew how

25  to appraise real property?

26  A.      That was their business.

27  Q      In the case of each rancheria, would it be fair to

28  say that a written appraisal report was prepared and submitted

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TILLIE HARDWICK, et al.,                )
                                        )
            Plaintiffs,                 )
                                        )       CIVIL NO. C-79-1710 SW
     vs.                                )
                                        )
UNITED STATES OF AMERICA,               )
                                        )
            Defendant.                  )
_____)




Deposition of

MAURICE W. BABBY

January 18, 1982











Reported by                 SANDY GILMAN KOSTER - CSR No. 3325

BARRON & RICH
CERTIFIED SHORTHAND REPORTERS
SACRAMENTO, CALIFORNIA

AR 120

1  get a deputization as a U. S. Marshal, is that correct?

2  A        Yes.

3  Q        So they could go on reservations and enforce federal

4  laws on the reservations?      A    That's right.          25-571

5  Q        Now, in 1958, Rancheria Act, Public Law 85671-D,

6  this Act as I recall had an appropriation authorization in it,

7  did it not?

8  A        No, it did not.  That was one of the problems.

9  Q        I am talking about an appropriation authorization as

10  opposed to an appropriation itself.

11  A        There was never any authorization for appropriations

12  made to my knowledge.

13        MR. KING:  Okay.  Off the record.

14        (Whereupon, counsel recessed the deposition briefly

15  and conferred off the record.)

16        MR. KING:  Back on the record.

17  A        I am a little hazy, I know that there was never any

18  money appropriated specifically to carry out this terminal act.

19  Q        Would it refresh your recollection if I told you that

20  there was in the 1958 Act an appropriation authorization for

21  approximately 509,000 dollars to carry out the provisions of

22  the Rancheria Act?

23  A        Yes, that is correct, I suspect.

24  Q        But your testimony is that Congress never actually

25  appropriated the money under this authorization found in the

26  Act?                                 A    That's right.

27  Q        Did they give you any additional money in your budget,

28  in your ordinary Sacramento area office budget, to carry out

35

the Rancheria Act?

A.      Well, yes, we were given a few -- some money from the various sources, and I can recall that there was a special section in the Commissioner's Office that was set up that was referred to, I can't recall the exact title, but it was a planning group, and a lot of funds that we used were those that would be diverted from that office or from that appropriation. Although those were just some rather small amounts for things other than water programs, for example, and land, we used some of those funds I believe for land surveys rather than using our regularly appropriated realty fund.

Q       Did you ever go to Congress with the request that it appropriate money under the 1958 Act?

A.      No, we did not, and the reason was that I understood from our associate commissioner at that time that there was an agreement between the Bureau and Congress that we would not ask for a special fund for this purpose.

Q       Now, you mentioned an agreement between the Bureau?

A.      Well, it was just an informal handshake sort of thing.

Q       Who entered into it, who were the personnel involved?

A.      Well, I don't know.  I know -- I think that one of the Congressmen that was involved was Congressman Sisk, I think.

Q       B. F. Sisk?              A.    Yes.

Q       Well, what did the Bureau get in exchange for entering into that agreement?

A.      Well, they didn't enter into an agreement.  Congress says we will go along with it provided you don't ask for any money.  That's all there was to it.

AR 122

1    terminated and these people had to live under the County

2    ordinances and the State laws?

3    A.        Well, yes, we did give consideration to the fact

4    that they would be out there on their own, but the fact is

5    that the County generally in these rural areas had no rules

6    and regulations.  At least for the private homes out in the

7    country they didn't go out and inspect their water systems.

8    Q.        Your feeling is that at that time, let's say in the

9    early '60s, the counties were pretty lax in requiring any

10   specific type of water development before a subdivision was

11   made.  Now, you mentioned having a couple of situations where

12   this became an issue within the government and the County,

13   can you recall what the instances were?

14   A.        Well, there was one up at Auburn, there is a little

15   rancheria there that was adjacent to the City of Auburn, and

16   we had completed our plan as we interpreted it, and we had

17   surveyed the land, and in order to facilitate the granting

18   title, facilitate the land descriptions, we prepared a map by

19   a subdivision map, but not under the subdivision requirements

20   of the County, and issued the deed by lot numbers specified on

21   that map, which map was filed in the County records.

22            After this was done, I guess it was the County Board

23   of Supervisors that made an issue of it, and they called,

24   asked Congressman Johnson, I think it was Congressman Johnson,

25   to hold a hearing up there, and they were insisting that this

26   was a subdivision, and as a regular subdivision that they

27   would have to approve it, and if they did approve it that

28   they would require water to the vacant lots and fire

AR 123

1    protection facilities, and a lot of other things that we didn't

2    feel were appropriate.

3         And we maintained that this was not a subdivision

4    in the usual sense.  Now, I don't think anything happened as

5    a result of that hearing, but there was the Congressman present.

6    Q       Well, was this hearing before the County Board of

7    Supervisors or what entity was the hearing presented before?

8    A       Well, it was not a formal hearing.  I think it was

9    just a request to Congressman Johnson to listen to them and

10   to listen to us, and I don't think it was to be considered

11   a hearing.

12        Really, it was just an informal information

13   session I think.

14   Q       Well, at this informal information session -- by the

15   way, about what time did that happen, what year, are you able

16   to say?

17   A       I don't recall.

18   Q       Was it early in the chain of events or was it some-

19   what later?

20   A       No, it was later.

21   Q       In the mid-60s or thereabouts?

22   A       I don't know the date.  It was after we had made the

23   surveys, and I don't know whether it was after the issue --

24   probably wasn't after we issued the deeds, but it was after

25   we were about prepared to.

26   Q       Well, did the County bring to your attention at that

27   time in your discussions with them the possibility of the

28   people that wanted say to build on a vacant lot on a

AR 124

1   the Hoopa agency disclosed the fact that no work was done on

2   the water system prior to the termination of that rancheria,

3   and that basically the same wells that existed in 1953 were

4   there when the rancheria was terminated, would you understand

5   that set of facts would go along with the request on the part

6   of those Indians up there to have their deeds right away

7   without the development of a distribution plan that called for

8   adequate wells?

9   A.       Well, that's kind of hard to say.  I don't know what

10   I might have done.  I think that we attempted to throughout

11   this termination activity, to comply with the wishes of the

12   people as nearly as we could, and we weren't anxious to spend

13   money just for the sake of spending it or to undertake

14   programs that we thought the people didn't want.

15          And then, of course, most of the plans were in rural

16   areas, and we didn't check in with the local requirements.

17   Q       You did not?

18   A.       Except in a general way so that, in other words, we

19   didn't attempt to go out of our way to do anything that the

20   people didn't want, so long as there was no public pressure or

21   so long as the Indian people were in general conformity with

22   the surrounding rural areas, as far as the water supply and

23   whatnot.

24   Q       Well, would it be fair to say, then, that you

25   regarded the discretion under Section 3, subdivision C of the

26   1958 Rancheria Act, as being fairly broad in cases where the

27   people weren't terribly concerned about having a long-lasting

28   water supply, you would accede to their request and not put one

AR 125

1  in?

2  A      Well, I would have to say it would depend on the

3  situations, I couldn't say yes or no to that.

4  Q      Okay.  Did the Bureau have a policy, while you were

5  the area director, of kind of looking at the water situation

6  for a period of time beyond the actual deeding of the land?

7  What I am trying to ask you is whether you showed any concern

8  for what the situation would be say 5 years after the land

9  was deeded in terms of water?

10  A      Well, I couldn't say what period we had in mind, but

11  we attempted to provide a system that would supply sufficient

12  water for I don't know how long, 5 or 10 years, something like

13  that perhaps.

14  Q      Now, was it your practice in the case of the

15  rancheria to go to the county authorities and ascertain from

16  them what a private development, a private developer would have

17  to do in terms of putting in a water system for a piece of land

18  that he was splitting up into parcels?

19  A      No, we did not have that policy.  In fact, that

20  became an issue at a couple of places, and our stand was that

21  it was, this was a federal matter, and that we did not have to

22  comply with the subdivision standards.  In fact, we said that

23  this was not a subdivision in the usual sense.

24  Q      Under the kind of laws of the State of California,

25  you felt you were not bound by these laws?

26  A      That's right.

27  Q      Did you give any consideration in taking this posi-

28  tion to what would happen after the rancheria would be

AR 126

1   which we used for domestic water purposes.

2           So I think that's how that irrigation term got in

3   there, and there were very few of these.

4   Q       Now, as this assessing, the need for any rancheria

5   for water, did the Bureau look at the need for the Indians

6   for maintaining home gardens in addition to flushing their

7   toilets and washing their dishes and taking showers?

8   A       No, I don't think that that was something that we

9   made special provisions for.

10  Q       And in the early '60s, before the Rancheria Act was

11  amended, provide for the performance of sanitation services

12  by the Indian Health Service, did the Bureau assess water

13  in any given rancheria in light of the need for interior

14  plumbing?

15  A       No, I don't think that we went that far.

16  Q       In other words, you were mainly concerned with just

17  having a water source there at the house which people could

18  draw off of and use?

19  A       Yes.  Sometimes it was adequate for sanitation

20  facilities and sometimes it wasn't.

21  Q       I see.  Do you have any specific recollection about

22  whether you considered the adequacy of the Robinson Ranch

23  water system with respect for the need of interior plumbing?

24  A       I can't recall what the plan provided for on the

25  Robinson rancheria, or what the ultimate improvement was, or

26  what the water system did supply, I just can't recall those

27  facts.

28  Q       But there were occasions when the BIA terminated a

1   haul water up to 5 miles, they were awfully lucky.  So you

2   can see what kind of progress has been made in the thinking

3   of people concerned with the Indian affairs.  There was no

4   concern about domestic water, with few exceptions,with

5   Indian housing and Indian health.

6          They maintained hospitals and clinics, but the ser-

7   vice was very poor, and we in this rancheria program, we

8   started out with standards that were acceptable for domestic

9   water, that had been acceptable over the years,and then the

10  Public Health Service came in with an improved water supply

11  standard and sanitation facilities, and whatnot.

12         So we were a little hard put to come up to some of

13  those new standards, and so some of the jobs that we had

14  thought were adequate actually by subsequent standards were

15  not adequate.

16  Q       Okay.  I have got one final area that I want to ask

17  you some questions about, and that is all of these distribu-

18  tion plans. As I understand it, the plan always contained a

19  list of the people who were going to get land and those people

20  were called distributees?

21  A       Yes.

22  Q       And in addition to that, under the name of each

23  distributee you listed the people who were dependents of the

24  immediate family, is that true?

25  A       Yes.

26  Q       And in determining who was dependent, immediate

27  dependent members of the immediate family, was there some

28  regulation that you were following; is that correct, that

1   rancheria that they might have trouble getting a building

2   permit after the deed had been issued because of the fact that

3   there was not a water supply on the vacant lot?

4   A       I don't recall whether they made that point or not.

5   That was included, I think, in the general statement that the

6   subdivision wasn't in accordance with the county requirements.

7   And, of course, naturally it followed that if they concluded

8   that it was a regular subdivision, there would be no building

9   permits issued.

10  Q       Did they take that position after the deeds were

11  issued, do you know?          A    I don't know.

12  Q       Now, I would assume from what you have already said

13  that you did not attempt to comply with, say, lot size stan-

14  dards set by the County under their subdivision ordinances

15  in determining how this rancheria land was to be broken up?

16  A       We didn't think it was any concern of the counties,

17  that they had any authority to dictate the manner in which we

18  subdivided the land or issued the deed.

19  Q       What I am trying to get at, Mr. Hill, is how did the

20  Government think the Indians would be able to use their land

21  after the trust relationship had been terminated unless there

22  was some attempt to comply with county ordinances, or was this

23  problem ever considered?

24  A       Well, we assumed that they would do the same as they

25  they had in the past.  They had been building homes out there,

26  and then, of course, the counties did not exercise their

27  authority on the Indian reservations.

28  Q       That is when they were reservations, but after

1    termination when they were no longer reservations, but void of

2    the state status as everybody else's land in the county, how

3    did the Bureau expect the people on these rancherias to use

4    their property if they didn't comply with the laws that were

5    then in effect regarding say the lot size?

6    A.         Well, I don't think that we had that as one of our

7    standards that these reservations or that the Indian proper-

8    ties would be in compliance with all of the county ordinances.

9    We knew that the water supply in some of these places did not

10   come up to what was required in a municipality for instance

11   or in a formal subdivision, we knew that there wasn't

12   sufficient water, there was no facility for protection from

13   fire, just as there weren't on a lot of other places that were

14   not Indian land, and were not informal subdivisions, and the

15   county doesn't ordinarily go in and kick people off their

16   property because they are not in complete compliance.

17   Q.         What I am referring to here is the case of unimproved

18   lots where there wasn't an existing structure at the time of

19   the termination, how did the Bureau of Indian Affairs expect

20   the Indian who got pieces of unimproved property to utilize

21   their land without complying with the county ordinances

22   regarding lot size, water, size of leach field, and so on?

23   A.         Well, we didn't follow that through.  We didn't

24   intend that we should make these properties or improve these

25   properties to the point where there would be no problem

26   involved.

27            Now, a lot of the counties in the state had no

28   codes for rural water supply or fire protection or, in fact, I

AR 130

1   Q       In other words, Congress put the appropriation

2   authorization into the bill, then strongly discouraged the

3   Bureau of Indian Affairs from actually coming to Congress and

4   asking for money?                      A   Yes.

5   Q       The answer to that question was yes?

6   A       Yes.  I think that's correct.

7   Q       Do you know approximately when this arrangement or

8   agreement, whatever you want to call it, was made?

9   A       No, I don't know, and I don't know under what

10  situations.  All I have is a statement from Mr. Lee saying,

11  well, we can't get you any special money for this because we

12  agreed that we wouldn't ask for any.

13  Q       Mr. Lee, the Associate Commissioner, told you that

14  in so many  words?                     A   Yes.

15  Q       And was that shortly after the Act was passed or

16  some years after it, do you have a recollection of approxi-

17  mately when?

18  A       No, I think that was a condition preceding the

19  passage of the Act.  In other words, the Indian Subcommittee

20  said we will go ahead and approve this provided we don't have

21  to give you any more money.

22  Q       Okay.

23  A       I believe that's right.  I don't know, I can't say

24  for sure.

25  Q       I don't want to get into a position of asking you an

26  argumentative question, and asking you to make a conclusion,

27  but it seems kind of funny to me that Congress could have made

28  an authorization for the money, then on the sly entered into

AR 131

1     AFTERNOON SESSION

2                                                        1:35

3          MR. KING:  Are we ready, back on the record.

4          Now, I want to get back to the subject of provisions

5     in distribution plans regarding water works on rancherias

6     that were undergoing termination while you were area director.

7     Was it the policy of the area office that the water source

8     developed on any given rancheria only be sufficient to take care

9     of existing households?

10    A       Yes.

11    Q       Houses that are already there?

12    A       Yes.

13    Q       Plus some of the distribution plans talks about

14    houses that are as much as 50 percent completed within a short

15    period after the distribution plan, and it was simply the policy

16    of the Bureau not to provide water or to assure a supply of

17    water for lots that were not developed, is that true?

18    A       That is correct.

19    Q       And what was the reason for that, essentially?

20    A       Well, I can't pinpoint the reason, except that we

21    were interested primarily in the people who were residents and

22    didn't think that it was justifiable expenditure to provide

23    water to a vacant lot, and then it took, of course, a larger

24    supply to do it.

25    Q       I'm talking now mainly about the supply, not the

26    distribution system, but what you said would hold true for the

27    supply that you would not assure an adequate supply for

28    undeveloped property; is that correct?

AR 132

1    Q        Now, in developing tentative plans, pre-1958, for

2    rancherias in California, when did this activity begin, how

3    early would you start actually doing that?

4             And by you I mean the Sacramento Area Office.

5    A        Well, I can't recall specifically.

6    Q        I understand.  I am just trying to get a general

7    idea of how many years before the act was actually passed

8    whether the Bureau of Indian Affairs had been meeting with

9    groups and attempting to come up with a terminal plan for each

10   rancheria.

11   A        I think it was about 2 years.

12   Q        So somewhere in '55, '56, in that general period of

13   time?

14   A        Yes, I believe so.

15   Q        And was it the approach of the Bureau of Indian

16   Affairs to say that the Indians would get improvement on their

17   property if they terminated, but if they did not terminate they

18   would not get these things?

19   A        No, it was never any such negotiation.

20   Q        It wasn't put to them that way?

21   A        Written down, I think we put it down on the positive

22   basis that this was one way to get some of these improvements,

23   and in the likelihood that they would get them without it was

24   not very good.  For years the budget was very stringent here

25   in California, and there just wasn't much money available to do

26   anything for these people, and we thought that this would be

27   an incentive for the Indians as well as Congress to get some of

28   these improvements made.

Case5:09-cv-02502-JW   Document59-17   Filed08/20/10   Page45 of 47

1    Q          Okay.  It's somewhere along the line, and correct

2    me if I am wrong, that it had been the plan at least by 1958

3    when the Rancheria Act was passed, it had been the intent and

4    the plan of the Bureau of Indian Affairs to completely pull

5    out of California in a very short period of time, maybe 5 or 6

6    years, is that more or less correct?

7    A          Yes.  That was the hope of the Commissioner.  At that

8    time I think the estimate was 5 years, or I have forgotten

9    what, there may have been some time limit in the concurrent

10   resolution 108, I am not sure.

11   Q          And by the time the 1958 Act was passed, was that

12   still the plan of the Commissioner's Office that they pull out

13   of California and completely, the Bureau would pull out of

14   California completely within a very fairly short period of

15   time?

16   A          Well, I can't say that was the plan of the

17   Commissioner.  I think that he had concluded that this was the

18   proper direction and that he still had hopes of pulling out

19   of California completely.

20   Q          So when they named only 41 rancherias in the 1958

21   Act, it was not the plan or the desire of the Bureau of Indian

22   Affairs at that time in 1958, that 10 years later or so we

23   would end up with the situation where some California Indians

24   were terminated and others were not?

25   A          No.  There was no deliberate plan in that regard

26   I believe that the proceeding with the terminal action on the

27   41 rancherias was something that was in keeping with the idea

28   of pulling out of California completely, and it was an effort

# Attachment D



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Pacific Regional Office
2800 Cottage Way
Sacramento, California 95825

IN REPLY REFER TO

Mr. George Skibine, Acting Assistant
Secretary of Indian Affairs
Office of the Assistance Secretary - Indian Affairs
1849 C Street N. W.
Washington, D. C.  20240

FEB 06 .٥09

Dear Mr. Skibine:

This letter is in reference to Scott Gabaldon, Chairman of the Mishewal Wappo Tribe of
the Alexander Valley, requesting a letter of support for the Tribe's efforts to restore the
Tribe's Federal recognition.  This request was received January 30, 2009.

The Mishewal Wappo Tribe of Alexander Valley is located in Sonoma County,
California, contained 54 acres, and was purchased by Government for the benefit of
James R. Adams, William McCloud and James R. Adams, Indians.  Title to the land was
vested in the United States with Indians having only a right to occupy and use the lands,
unless otherwise authorized by Congress.  The Rancheria was terminated under Public
Law 85-671 (72 Stat. 619, as amended; 72 Stat. 619), became final on September 25,
1959, when it was unanimously accepted by the distributees.  The Indians of the
Alexander Valley Rancheria voted June 11, 1935 to accept the Indian Reorganization Act
of June 18, 1934.  They did not have a constitution or charter.

We have reviewed the enclosed documents that the Mishewal Wappo Tribe of the
Alexander Valley has provided to this office which outlines and supports their efforts to
restore the Tribe's Federal Recognition Status.  Therefore, the Bureau of Indian Affairs,
Pacific Region, supports the Tribe's efforts for restoration, either through legislation or
administration action.

Sincerely,

Acting       Regional Director

Enclosures

cc:  Superintendent, Central California Agency
     Scott Gabaldon, Chairman
     Mishewal Wappo Tribe of Alexander Valley

